"Exhibit A"



BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center
7th Floor
San Francisco  CA 94111 4070
T: +1 415 675 3400
F: +1 415 675 3434
bclplaw.com

September 3, 2024

Rachel E. Matteo-Boehm
Partner
Direct:  +1 415 268 1996
Fax:  +1 415 430 4396
rachel.matteo-boehm@bclplaw.com

**Via Email (info@kbs-america.com; intl@kbs.co.kr; happykbs@kbs.co.kr)**
**Confirmation Via U.S. Mail and Air Mail**

KBS
Attn: Mr. Min Park, President and CEO
13 Yeouigongwon-ro, Yeongdeungpo-gu
Seoul, Korea 07235

KBS America, Inc.
Attn: Mr. Kyongkyun Shin, CEO
625 Kingsley Drive
Los Angeles, CA 90005

Re:    Correction of Errors in August 25 KBS and/or KBS America Report regarding SeeDevice and Dr. Hoon Kim

Dear Mr. Park and Mr. Shin:

We represent SeeDevice, Inc. ("SeeDevice") and its founder and CEO, Dr. Hoon Kim, and write to bring to your attention several serious factual errors in a recently-aired news report so that these errors may be promptly corrected.

We also wish to ensure that any future reports concerning SeeDevice and Dr. Kim are factually correct.

On or about August 25, KBS and/or KBS America, Inc. (collectively, "KBS") published on the KBS News YouTube channel, and may also have broadcast on KBS News 9, a Korean-language news "exclusive" report about Dr. Kim. The report remains on the YouTube channel at https://www.youtube.com/watch?v=ihO47Ftu0ag as of the date of this letter. Translated into English using YouTube's auto-translate subtitles, and as confirmed by a certified English translation (attached),[1] the broadcast identifies Dr. Kim as the developer of quantum image sensor technology. The KBS report then shows, at 0:25 of the report, a screen shot of a cover story from Global Business Leaders Magazine's web site, https://globalbusinessleadersmag.com/20-most-innovative-business-leaders-to-watch-in-2023/, honoring Dr. Kim as one of the 20 most innovative business leaders to watch in 2023. In this screen shot, Dr. Kim is identified as the Founder and CEO of a company located in "the heart of Southern California" "[e]stablished in 2017 by Dr. Kim" that "is making waves by developing a QMOS™ (quantum effect CMOS) SWIR image sensor." Although SeeDevice's name is redacted from the screen shot, SeeDevice is clearly identifiable as the company at issue to those who are familiar with Dr. Kim and SeeDevice.

The KBS report then states that the company has received recent media attention for developing a

---

[1] As noted below, a transcript of the report in Korean is also attached. The statements of fact that are false and require correction are highlighted in yellow.



monitoring device that measures blood sugar in real time using only an image sensor technology.

The report goes on to state that Dr. Kim was engaged in "technology fraud" in connection with his image sensor technology that received media attention many years ago, and adds:

> "…However, KBS raised suspicions of 'technology fraud' in 2007, and the Korea Evaluation Institute of Industrial Technology deemed Dr. Kim's technology false and decided to return it to the national treasury. It was decided to recover KRW 9.2 billion, the full amount of research funds for nanotechnology that was found to be false."

A screen shot of what appears to be government reports, presumably reaching the conclusions reported above, is also shown (at 1:07 of the report). The report then states that "[a]fterward, Dr. Kim, who left for the United States, returned and started business again with image sensor technology" – which in context, a reasonable reader would understand as the SeeDevice blood sugar monitoring device referenced earlier in the report – and quotes an "insider" as saying there was "no basis" in the legitimacy of the technology before, and "no basis now."

As shown in the attached certified English translation, the headline to KBS's report also states that Dr. Kim's technology "did not exist" before, is "fake again this time," "does not exist," and is "false."

The statements that Dr. Kim engaged in "technology fraud," that there is "no basis" in his technology, and that the technology "did not exist before," is "fake again this time," "does not exist," and is "false" are all in serious error.

In 2009, the Seoul High Court reviewed reports of Dr. Kim's technology and found that "the pixel sensitivity of the SMPD image sensor, 2400v/lux. sec, is hundreds or thousands of times higher than the pixel sensitivity of existing CMOS image sensors (1-20v/lux.sec.), which is all recognized by the Verification Committee dated April 30, 2007, the Preliminary Investigation Committee, and the Main Investigation Committee as well." *See* the 2009 Seoul High Court decision (certified translation) at 20. Thus, after a full review of all the facts, the Seoul High Court held that "it cannot be concluded as discussed earlier that the SMPD image sensor technology is fake." *Id* at 24. Despite these findings, the Korean Evaluation Institute of Industrial Technology alleged that there were problems with Dr. Kim's technology, and in 2011 ordered the return of the 9.2 billion KRW government grant.

However, these allegations were proven false, when **the 2011 order to return funds was reversed the following year**. The Electronic Components Research institute, with Dr. Kim as its research principal investigator, filed an appeal of the 2011 order, and on May 10, 2012, the Seoul Administrative Court issued a judgment (the "2012 Judgment") revoking the 2011 disposition for the return of the government grant. *See* the 2012 Judgment (certified translation) at 1 and 6. The Seoul Administrative Court reversed the order to return funds with respect to Dr. Kim's technology. *See id.* at 6 (characterizing Dr. Kim's disputed technology as the "ultra sensitivity image sensor technology development task using nanotechnology", which the Court refers to as the "Project of this Case"). This is the very technology that is targeted in the KBS/KBS America reports, and that KBS called "fake." As part of its investigation of Dr. Kim's technology, the Court found that KBS had a hand in forming the Committee that made unfounded declarations disputing the legitimacy of Dr. Kim's technology, and which ultimately resulted in the erroneous 2011 order mandating return of government funds:

> "… when the Korean Broadcasting System raised objections to the Defendant again regarding the Project of this Case, the Defendant formed the "Nano Image Sensor Research Integrity Verification Re-investigation Committee" (hereinafter referred to as the "Re-

KBS, KBS America
September 3, 2024
Page 3



Investigation Committee") and conducted a re-investigation on the Project of this Case. **The Re-investigation Committee could not determine whether the research was fraudulent around December 2010 but concluded that there was no differentiation between the technology of the project and the existing CMOS technology**, and that the image sensitivity couldn't not be said to be about 500 times high, and nanotechnology was not applied... On June 20, 2011, the Defendant notified the Plaintiff to return KRW 9.22 billion government grant paid for the Project of this Case..."

*Id.* at 3 (emphasis added). Indeed, the Court agreed with Dr. Kim that the Re-investigation Committee's demand for the return of government funds was "illegal." *Id.* at 11. Overall, the 2012 Judgment confirmed that "the plaintiff and Hoon Kim did not commit research misconduct in carrying out the project at issue," and "there is no evidence to support the assertion that the Plaintiff and Hoon Kim committed fraudulent misconduct while carrying out the project at issue." *Id.* at 10. To support its conclusions, the Court cited to an undisputed – and more importantly, unrefuted – report by the Korean National IT Industry Promotion Agency that was tasked specifically with evaluating the technology at issue:

> "... *based on the final result report on the Project of this Case* submitted by Hoon Kim on May 25, 2007, *the Promotion Agency evaluated that the research results were excellent (91.8 points) in accordance with the basic evaluation plan presented by the Electro-0580 Project Team,* which was the entrusted management agency for the Project of this Case..."

*Id.* at 6. By citing to this report, the Seoul Administrative Court not only upheld the legitimacy of Dr. Kim's technology, but endorsed its superiority.

Given the foregoing, your report is not a fair and true account of the public proceedings concerning Dr. Kim and his technology as of the date of the news reporting at issue, as is required by the fair report privilege recognized by the vast majority of U.S. jurisdictions, including in California where KBS America is based. A correction is thus required to explain that the 2012 Judgment reinstating Dr. Kim's 9.2 billion KRW government grant confirms the 2009 findings of the Seoul High Court, that neither Dr. Kim's technology – or that of SeeDevice – is "fake," false," or "does not exist," and that Dr. Kim did not engage in "technology fraud."

<u>Requested Corrections</u>

Erroneous assertions that a technology company's technology is fake or non-existent, and that its founder engaged in technology fraud with respect to government funding involving the same or similar technology, are extremely serious, with economically devastating consequences. While we recognize and respect the free speech rights that publishers have under the First Amendment to the U.S. Constitution and relevant state laws to report on official government proceedings, reporting only selected inculpatory proceedings without also reporting later related exculpatory proceedings is not only contrary to the requirement that reports be "fair and true." It is also contrary to basic standards of responsible journalism.

Accordingly, we request that a correction of the above factual errors be published on all platforms (broadcast, YouTube, or any others) in which the KBS report appeared. This correction should be published in a manner that is at least as prominent as the original report. It should also be published

KBS, KBS America
September 3, 2024
Page 4



promptly. Dr. Kim and SeeDevice incur additional economic, and other, harms each day that these errors go uncorrected.

We also trust you will ensure that any future reports on SeeDevice and Dr. Kim will not repeat these factual errors.

By way of background, we have advised and currently represent many media companies concerning, among other things, their editorial content. With respect to this matter, we have been retained only to explain to KBS the mistakes in the KBS report, and why corrections are required. If the matter is not resolved by a correction and requires further attention, it will be referred to litigation counsel.

If you have any questions about this matter, please do not hesitate to contact me or my partner Jeff Haidet, who can be reached at 404-572-6619. Otherwise, please notify us as soon as the corrections have been made and provide us with copies of those corrections so that we may review them for accuracy and completeness.

Very truly yours,

Rachel E. Matteo-Boehm

cc:     Dr. Hoon Kim
        Jeff Haidet, Esq.
        Jan Han-sik, KBS, Executive Managing Editor, News and Sports (hansik@kbs.co.kr)

Attachments:

(1) Korean version of KBS/KBS America report with false statements requiring correction, highlighted
(2) Certified English translation of KBS/KBS America report
(3) Korean 2009 Seoul High Court decision and certified English translation
(4) Korean 2012 Seoul Administrative Court Judgment and certified English translation

ATTACHMENT 1

## KBS NEWS

**[단독] 19년 전 실체없던 '양자' 기술..."이번에도 거짓"**

입력 2024-08-25 21:19:45 | 수정 2024-08-25 21:58:48                                    뉴스 9



[앵커]

이 회사의 실소유주는 '양자이미지센서'라는 혁신적인 기술 개발로 정상적인 투자 유치를 시도했다 주장하고 있습니다.

하지만 알고 보니 이 기술은 이미 KBS가 과거 수차례 취재해 실체가 없다는 판명을 받은 바 있는 기술이었습니다.

퀀타피아의 내부 제보자 역시 이 기술이 거짓이라고 밝혔습니다.

이어서 이예린 기자의 단독 보도입니다.

[리포트]

'양자이미지센서' 기술의 개발자 김 모 박사.

지난해 양자 산업 컨퍼런스에서 한 발표가 언론에 보도되면서 신기술 혁신 리더로 주목받았습니다.

[SBS 12시 뉴스/2023년 11월 6일 : "이미지 센서만으로 혈당을 실시간 측정하는 모니터링 기기를 개발..."]

그런데 김 박사, 지난 2005년에도 이미지센서 기술을 개발했다며 언론의 주목을 받았던 인물입니다.

[김○○/박사/KBS 9시 뉴스/2005년 11월 10일 : "암흑이라고 하더라도 고감도 센서만 있으면 컬러로 구현할 수 있는..."]

김 박사는 당시 제2의 황우석으로 불리며 100억 원에 가까운 정부출연금도 지원받았습니다.

하지만 KBS가 2007년부터 '기술 사기' 의혹을 제기했고, 한국산업기술평가관리원은 김 박사의 기술을 거짓으로 보고 국고 환수를 결정했습니다.

[KBS 추적60분/2011년 8월 3일 : "허위로 밝혀진 나노 기술에 대해 연구비 전액인 92억 환수가 결정됐습니다."]

이후 미국으로 떠났던 김 박사가 다시 돌아와 이미지 센서 기술로 또 사업을 벌인 건데, 내부 제보자는 이번에도 김 박사의 기술이 실체가 없다고 얘기합니다.

[내부 제보자/음성변조 : "기술을 좀 파악해보려고 하는 데 전혀 없습니다. KBS에서 2016년에 보도한 내용. 그때는 나노 이미지센서라고 이름을 했는데 똑같아요. 그때도 근거가 없고 지금도 근거가 없고."]

취재진은 김 박사 측에 수차례 연락했지만 닿지 않았고, 회사 임직원들도 공식적인 해명을 하지 않았습니다.

KBS 뉴스 이예린입니다.

촬영기자:박세준/영상편집:이태희/화면제공:SBS


이예린 기자 eyerin@kbs.co.kr
이예린 기자의 기사 모음

저작권자©KBS뉴스(http://news.kbs.co.kr), 무단전재 및 재배포금지

ATTACHMENT 2

## KBS◉NEWS

## [Exclusive] "Quantum" Technology that Did Not Exist 19 Years Ago… "Fake Again This Time" News 9

Posted 8.25.2024 21:19:45 Updated 8.25.2024 21:58:48                                          News 9



[Anchor]
The Company's beneficial owner claims that it has attempted to attract normal investment with the development of an innovative technology called "Quantum Image Sensor."

However, it turned out that KBS had reported several times in the past that this technology does not exist.

Quantapia's internal informant also said that the technology was fake.

Up next, It's reporter Yerin Lee's exclusive report.

[Report]
Dr. Kim, the developer of the 'Quantum Image Sensor' technology.

An announcement made at last year's quantum industry conference was reported in the media, drawing attention as a new technology innovation leader.

[SBS 12:00 News / November 6, 2023: "Development of monitoring devices that measure blood sugar in real time with image sensors only…"]

Dr. Kim, however, also received media attention in 2005 for developing image sensor technology.

[Dr. Kim 00/KBS News at 9 PM/Nov. 10, 2005] "Even if it's dark, color can be realized with a high sensitivity sensor…"]

Dr. Kim was called the second Hwang Woo-Suk Hwang at the time and received nearly 10 billion won in government grant.

However, KBS has raised suspicions of "technology fraud" since 2007, and the Korea Institute of Industrial Technology Evaluation and Management decided to take back the government grant treating Dr. Kim's technology as fake.

[KBS Tracking 60 Minutes/Aug. 3, 2011: "Return of the full research grant amount, 9.2 billion, has been decided for nanotechnology that turned out to be fake."]

Dr. Kim, who left for the U.S. after that, returned and conducted another business with image sensor technology, but an internal informant says that Dr. Kim's technology is not real again this time.

[Inside informant/voice alteration: "I'm trying to figure out the technology, but there's no technology at all.  The information KBS reported in 2016.  Back then, it was called Nano Image Sensor, but it's the same.  There's no basis then and there's no basis now."]

The reporters contacted Dr. Kim several times, but could not reach him, and the Company's executives and employees did not give an official explanation.

I'm Lee Yerin from KBS News.

Filmmaker: Park Se-Joon/Video Editing: Lee Tae-Hee/Courtesy of Screen: SBS

 Reporter Yerin Lee eyerin@kbs.co.kr
A collection of articles by Reporter Yerin Lee

Copyright KBS New (http://www.kbs.co.kr); Unauthorized reproduction and redistribution are prohibited

**Certification of Accuracy**

Re: Translation of KBS New 8.25.2024

I, Claire Park, hereby attest that I have translated the attached documents, and that to the best of my knowledge, ability, and belief, the translation is a true, accurate, and complete translation of the original Korean document that were provided to me.

Claire Park

8/29/2024

ATTACHMENT 3



**Registered No.** 2023-4189

# CERTIFICATE



## GNS TRANSLATION & ADMINISTRATION OFFICE

#1405 Daeil Bldg, 12, Insadong-gil, Jongno-gu, Seoul, Korea

2008No2243

# JUDGMENT



## SEOUL HIGH COURT

# SEOUL HIGH COURT

# EIGHTH CRIMINAL DIVISION

This is a registered copy.
January 13, 2009
Kim Dong [illegible], Junior
Court Clerk (Official seal)

# DECISION

| | | |
|---|---|---|
| Case No. | 2008No2243 | A. Violations of the Act on the Aggravated Punishment, Etc. of Specific Economic Crimes (Embezzlement) |
| | | B. Violations of the Act on Aggravated Punishment of Specific Economic Crimes (Fraud) |
| | | C. Violations of the Securities and Exchange Act |
| | | D. Violations of the Act on Regulation and Punishment of Criminal Proceeds Concealment |
| | 2008Chogi1064 | Petition for Compensation Order |

| | | |
|---|---|---|
| Defendants | 1. A. C. D. | Representative Director, |
| | Planet 82 Inc. | |
| | Residence: | |
| | Permanent domicile: | |
| | 2. B. C. Kim, Hoon | Senior Researcher, Korea |
| | Electronics Technology Institute | |
| | Residence: | |
| | Permanent domicile: | |
| | 3 A. C. D. | Director, Planet 82 Inc. |
| | Residence | |
| | Permanent domicile: | |

| | | |
|---|---|---|
| Appellants: | Defendants | , and the Prosecution (against all of the Defendants) |

No document certification or copy-prevention marks have been printed on this document (perforation required)

Prosecutor:

Counsel for the Defendants: Attorneys                                         (hired

privately for Defendant            )

DR & AJU International Law Group, Attorney in charge

(hired privately for Defendant Kim, Hoon)

Attorneys                              (hired privately for Defendant

)

Claimant for compensation:

District Court's Decision:  Seoul Central District Court, Decision 2008Gohab164, dated August 14,

2008

Decision Date:            January 9, 2009

# ORDER

In the lower court's judgment, parts regarding Defendant            and guilty verdicts on Defendant

shall be reversed, respectively.

Defendants `                              shall be each sentenced to imprisonment for two years and

six months.

The detention period of 201 days before the date of the lower court's judgment shall be counted toward

the above punishment.

However, the execution of the individual judgments against Defendants

shall be suspended for four and three years, respectively, from the date this judgment is finalized.

Among the facts charged in this case, Defendant `            shall be found not guilty of the followings:

violations of the Securities and Exchange Act for disseminating false information in December 2004

and for disseminating false information in November 2005, and violations of the Act on Regulation

and Punishment of Concealment of Criminal Proceeds by disguising criminal proceeds.

The appeals by the Prosecution against Defendant Kim, Hoon and the not-guilty verdicts of Defendant

No document certification or copy-prevention
marks have been printed on this document (perforation required)

shall be each dismissed.

The petition by the claimant for compensation shall be rejected.

# OPINION

**I. Grounds for Appeal by Defendants**

1. Misconception of facts or error of law

The lower court erred in reaching a guilty verdict by misunderstanding facts or law as explained

below.

A. Regarding the district court's judgment on criminal fact 1-A (Defendant            )

The purpose of the public notice on December 6, 2004 was to explain to security analysts the development process for "ultra-sensitive image sensors using nanotechnology" (hereinafter, "single carrier modulation photo detector (SMPD)" image sensors), and the notice was a so-called "fair public disclosure based on a forecast;" the above image sensors possessed technological properties differing from existing image sensors, and the Defendant made the public disclosure in good faith without criminal intent to disseminate false information or to obtain unlawful profits.

B. Regarding the district court's judgment on criminal fact 1-B (Defendants

)

The five billion KRW (deposited in an MMF account) which was provided as security to            a moneylender, by the Defendant under an agreement between        and the Defendant which set out that the amount would be used as security on the 50% capital increase when borrowing money for the capital increase; the above amount was never included in the capital of Planet 82 Inc. (hereinafter, "Planet 82") and was later withdrawan as a check from the deposited account, which was converted  to a security form at the request of          . Therefore, it cannot be concluded that the Defendants intended to illegally acquire funds for Planet 82, nor can it be found that the acts of the Defendants consitute occupational embezzlement, even though the acts of the Defendants constitute a disguised payment.

No document certification or copy-prevention
marks have been printed on this document (perforation required)

C. Regarding the district court's judgment on criminal fact 2 (Defendant            )

The technology for SMPD image sensors differs from the technology for existing image sensors; even though some of the content presented in the public demonstration on November 10, 2005 was exaggerated, the public demonstration was hosted by the Ministry of Commerce, Industry and Energy and Korea Electronics Technology Institute, and the press release was also prepared by the hosts while the Defendant only trusted technologies developed and verified by the government agencies, and therefore it cannot be concluded that the Defendant had criminal intent to disseminate false information.

D. Regarding the district court's judgment on criminal fact 1-D (Defendant            ) 

The public demonstration on November 10, 2005 does not constitute an act of disseminating false information, thereby not constituting the alleged crime premised on criminal fact 1-D. Meanshile, the share price rose unexpectedly after the capital increase around September 2, 2005, and the remaining money from cashing out of the positions had to be deposited with             for its safety; Also, the funds was used only to purchase shares of Planet 82, and the shares were later disposed of and the proceeds were all used as operating funds, etc. of Planet 82, and therefore it cannot be concluded that the Defendant had intent to conceal or disguise the proceeds of crime.

E. Regarding the district court's judgment on criminal fact 1-C (Defendant            )

Defendant              merely performed clerical duties for guaranteeing the debt, without any individual discretion and based on instructions by Defendant            , and did not conspire with Defendant            to guarantee the debt.

2. Unreasonableness of the sentence

Considering the overall circumstances, the sentences by the lower court against Defendants          and           (five years of imprisonment to Defendant            and two years and six months to Defendant           ; suspended for four years) are too heavy and therefore unreasonable.

**II. Grounds for Appeal by the Prosecution**

- 4 -                    No document certification or copy-prevention marks have been printed on this document (perforation required)

Although the Defendants were guilty on all of what they were found not guilty as reviewed below, the lower court erred in reaching a not-guilty verdict by misunderstanding the facts or law.

1.  Regarding the district court's not-guilty verdict 1 (regarding Defendant              , excluding the calculation of the amount of the profit)

Defendant                disseminated false information that a 93% yield was attained using nanotechnology to exaggerate research results with no clear supporting data, in spite of the fact that he did not use any nanotechnology and failed to attain a 93% yield.

2.  Regarding the district court's not-guilty verdict 2 (regarding Defendant Kim, Hoon)

In spite of knowing that Defendant               intended to obtain unlawful profits, Defendant Kim, Hoon conspired with Defendant              and disseminated false information or used deception while holding the public demonstration.

3.  Regarding the district court's not-guilty verdict 2-B (regarding Defendant Kim, Hoon)

Defendant Kim, Hoon exaggerated his rsearch achievements through fabricated public demonstrations, etc. and then swindled a large amount of research funds based on this.

4.  Regarding the district court's not-guilty verdict 3-A (regarding Defendant              )

Although Defendant              was not in charge of the public disclosure on December 6, 2004, he received the details of the disclosure in advance from the person in charge of the public disclosure, reviewed the contents, and received the approval from Defendant              to disseminate false information in collusion with Defendant        .

5.  Regarding the district count's not-guilty verdict 3-B (regarding Defendant           )

In consideration of the circumstances where Defendant              was aware that Defendant      ,              disseminated false information at the time, and was fully aware of the company's financial situation, as well as knowing that the funds delivered to              were the profits from the stock disposal, Defendant              is deemed to have conspired with Defendant              to disguise criminal proceeds.

**III. Dscussion on the Grounds for Appeal by Defendants**

1. Background

The following facts can be recognized by the evidence lawfully investigated and accepted by the lower court and this court.

A. Concept and manufacturing process for image sensors

(1) Image sensors, as semiconductors that convert external light signals into images that are visible to humans, consist of a pixel part that receives light and converts it into electric signals and a signal processing circuit part (that converts pixel-based electronic signals from the pixels into images and consists of an analog circuit and analog-digital converter (ADC)), and the pixel part out of the two is the core technology.



(2) Existing image sensors are categorized into CCD (charge coupled device) and CMOS (complementary metal oxide semiconductor image sensor) types, and these two types have a light-receiving part that receives light and converts the light into electric signals. The CCD sensors are expensive to produce due to the need for a dedicated manufacturing process and consume a lot of power and are difficult to develop while exhibiting high image quality, thereby being used for advanced image sensors. On the other hand, CMOS sensors have advanatges in low manufacturing costs due to the use of ordinary CMOS processes and low power consumption while having disadvantages in poor image quality.

(3) Meanwhile, Defendant Kim, Hoon argues that the SMPD image sensor he developed is more sensitive than a CCD image sensor because the SMPD image sensor uses a nanotechnology-based mechanism for the light-receiving part, even as the SMPD image sensor is manufactured using a CMOS process.

(4) While the pixel light-receiving parts of the CCD and CMOS image sensors have a photo-diode structure, the pixel light-receiving part of the SMPD image sensor has a photo-transistor (MOSFET)

No document certification or copy-prevention marks have been printed on this document (perforation required)

structure and a floating gate, which makes the SMPD image sensor different from the existing technology.

(5) Generally, image sensors are manufactured as follows: ① A fabless company (a company that does not have its own semiconductor plant) such as Planet 82 selects a foundry (a company that manufactures chips) and then designs an image sensor circuit based on the design template provided by the foundry; ② the fabless company submits its actual design drawings after the simulation work (testing the performance of the design using a computer-based simulation program, after having completed the design) to the foundry (The stage where design drawings are submitted is called "fab-in" and the stage where the chip is provided after completing the manufacturing is called "fab-out."); ③ packaging work is performed to separate the wafer fab-out chips into individual chips; and ④ a separate image-generating PCB board is produced and images are verified or tested using the packaged image sensor chips.

B. Development of the ultra-sensitive image sensor and circumstances leading up to the signing of the technology transfer agreement

(1) Korea Electronics Technology Institute started the "development of ultra-sensitive image sensors using nanotechnology," a designated task under the Electro-0580 Project jointly carried out by the older Ministry of Industry and Resources (currently, the Ministry of Knowledge Economy; hereinafter, "Ministry of Industry and Resources") and the Ministry of Science and ICT to achieve 80% domestic production of electronic parts; the period for the research and development was from January 1, 2002 to December 31, 2006, with approximately 10 billion KRW set aside in subsidies.

(2) Defendant Kim, Hoon, as Director of the Center for Research of Nano Photoelectric Devices under Korea Electronics Technology Institute, was designated as the person responsible for development of the ultra-sensitive image sensors.

(3) Meanwhile, Planet 82—of which Defendant            was the representative director—signed an agreement on December 24, 2003 with Korea Electronics Technology Institute for the transfer of ultra-sensitive image sensor technologies for five billion KRW in license fees and 2% royalties on

future sales, and paid 50 million KRW as part of the license fees on January 26, 2004. After that, Planet 82 signed a final technology implementation agreement on February 8, 2006 for a total license fee of 4.6 billion KRW, and then fully paid the remaining 4.1 billion KRW of the license fee by June 30, 2006, including one billion KRW as part of the license fee on December 15, 2005, after the public demonstration on November 10, 2005.

（4）To receive the technology transfer following the signing of the technology transfer agreement, Planet 82 established a research lab by leasing a separate building, and signed an agreement around March 2004 with            —a person having experience designing signal processing circuits of image sensors—for signal processing circuit design services.

C. The SMPD image sensor design process and circumstances leading up to the public demonstration on November 10, 2005

(1) The key steps in the SMPD image sensor development process under the leadership of Defendant Kim, Hoon are summarized in the following table:

| No. | Foundry (chip name) | Manufacturing period (from fab-in to fab-out) | Remarks |
|---|---|---|---|
| 1 | TSMC (T1 chip) | Jun. 2004 – Jul. 2004 | Chip without an analog-digital converter (ADC). Image was verified but there was a lot of noise. |
| 2 | TSMC | Oct. 2004 — Dec. 2004 | Signal-processing circuit chip consisting only of an analog circuit and ADC, but without a pixel part. |
| 3 | TSMC (T2 chip) | Nov. 2004 – Jan. 2005 | Image sensor chip including a pixel part, analog circuit, and ADC. Noise problem partially improved, compared to the T1 chip. |
| 4 | Magna Chip (M1 chip) | Jul. 2005 – Aug. 2005 | Chip used for the public demonstration on Nov. 10, 2005. |
| 5 | Magna Chip (M2 chip) | May 2006 – Jul. 2006 | Chip used for verification by the Verification Committee and Preliminary Investigation Committee dated Apr. 30, 2007. |
| 6 | IBM (I1 chip) | Jul. 2007 – Aug. 2007 | Chip used for verification by the Main Investigation Committee. |
| 7 | Magna Chip (M3 chip) | Sep. 2007 – Nov. 2007 | Chip used for verification by the Main Investigation Committee. |

No document certification or copy-prevention marks have been printed on this document (perforation required)

（2）  Around October 19, 2005 during the test of a fab-out M1 chip, Defendant Kim, Hoon and his researchers identified a chip on which images were captured under low light; an internal demonstration was then held attended by Director _____ , of Korea Electronics Technology Institute and Defendants Kim, Hoon and _____ , etc. where having confirmed that the chip captured images under low light conditions, _____ instructed the PR Team of Korea Electronics Technology Institute to report this to the Ministry of Industry and Resources and hold a public demonstration while the holding of the public demonstration was not suggested by Defendants Kim, Hoon and

（3）  The public demonstration was jointly hosted on November 10, 2005 by the Ministry of Industry and Resources and Korea Electronics Technology Institute, in which SMPD image sensor was demonstrated in comparison with other image sensors (PC cam and ordinary digital camera sensors).

（4）  At the above public demonstration, the Ministry of Industry and Resources distributed a press release stating that the SMPD image sensor—being the first high-sensitive image sensor in the world to use nanotechnology—was 500 times more sensitive than existing products and that it was expected that full production could start during the following year.

However, the draft of the press release was provided by Korea Electronics Technology Institute and the technical part such as sensitivity was written by a senior deputy director of the Ministry of Industry and Resources after confirmation by Defendant Kim, Hoon, and Planet 82 only provided data on market size and marketing. After that, Planet 82 received the press release and distributed at the public demonstration an English translation of it, along with the Korean press release, and the content was nearly the same as that of the press release by the Ministry of Industry and Resources; Defendant _____ confirmed the content of the prss release back then but did not provide any separate technical data or revise the press release.

（5）  Following the public demonstration, Planet 82 organized a marketing team by hiring six new marketing staff, including _____ , hired _____ —a person having extensive experience in

production of image sensors—as the director of its technology research lab around January 2006, and started the internal development of a color version completely for production by hiring around 10 research staff, including General Manager                ; however, they failed to develop an image sensor that captured images adequately.

（6）  In this process, Planet 82 pursued a strategic alliance with Magna Chip and IBM to produce the best image sensor from around January 2006 but this effort also ended in failure.

D. Circumstances thereafter 

（1）  Meanwhile, the Korea Broadcasting System raised various suspicions about the SMPD image sensor technology starting from January 2007. In response, Korea Electronics Technology Institute set up a technology verification committee made up of five university professors on April 30, 2007 and verified the technology (The members of the committee included

                          . Hereinafter, "Verification Committee dated April 30, 2007").

While the M1 chip was used for the public demonstration on November 10, 2005, the Verification Committee dated April 30, 2007 compared the M2 chip (the chip for which a little more noise had been removed compared to the M1 chip by improving part of the analog circuit) with other image sensors in demonstration.

（2）  The Korea Broadcasting System reported suspicions concerning the SMPD image sensor technology by broadcasting the KBS Special "New Technology Creates an Environment of Big Wins and Suspicions" around May 20, 2007 after the announcement of the Verification Committee dated April 30, 2007.

（3）  In response, Korea Electronics Technology Institute organized a preliminary investigation committee made up of members of its internal verification committee and verified the SMPD imange sensor technology around June 2007 (members of the verification committee included

                          , etc. who were all staff of

Korea Electronics Technology Institute. Hereinafter, "Preliminary Investigation Committee"), and then organized a main investigation committee around November 2007 made up of outside experts and verified the technology again (members of the committee included

                                                                        . Hereinafter, "Main Investigation Committee").

   2.  Regarding ground for appeal 1-A (dissemination of false information by Defendant in December 2004)

   A. Summary of the facts charged and the lower court's discussion



   (1) Defendant        , on behalf of Planet 82, signed an agreement on December 24, 2003 with Korea Electronics Technology Institute on the transfer of technology related to the "development of nano image sensor chips" for payment of five billion KRW. However, Defendant         failed to repay the approximately 1.99 billion KRW in capital increase funds he had borrowed from

, a moneylender, for the capital increase carried out by Planet 82 on August 24, 2004, had not only approximately 57 million won paid out in monthly interest on the loan but also 300–500 million KRW lost every month, thereby creating the need to increase the stock price and dispose of stock (1,530,000 shares; 1,300 KRW per share)        held as security.

    In the meantime, even though Defendant        confirmed that the nano image sensor chips being tested were unable to capture images under low light around October 2004, he decided to push up the share price by publicizing it as if the development had been completed because of the necessity examined above.

    So, Defendant        , in spite of the fact that no one should deliberately disseminate false market prices, false information or rumors, or employ deception to obtain unlawful profits, still published false information on the digital disclosure system (DART) of the Financial Supervisory Service on December 16, 2004, stating, "High-sensitive image sensor developed - overview of new product: Ultra-sensitive nano CMOS image sensor, VGA-class image sensor manufactured using

existing standard CMOS process; New product features: Images can be captured without a flash at low luminance of nearly no light; Sales forecast for the new product: 2005 quarterly sales forecast: 10.2 billion KRW for VGA camera phones, 8.4 billion KRW for MEGA camera phones, 2.7 billion won for CCTV: total of 21.8 billion KRW." Also, during the phone interview with Korea Economy TV on December 15, 2004, in response to a question by the reporter—"This new product of Planet 82 is said to be in the 300,000-pixel class, but current products now get up to three million pixels. What is your opinion on this?"—, Defedant          said, "... Even next year, I think the 300,000-pixel class will make up the main part of the market, while the demand for mega-pixel image sensors will grow gradually thanks to replacement demand. That is why products having a competitive advantage at 300,000 pixels are still being launched. ... We are planning to launch 1.3 to 2.0 megapixel products in the first half of next year." Through statements like these, Defendant          announced false information by replying as if the company had completed its development of image sensor chips that can capture video images under low light conditions and that production would begin soon.

(2)  The lower court rejected the arguments by Defendant          regarding the above fact charged and found him guilty.

B. Discussion

(1)  It is first examined whether Defendant        had awareness or criminal intent to disseminate false information at the time of publicizing the above facts.

The following circumstances based on the evidence cited above are recognized: Planet 82 signed a technology transfer agreement with Korea Electronics Technology Institute for the large amount of five billion KRW and had already paid part of the license fee. The company also tried to develop the technology, such as by setting up a research lab. As a result, it was confirmed that the T1 chip developed by Defendant Kim, Hoon captured images under ordinary light conditions, although there was a lot of noise in the images. Pixel sensitivity was measured at 2400 v/lux.sec, which is between hundreds and thousands of times more than that of existing CMOS image sensors (1–20 v/lux.sec). Therefore,

Defendant             could have expected success from development of the T2 chip— for which the

manufacturing had been ordered from TSMC—because the previous deficiencies had been addressed.

To explain the situation to security analysts when questions about the chip development began to flood

in during this process, he made the public disclosures as described in the fact charged regarding sales

forecasts of the new products, doing so based on forecasts by outside market survey organizations which

assumed development of high-sensitive image sensors and expected successful development of the

image sensors. Planet 82 made it clear that the above public disclosures were based on forecasts subject

to change based on changes in company strategy, market circumstances, and other external

environmental factors, and Planet 82 clearly does not bear legal responsibility for the information

disclosed. By extension, in the interview with Korea Economy TV, Defendant             also appears

to have been talking about forecasts contingent on the T2 chip development being successful. Although

the above public disclosure and interview remarks did not end up being fully realized, it cannot be

concluded based only on these circumstances that Defendant             was aware or criminally

determined to disseminate false information at the time.

　（2）　Next, whether the Defendant intended to obtain unlawful profits is examined.

　　Planet 82 was financially difficult as examined above, but in light of the circumstances recognized

based on the evidence cited above—namely, that Defendant was already under investigation by the

Financial Supervisory Service, including on suspicion of stock price manipulation, and that there were

no notable changes in the share price of Planet 82 around the time of the public disclosure and

interview—it is difficult to conclude that Defendant             intended to obtain unlawful profits

through manipulation of the share price.

　（3）　Therefore, the abovementioned fact charged constitute a case where there is no proof of

criminality, thereby falling under the latter part of Article 325 of the Criminal Procedure Act; however,

the lower court erred in making the Defendant found guilty on the above fact charged by

misunderstanding the facts.

No document certification or copy-prevention
marks have been printed on this document (perforation required)

3.  Regarding ground for appeal 1-B (occupational embezzlement)

A. Where the person in charge of a corporate establishment or the capital increase in collusion with subscribers pay in share capital with borrowed money from a third party, other than a bank, dealing with payment of share capital and then withdraws the paid-in share capital, and uses the capital ro repay borrowed money after being issued a certificate on custody of share capital from the bank and completing the registration procedure of incorporation or a registration procedure of capital increase, such act does not actually increase the corporate capital, but merely mimics paid-in capital for a registration, and thus no real change in capital has ever occurred during the whole process of payment and withdrwal of share capital. Therefore, they do not have any intent to acquire unlawful profits by appropriating the company's money at will. In this respect, a crime of Occupational Embezzlement cannot be established since it presupposes an actual increase in corporate capital (refer to Supreme Court en banc Decision 2003Do7645, decided on June 17, 2004); also this legal principle is applied with the case where a portion of the payment is withdrawn immediately after completion of the capital increase registration procedure and provided as collateral for the borrowed money in the form of a certificate of deposit, which is consistent with the above Defendants' claim (refer to Supreme Court Decision 2004Do3314, decided on September 22, 2006); that is because even though certificates of deposit are  provided as collateral for debt obligations, the person who received them as collateral can arbitrarily transfer them to a third party or convert them into cash and use them for repayment due to their exchangeability of being freely circulated in the financial market anonymously, which makes the case identical to cash repayment.



However, once the paid-in share capital actually belong to the company and increase the corporate capital, the act of arbitrary use of proceeds from capital increase constitutue occupational embezzlement.

B. Based on this, the following facts can be established by the above evidence of this case: Even before borrowing the funds for the capital increase from                , a moneylender, on September 2, 2005, Defendants                                visited                on multiple occasions and provided negotiable certificates of deposit as security when borrowing money for the capital increase,

No document certification or copy-prevention marks have been printed on this document (perforation required)

with Defendant            mainly handling the clerical functions for the borrowing and repayment;

On August 22, 2005, Defendant            again borrowed eight billion KRW from

for the September 2, 2005 capital increase of Planet 82, and agreed with            to repay the

loan principal and interest by October 1, 2005, providing security for 50% of the amount borrowed after

completion of the capital increase; then, as there was not much participation by ordinary investors in the

capital increase, Defendant            borrowed 9,692,900,000 KRW, an amount greater than the

original agreement, from        on September 2, 2005, and immediately after the payment for shares

under the capital increase, Defendant            withdrew five billion KRW by check from an

Industrial Bank of Korea account where the capital increase proceeds had been deposited and deposited

the check in a Planet 82 Money Market Fund (MMF) account with Woori Investment Securities and 

then gave the account passbook to            as security; not only was the seal for the passbook

returned by            to Planet 82 and continuously in the custody of Planet 82, but the account

was set up so that the money could not be withdrawn by the customer; afterwards,            could

not directly withdraw the funds from the account and use them due to being unable to use the funds with

third parties and thus later requested a check to be issued from the account and Defendant            ,

in response, withdrew five billion KRW in cashier's checks from the MMF account and provided the

checks as security between September 12, 2005 or September 30, 2005 and received the passbook back

and Defendant (sic)            borrowed money from third parties by again providing the checks

as security (After that, between October 13, 2005 and November 14, 2005, Defendant

received back the checks for five billion KRW from            and separately provided again five

billion KRW in checks to            for loan repayment.); after this, the Defendants again came up

with approximately five billion KRW, which they deposited with Planet 82 and used as operating funds

of the company; and Defendant            , as finance director of Planet 82, personally handled the

above work for Defendant            .

     Based on the facts established above, not only did Planet 82 keep the seal of the MMF passbook

No document certification or copy-prevention
marks have been printed on this document (perforation required)

that was provided as security, but the MMF account was set up so that the money could not be withdrawn by the customer and therefore, it does not seem possible for                    to withdraw the funds deposited in the MMF passbook account or to convert them to cash imediately, which makes the passbook provided to                 deem only a non-marketable security that could not be cashed at                    's discretion, unlike cash or negotiable certificates of deposit (                    also testified at the lower court that she thought that the above Defednatns would just take the momey from the above bank account); considering that the above Defendants withdrew and provided the five billion KRW deposited in the MMF account as security with                    at her request when receiving the passbook back, it can conclude that the five billion KRW in proceeds from the capital increase deposited in the MMF account actually belonged to Planet 82 already.

   Therefore, it deems reasonable that the act of the Defendants to withdraw and provide the funds that belonged to victim Planet 82 as security for Defendant                    's personal debt constitutes occupational embezzlement (Defendant                    testified that the MMF passbook was provided as security after discussing with                    , in consideration of the hardship during the investigation by the Financial Supervisory Service due to the provision of negotiable certificates of deposit as loan security before, which makes it possible to recognize that the above Defendants were also aware that the owner of the money in the MMF account was still Planet 82 and that just providing the passbook as security would less likely constitute an act of embezzlement than providing negotiable certificates of deposit that are marketable.) and therefore, the above argument by the Defendants is without merit.

   4. Regarding ground for appeal 1-A (dissemination of false information by Defendant
in November 2005)

   A. Summary of the facts charged and the lower court's discussion

   (1) Defendant                    borrowed 9.7 billion KRW from                    again and acquired a total of 4.27 million shares while carrying out a capital increase on September 2, 2005 eveh when failing to repay the private loan he had borrowed at the time of capital increase described in Criminal

Fact 1-A of the lower court judgment, but he, without being able to repay it, suffered from the repayment pressure such as                  's counter-selling in October 200 as the stock price fell, which created the need for him to falsely publicize as if the development of the image sensor chip of this case had been completed and could soon be produced and make sales even though it had not been completed.

In the meantime, no one shall deliberately spread false market prices or false facts or other rumors or use fraudulent means to obtain unlawful profits, but Defendant                  disseminated and announced the details in the press releases by the former Ministry of Industry and Resources (currently the Ministry of Knowledge Economy; hereinafter, "the Ministry of Industry and Resources") and Planet 82, mentioning "the world's first successful development of commercialized high-sensitive nano image sensors" at the demonstration on development of the nano image sensor chips at KOEX Inter-Continental Hotel, Samsung-dong, Kangnam-gu, Seoul on November 10, 2005 and also had the Chosun-Ilbo and other seven daily newspapers publish articles such as "the world's first development of high-sensitive nano photo/video image sensors," "production possible in three months or full production system starting next year or 93% yield (production success rate)."

However, the facts are as follows: ① a "high-sensitive image sensor chip" with 500 times higher sensitivity than that of existing image sensors had not been developed for the first time in the world because the image sensor chip performed worse than that of other products that can capture video images, including video cams, CCTV, and PC cams; ② despite the fact that the conditions for the receiving the light must be maintained at an equal level given that camera performance varies depending on the amount of light,  in an environment where a 150-watt halogen lamp that emits a large amount of infrared light was set while infrared-ray blocking filters were installed on the other compared cameras but not on the image sensor chip of this case., which makes the image sensor chip of this case able to receive more light than the compared cameras, the brightness was also controlled using an ND filter that lets infrared rays penetrate while blocking most visible light, making the image sensor chip of this case the only technology appearing to work as the visible brightness was gradually dimmed in the demonstration. In

No document certification or copy-prevention marks have been printed on this document (perforation required)

this way, the demonstration was carried out using a deceptive scheme to falsely show that the performance of the image sensor chip of this case was superior to that of the other cameras; And ③ Defendant                disseminated false information by announcing that production within three months could be possible, or that a production system would be introduced the next year, even though this was impossible because a substantial period of time would be required to start production after enhancing performance including noise removal, performing reliability testing, and executing the technology transfer, even as the company was facing cash shortages.

As a result, Planet 82's stock price soared from 4,300 KRW to 46,950 KRW, and Defendant sold 2,432,917 shares held under the names of 22 people, including the borrowed name , from November 20, 2005 to April 10, 2006, earning a total of 25,748,140,864 KRW worth of unlawful profits.

(2) Regarding the above fact charged, the lower court rejected the arguments of Defendant and found the fact charged tuilty, stating that it is reasonable to believe that Defendant intentionally spread false information or used a deceptive scheme at the public demonstration to solve the compnay's financial difficulties.

B. Discussion

Of course, as described in the fact charged, considering that Defendant                was suffering from debt repayment pressure at the time and obtained a substantial amount of gain as the Planet 82 share price rose significantly as a result of the public demonstration and press release, and that the product has not bet been commercialized, it is also true that there is a strong suspicion that Defendant                disseminated false information or used a deceptive scheme while being aware that the SMPD image sensor technology is false.

However, in view of the following circumstances, it is difficult to conclude that the above SMPD image sensor technology was falsely announced in the public demonstration or press releases, and even if the above technology is different from the announcement in the public demonstration or press releases,

No document certification or copy-prevention marks have been printed on this document (perforation required)

it still cannot be concluded that Defendant      intentionally disseminated false information or used a deceptive scheme while being aware of such facts at that time.

(1) Whether the acts fall under dissemination of false information or use of a deceptive scheme

(A) Regarding the definitions of sensitivity of ordinary image sensors

The lower court premised that whether the sensitivity of the SMPD image sensor is 500 times higher than that of existing products should be judged from the perspective of the general public and determined that the content that the SMPD image sensor is 500 times higher than that of existing products is false. Given that, there is room for accepting the discussion of the lower court in that the general public would believe that image quality or image sensitivity is 500 times or more better from the statement that sensor sensitivity is 500 times higher.

However, apart from the quality of image, it is difficult to deem that the sensitivity of the image sensor as the sensitivity of the pixel itself is fals and it only seems to result from misunderstanding due to the mixed use of terms according to the following facts: according to the report by the Main Investigation Committee, the term "sensitivity" expressed as a performance index of an image sensor is used interchangeably with photodetector sensitivity, general sensitivity, or unit-pixel sensitivity, etc. in various literature, and the property of the SMPD image sensor sensitivity being 500 times greater than that of existing chips refers to the capacity of how little light the SMPD image sensor can detect a meaningful "signal" that can capture an image, and there is no error in such an expression itself. (In particular, according to the minutes of the 5th meeting of the Main Investigation Committee, there are various methods used for the definition of sensitivity, and the method announced by the lead researcher, that is, defining the difference in sensitivity at the time when an image cannot be captured while lowering the illuminance without changing other conditions is not incorrect.); xperts and manufacturers of image sensors generally express image sensor sensitivity in "v/lux.sec. (Witness at the lower lower court

, who was a member of the Main Investigation Committee, testified that expressing the SMPD image sensor chip sensitivity based on pixel sensitivity is the correct way, and witness

No document certification or copy-prevention marks have been printed on this document (perforation required)

ı, an expert on image sensor sensitivity at the lower court trial, also testified that the expression "image sensitivity" is not commonly used, and image sensor manufacturers such as Micron, Hynix also imdicate the sensitivity of express image sensors as pixel sensitivity.); and image quality is determined not only by the performance of the image sensor itself, but also by the performance of the image signal processor (ISP).

(B) Regarding the argument that a chip with 500-times higher sensitivity had been developed for the first time in the world

In light of the following circumstances established by the above evidence, it is difficult to conclude that the corresponding announcement is based on the technical characteristics of the SMPD image sensor and that the announcement related to the 500 times sensitivity is false: image sensor pixel sensitivity is expressed in "v (voltage)/lux (luminance).sec(time)," and the pixel sensitivity of the SMPD  image sensor, 2400v/lux. sec, is hundreds or thousands of times higher than the pixel sensitivity of existing CMOS image sensors (1–20v/lux.sec.), which is all recognized by the Verification Committee dated April 30, 2007, the Preliminary Investigation Committee, and the Main Investigation Committee as well; the Ministry of Industry and Resources requested specific values for preparation of the press release and Defendant Kim, Hoon thought it would be acceptable to reference 500-times sensitivity, taking into consideration the pixel sensitivity value, so the reference to 500-times sensitivity was included in the press release; In particular, the Verification Committee dated April 30, 2007 determined that "We were able to confirm that the SMPD image sensor exhibits excellent sensitivity at long wavelengths of 900 to 1000 nm (wavelength band of near-infrared rays)," and the Preliminary Investigation Committee, which was adopted as evidence at the Main Investigation Committee, also determined through a comparative demonstration with other products that "The SMPD image sensors demonstrated a sensitivity 200 times higher than that of inexpensive PC cams under fluorescent lamp lighting conditions, and under incandescent lamp lighting conditions, the SMPD image sensors showed a sensitivity 5,000 times higher than that of H company's CMOS product and 8,000 times higher than

that of inexpensive PC cams. The SMPD image sensors also captured images at luminance levels of 1

lux or below under candlelight conditions, and the other comparison image sensors failed to capture any

images at all," and concluded that there was no illegality in the methods used for the sensitivity testing

and demonstration by Defendant Kim, Hoon; the Main Investigation Committee also determined that

"The SMPD image sensor has a photoreactive value hundreds to thousands of times higher than that of

existing image sensors due to its short integral time, and its measured unit-pixel sensitivity is hundreds

to thousands of times higher than the pixel sensitivity of existing CMOS image sensors"; the Main

Investigation Committee also stated determined that "it was confirmed that the sensitivity measurement

equipment and measurement method by the lead researcher were being properly conducted. As

confirmed by the investigation committee so far, there was no evidence that the lead researcher intended

or conducted research misconduct," and it seems that there was no member who raised an objection to 

this determination; and in a comparison demonstration with Company A's CCTV product (with a Sony

CCD chip built in), the Main Investigation Committee determined that it was difficult to state that the

SMPD image sensor had a higher image sensitivity, but it also concluded that it would be difficult to

make a precise comparison because the SMPD image sensor chip was still under development in a bare

condition and that the CCD chip used for comparison was a high-priced, advanced image sensor that

had been commercialized and was being used for military applications, and that it included many image

signal processors, and based on the images captured under low light conditions, it was observed that

both could capture images at a luminance of 0.1 lux or lower (Of course, the chip used at that time was

the M3 chip, and unlike the M1 chip actually used in the public demonstration, the image sensitivity of

the M1 chip was higher in that it solved a lot of noise compared to the existing chip by using a capacitor

instead of a resistor in the circuit processing part, and that is why the lower court's judgment is

understandable, but the M3 chip does not change the pixel part, which is the core technology of the

image sensor, but only the capacity part, which is a technology commonly used to improve noise, and

as seen earlier, it is difficult to conclude that the expression itself of 500-times sensitivity is improper as

No document certification or copy-prevention
marks have been printed on this document (perforation required)

long as sensitivity is understood as unit-pixel sensitivity.

    (C) Regarding the argument that a deceptive scheme was used at the public demonstration

    According to the foregoing evidence, the SMPD image sensor demonstrated higher sensitivity than those other image sensors, particularly in the infrared light wavelength range; it is also recognized that a 150-watt halogen lamp that emitted large amounts of infrared rays was set up for the public demonstration and that the ND filter used to control the light level allowed penetration of a considerable portion of the infrared rays while blocking a considerable portion of visible rays.

    However, in light of the following circumstances acknowledged by the foregoing evidence, it can be seen that whether or not an infrared cut-off filter was attached or whether an ND filter was used at the time of the public demonstration did not have a significant effect on the result, and thus it deems difficult to believe that Defendant Yun, Sang-jo conspired with Defendant Kim, Hoon, or intentionally used deceptive schemes without the knowledge of Defendant Kim, Hoon or other researchers: as seen above, the public demonstration in this case was hastily put together by the instructions of President Kim, Chun-ho of Korea Electronics Technology Institute immediately after the internal demonstration of the institute, and in relation to the holding of the public demonstration, Defendant     or Planet 82 arranged a necessary venue and prepared tools, including dolls and digital cameras, but did did not play a leading role in holding or proceeding with the public demonstration; at the time of verification by the Preliminary Investigation Committee, four cameras were compared and demonstrated with the infrared ray cut-off filter removed, including SMPD image sensor bare chip, CMOS image sensor bare chip, CCTV equipped with CCD, and PC camera equipped with CMOS image sensor (However, the PC camera was tested with the infrared ray cut-off filter as it was difficult to remove it.), in the case of using almost no fluorescent light as a light source, only the SMPD image sensor bare chip realized images at 0.8 lux for black and white and 0.5 lux for color While images could not be realized from 100 lux in the case of PC cameras, 50 lux in the case of CMOS, and 20 lux in the case of CCTV. Also, in the incandescent light source, it was confirmed that the SMPD image sensor bare chip



implemented images under 0.01 lux, PC cameras at 80 lux, the CMOS chip at 50 lux, and the CCTV chip at 0.04 lux (in this process, it was also confirmed that the infrared ray cut-off filter installed in the low-cost PC camera transmits most of the infrared rays.);.the above result is consistent with the fact that at the time of the public demonstration, the comparison target image sensors could not implement video long before the ND filter was used; as such, since the illuminance cannot be lowered by the illuminance controller in a situation where the image sensors to be compared cannot implement videos, it can be deemed that an ND filter having the effect of adjusting the amount of light without moving the light source is used to adjust the illuminance (There is no evidence to suggest that Defendants

or Kim, Hoon intentionally used the ND filter while knowing the characteristics of the ND filter.); at the time of the above comparison demonstration, the image sensors to be compared were equipped with image correction circuits such as microlenses that improve sensitivity by increasing the amount of light condensed, so the conditions for the public demonstration were not necessarily favorable to the SMPD image sensors; in the above fact charged, it can be misunderstood that Defendant 

or Defendant Kim, Hoon intentionally manipulated whether or not the infrared ray cut-off filter was installed by expressing "other cameras to be compared have an infrared ray cut-off filter attached, but the image sensor chip in this case does not have an infrared ray cut-off filter attached," but it was difficult to separate, so the attached infrared ray cut-off filter was not removed, but it was not intentionally attached; and it is difficult to conclude that Defendants          and Kim, Hoon deceived even other researchers of the R&D team and used deceptive schemes in relation to the public demonstration, and both the Preliminary Investigation Committee and the Main Investigation Committee determined that there was no fraud in the Defendant Kim, Hoon's sensitivity measuring equipment or method based on the above experimental results and admitted that the broadcast report called sensor was wrong.

(D) Regarding the argument that production would be possible within three months or during the next year (2006)

No document certification or copy-prevention
marks have been printed on this document (perforation required)

Reporters              of Korea Economy Newspaper and              of Electronics Newspaper, who attended the public demonstration on November 10, 2005, testified to the Prosecution and in the lower court trial that "Defendants `          and Kim, Hoon mentioned the possibility of production within three months," and it is true that articles that included this were also reported in some newspapers, including the Hankuk Ilbo and Seoul Economic Daily.

However, considering the folloing matters, it is difficult to deem that Defendant announced false information: in the press release officially distributed at the time, there was only a description that production was possible in the following year, but there was no description about the possibility of production within three months, and there was no mention of the possibility of production within three months at the official press conference either; among the newspapers published at that time,  there are some newspapers that did not report "the possibility of production within three months"; it is not necessarily clear which of Defendants Kim, Hoon and              mentioned the possibility of production within three months, as it was about the remarks made about tw years ago from the time of the statements by                              ; and even if the Defendants mentioned the possibility of production within three months, they expressed their expectation that production may be possible within three months if the technology development process proceeds smoothly after the public demonstration in a private conversation with several reporters rather than an official press conference, which cannot lead to the conclusion that the above statement is false.

Next, regarding the possibility of production during the next year, it is difficult to determine that there was no possibility of production at the time of the public demonstration just because production has not been done thus far, judging from the followings: it cannot be concluded as discussed earlier that the SMPD image sensor technology is fake; it cannot be ignored that the prosecution's investigation in relation to the technology leakage after the public demonstration, the change of the strategic partner, and the report by the Korea Broadcasting System and investigation of this case had an impact on the development process; it was confirmed even in the Main Investigation Committee that as a result of

No document certification or copy-prevention marks have been printed on this document (perforation required)

checking the video in low light, both the SMPD image sensor (M3 chip) and CCTV, which were improved after the public demonstration, were able to check videos at 0.1 lux or below and acknowledged that the noise problem at issue was resolved significantly by using a capacitor instead of a resistor on the circuit processor of the M3 chip; the SMPD image sensor is not simply a laboratory product made for R&D, but is manufactured using a production-capable fab process; and after the public demonstration, the internal production team of Planet 82 then started development of a color-version chip.

  (2) Regarding whether Defendant _ _ had criminal intent

  Considering the following circumstances are recognized based on the evidence cited above, it is difficult to easily acknowledge that Defendant   had a criminal intent to spread false information: as seen examined earlier, the public demonstration at issue was hastily held under the direction of President   of Korea Electronics Technology Institute immediately after the  internal demonstration thereof, and neither Defendant   nor Planet 82 played a leading role in holding or proceeding with the public demonstration; the nano image sensor technology at issue was selected as a national project and had been carried out with government subsidies; regarding the preparation of the technical part of the distributed press release, as examined above, neither Defendant   nor Planet 82 were directly involved in preparing the contents or phrases, and the Ministry of Industry and Resources too the intiviate in preparing it; even at the time of the public demonstration, while I   made the presentation to the press, he also directly mentioned the possibility of production or commercialization; Defendant   , after the above public demonstration, paid all the remaining license fee of 4.1 billion KRW in several payments and recruited new staff for marketing and research; according to the preliminary investigation report to verify the research integrity, even researchers themselves believe that the technology they developed is different from the existing technology (   , one of the researchers, also at the lower court trial that the SMPD image sensors could be said to exhibit ultra-high sensitivity at the pixel level.); even among experts, there are

conflicting opinions as to whether the image sensor technology at issue is real; it is difficult for Defendant          to accurately recognize the characteristics of halogen lamps and ND filters and to deceive other researchers at the public demonstration and use deceptive schemes just because he majored in photography at university and had experience as a photo journalist; and some patents related to SMPD image sensors have already been registered.

(3) Therefore, the abovementioned fact charged constitute a case where there is no proof of criminality, thereby falling under the latter part of Article 325 of the Criminal Procedure Act; however, the lower court erred in making the Defendant found guilty on the above fact charged by misunderstanding the facts.

5. Regarding ground for appeal 1-D (disguising of criminal proceeds by Defendant          )

A. Summary of the facts charged and the lower court's discussion 

(1) When Defendant          was handed over from          the unlawful profits obtained from the crime sated in Criminal fact 2 at the lawer court decision, the defendant decided to deposit it into the account of          , a third party, to avoid tracking by the Financial Supervisory Service and investigative agencies.

Defendant Yun, Sang-jo opened an account in the name of          at the Bundang branch of Hyundai Securities located in Bundang-gu, Seongnam-si on February 20, 2006 and then deposited 27 cashier's checks totalling 1,690,000,000 KRW, which is a part of the above unlawful profits, and a total of 126 cashier's checks totalling 11,040,000,000 KRW over a total of six times as described in Annex 1 "Deposit Details of Lee, Myeong-cheol's Securities Account" at the time of the lower court judgment to disguise the act of acquiring or disposing of criminal proceeds.

(2) Regarding the above fact charged, the lower court rejected the arguments by Defendant          and recognized the charges as guilty.

B. Disuccsion

However, as seen in paragraph 4. above, since Defendant          did not violate the

No document certification or copy-prevention marks have been printed on this document (perforation required)

Securities and Exchange Act due to the apread of false information in November 2005, the profits obtained by Defendant                due to the rise in stock prices cannot be regarded as criminal proceeds, and there is insufficient evidence to conclude that the gains obtained by Defendant

amount to criminal proceeds.

Therefore, the abovementioned fact charged constitute a case where there is no proof of criminality, thereby falling under the latter part of Article 325 of the Criminal Procedure Act; however, the lower court erred in recognizing the facts charged as guilty by misunderstanding the facts.

6. Regarding ground for appeal 1-E

According to the evidence cited above, it can be acknowledged that Defendant                , as finance director of Planet 82, did most of the acts on behalf of Defendant                , including raising or repaying funds from and to                , a moneylender, and considering Defendant

's status and involvement in financing, it is recognized that Defendant                conspired with Defendant                to have Planet 82 guarantee the debt and therefore, the above argument by Defendant                is without merit.

7. Regarding the argument by Defendant                about the unreasonableness of the sentence

Although the Planet 82's funds embezzled by Defendant                in collusion with Defendant                are a large sum of up to five billion KRW, the facts that the embezzled amount was returned to Planet 82 later, that in light of the characteristics of the embezzlement at issue, the criminality thereof does not seem to deserve a heavy criminal punishment, that Defendant                took part in the crime at issue at the direction of Defendant                and therefore the degree of involvement cannot be said to be serious, that he is a first-time offender, and other various principles for determination of punishment set for in Article 51 of the Criminal Act, the punishment sentenced by the lower court against Defendant                is rather heavy and therefore unreasonable.

**IV. Discussion on the Grounds for Appeal by the Prosecution**

No document certification or copy-prevention marks have been printed on this document (perforation required)

1. Regarding ground for appeal 1 by the Prosecution

A. Summary of the facts charged

The summary of this fact charged is that Defendant                 disseminated false information on November 10, 2005 as described in paragraph 2 of the criminal facts in the judgment, ① in fact, nanotechnology was not used in the SMPD image sensors, ② dispite the fact that there is no experimental data that can be considered to have achieved a yield of 93%, false information was spread by making an announcement as described in paragraph 2 of the criminal facts in the judgment.

B. Discussion

(1) Whether nanotechnology was used is examined first.

Defendant Kim, Hoon admitted at the prosecution that the SMPD image sensor is not a nanotechnology using nano processes. However, nanotechnology can be considered as nanotechnology not only when nanoprocess is used, but also when quantum phenomena appear.



According to the above evidence, the following circumstances are recognized: ① the Verification Committee dated on April 30, 2004 determined that "it may be different depending on the point of view, but considering the quantum properties of the structure of the SMPD image sensor chip, nanotechnology was adopted,"; ② the Main Investigation Committee also concluded, "theoretical hypothesis was presented by Defendant Kim, Hoon, but it is difficult to make a clear judgment that because it is difficult to explain it clearly with the theory currently known in the academic world, and therefore it cannot be concluded that the technology applied to the SMPD image sensor is not nanotechnology"; and ③ on the other hand, witnesses such as                       , testified that the technology applied to the SMPD image sensor was not nano technology but, considering the wide range of nanotechnology, it cannot be concluded that nanotechnology was not applied to the SMPD imager sensor chip. Considering these circumstances comprehensively, the lower court determined that the evidence submitted by the Prosecution was insufficient to conclude that nanotechnology was not applied to the SMPD image sensor and that there was no evidence to otherwise acknowledge it; when the above

No document certification or copy-prevention marks have been printed on this document (perforation required)

judgment of the lower court judgment is compared with the records, the judgment of the lower court is accepted, and it cannot be deemed that there is a violation of the law that affects the judgment by misinterpreting facts or legal principles by violating the law of evidence collection. As a result, the Prosecution's argument above is without merit.

(2)The argument that a 93% of yield was obtained is examined.

According to the above evidence, the following circumstances are recognized: ① for the production of the SMPD image sensor, the already used Mixed Signal process was used as it is; ② however, foundries were already guaranteeing a yield of 90% or higher for the above process (witness statement by               , a witness at the lower court trial and the second statement by

to the Prosecution). Considering these circumstances comprehensively, the lower court determined that the evidence submitted by the Prosecution was insufficient to prove these statements to be false and that there was no evidence to otherwise acknowledge it; when the above judgment of the lower court is compared with the records, the judgment of the lower court is accepted, and it cannot be deemed that there is a violation of the law that affects the judgment by misinterpreting facts or legal principles by violating the law of evidence collection (              also testified at the lower court trial that about 100 M1 chips were produced at the time of the public demonstration, and as a result of examining the number of chips that impelemented images, about 93% were implemented). As a result, the Prosecution's argument above is without merit.



2.  Regarding ground for appeal 2 by the Prosecution

A. Summary of the facts charged

The summary of this part of the fact charged is that Defendant Kim, Hoon conspired to participated in Defendant                's offenses as described in paragraph 2 of the criminal facts of the lower court judgment.

B. Discussion

However, as examined above, it is difficult to conclude that false information was disseminated

No document certification or copy-prevention marks have been printed on this document (perforation required)

or that a deceptive scheme was used in the public demonstration on November 10, 2005; it deems that the holding of the public demonstration at the time was to announce that the original technology of the image sensor using nanotechnology was secured; and it does not appear that there was a purpose for Defendant Kim, Hoon to obtain unlawful profits in relation to the trading of securities by influencing Defendant          's stock trading, and therefore the evidence submitted by the Prosecution is insufficient to recognize this part of the criminal count, and there is no other evidence to otherwise acknowledge it.

    Accordingly, the lower court judgment finding the Defendant not guilty for the same reasons is reasonable, and the above argument by the Prosecution is without merit.

   3. Regarding ground for appeal 3 by the Prosecution

  A. Summary of the facts charged



    The development of the nano image sensor chip at issue is a research project to be carried out by Korea Electronics Technology Institute with R&D funds provided by the Informatization Promotion Fund administered by the National IT Industry Promotion Agency, and research results have been reported to and evaluated by the National IT Industry Promotion Agency every year to decide whether to continue the R&D support.

    As indicated in paragraph 2 of the criminal facts of the lower court judgment, Defendant Kim, Hoon falsely reported to an employee in charge at the National IT Industry Promotion Agency on Expo Road in Yuseong-gu, Daejon on March 27, 2006 on what was presented at the demonstration on November 10, 2005 as if the nano image sensor chip at issue is evaluated as the world's first new technology even though it cannot be considered superior to other existing products that can record video and it is not the world's first new technology, and applied for R&D funds and received 1.92 billion KRW from the deceived exmployee in the name of Defendant in charge of development at Korea Electronics Technology Institute on July 25, 2006, thereby constituting the act of deciving a person receiving the delivery of property.

No document certification or copy-prevention marks have been printed on this document (perforation required)

B. Discussion

According to the records of this case, it is acknowledged that Defendant Kim, Hoon received 1.92 billion KRW in R&D funds in the same way as described in the above fact charged and therefore, whether Defendant Kim had any criminal intent to defraud is examined.

According to the above evidence, however, the following circumstances are recognized:  as examined above, it cannot be concluded that the image sensor technology at issue was false or that nanotechnology was not employed; the Verification Committee dated April 30, 2007 judged that "while existing image sensors directly detect the number of electrons or holes based on the intensity of light, the SMPD image sensor technology detects changes in the threshold voltage of MOSFETs constituting pixels, and the structural process and circuit technology vary depending on this difference and therefore, the SMPD image sensor technology is a differentiated technology compared to existing technologies." Also, the Main Investigation Committee determined that "the SMPD image sensor has a different structure and operation principle from CCD and CMOS image sensor chips to which the principle of PN photodiode is applied in terms of the phototransistor principle of the floating gate structure, and it is possible to reduce the manufacturing cost." In light of the above circumstances recognized as above, as long as it is difficult to conclude that Defendant Kim, Hoon presented false facts completely unrelated to the technical properties of the SMPD image sensor when applying for the R&D funds in March 2006, the evidence submitted by the Prosecution is insufficient to conclude that Defendant Kim had criminal intent to defraud, and there is no evidence to otherwise acknowledge it.




Accordingly, the lower court judgment finding the Defendant not guilty for the same reasons is reasonable, and the above argument by the Prosecution is without merit.

4.  Regarding ground for appeal 4 by the Prosecution

A. Summary of the facts charged

The main idea of this fact charged is that Defendant               conspired and participated with Defendant                in the offenses described in paragraph 1-A of the criminal facts of the lower

No document certification or copy-prevention marks have been printed on this document (perforation required)

court judgment.

B. Discussion

However, as examined above, unless Defendant             is not found guilty of violating the

Securities and Exchange Act by disseminating false information in December 2004, it cannot be deemed

that Defendant            did spread false fact in collusion with Defendant       , and otherwise, there

is no evidence to acknowledge that Defendant                   independently disseminated false

information.

Accordingly, the lower court judgment finding the Defendant not guilty for the same reasons is

reasonable, and the above argument by the Prosecution is without merit.

5.  Regarding ground for appeal 5 by the Prosecution



A. Summary of the facts charged

The main idea of this fact charged is that Defendant               conspired and participated with

Defendant                in the offenses described in paragraph 1-A of the criminal facts of the lower

court judgment.

B. Discussion

However, as examined above, unless Defendant               is found guilty of violating the Act

on Regulation and Punishment of Concealment of Criminal Proceeds by disguising criminal proceeds,

it cannot be deemed that Defendant             conspired with Defendant           to disguise the

acquisition or disposal of criminal proceeds.

Accordingly, the lower court judgment finding the Defendant not guilty for the same reasons is

reasonable, and the above argument by the Prosecution is without merit.


**V. Conclusion**

1.  Therefore, the appeal by the Prosecution against Defendant Kim, Hoon and the appeal by the

Prosecution against the not guilty verdicts for Defendant               are both without merit and thus

No document certification or copy-prevention
marks have been printed on this document (perforation required)

dismissed in accordance with Article 364(4) of the Criminal Procedure Act.

2.  Meanwhile, in the case of Defendant                , the act of disseminating false information in November 2005 constitutes a single offense; while the Defendant appealed the guilty verdict, the Prosecution appealed the not guilty verdict; and as examined above, as long as the appeal by the Prosecution is without merit and the appeal by the Defendant is upheld, the constituted offense must be treated inseparably in lawsuit even though only the appeal by the Defendant is grounded, and thus, not only must all of the violations of the Securities and Exchange Act due to the spread of false information in November 2005 be revered in entirety on an ex officio basis, but also be there no need to further discuss the ground for appeal of the unreasonableness of sentence because the grounded part of the Defendant                's calim of false facts and the remainder constitute concurrent offenses under the first part of Article 37 of the Criminal Act and thus, the lower court's judgment against Defendant                shall be reversed pursuant to Article 364(2) and (6) of the Criminal Procedure Act and concluded as follows after hearings. 

3.  Ground for appeal by Defendant                is upheld and therefore the guilty verdict of the lower court's judgment against Defendant                shall be reversed pursuant to Article 364(6) of the Criminal Procedure Act, and the decision shall be made again after hearings.


**Summary of the evidence and the criminal facts**

The criminal facts of Defendants                                recognized by this court and summary of the evidence against them are to the same as the descriptions in each relevant sections of the lower court's judgment except for deleting paragraphs 1-A, 1-D and 2 of the criminal facts of the lower court judgment against Defendant                and removing paragraphs 1-A, 1-D, and 2 of the summary of the evidence corresponding to the above criminal facts to be deleted, and thus they are granted in accordance with Article 369 of the Criminal Procedure Act.

No document certification or copy-prevention marks have been printed on this document (perforation required)

**Application of the law**

1. Selection of relevant legal provisions and punishments for the criminal facts

    A. Defendant           : Article 3(1)(i) of the Act on Aggravated Punishment of Specific Economic Crimes; Articles 356, 355(1), and 30 of the Criminal Act (selection of prison terms for occupational embezzlement); Articles 207-3(vii), 191-19 (1)(i)(c) of the Securities and Exchange Act; Article 30 of the Criminal Act (selection of prison terms for insider trading with major shareholders and other stakeholders); Articles 210(v), 188(6) of the Securities and Exchange Act (selection of prison terms for violations of mandatory shareholding reporting); and Articles 210(v-2), 200-2(1) of the Securities and Exchange Act (selection of prison terms for violations of mandatory large holdings reporting)

    B. Defendant         : Article 3(1)(i) of the Act on Aggravated Punishment of Specific Economic Crimes; Articles 356, 355(1), and 30 of the Criminal Act (selection of prison terms for occupational embezzlement); Articles 207-3(vii), 191-19(1)(i)(c) of the Securities and Exchange Act; and Article 30 of the Criminal Act (selection of prison terms for insider trading with major shareholders and other stakeholders)

1. Aggravation for concurrent crimes

   First part of Article 37, Articles 38(1)(ii), and 50 of the Criminal Act (The sentence for each concurrent crime is aggravated in addition to the most severe punishment imposed on Defendant Yun, Sang-jo and to the punishment provided for violations of the Act on Aggravated Punishment of Specific Economic Crimes (embezzlement) for Defendant          , (up to the sum of the longest punishments for each crime).

1. Discretionary mitigation

    Article 53, Article 55 (1) 3 of the Criminal Act (The above extenuating circumstances are considered for Defendant Lee, Bu-yeol while the following favorable circumstances are considered for Defendant          .)

1. Inclusion of number of days of confinement before imposition of sentence (Defendant          )

No document certification or copy-prevention marks have been printed on this document (perforation required)

Article 57 of the Criminal Act

1. Suspension of execution of sentence

Article 62(1) of the Criminal Act (extenuating circumstances examined above)

1. Dismissal of claim for compensation

Article 32(1) and (2), Articl 25(3)(iii) of the Act on Exceptional Acceleration of Lawsuits (as the scope of responsibility for compensation is unclear)

**Verdict of Not Guilty**

The summary and disucssion of the respective violations of the Securities and Exchange Act by disseminating false information by Defendant              in December 2004 and November 2005 and violations of the Act on Regulation and Punishment of Concealment of Criminal Proceeds due to disguising of criminal proceeds out of the facts charged are identical to the descriptions in the above III-2, 4, and 5; the facts charged constitute a case where there is no proof of criminality, thereby making the Defendant found not guilty on the respective facts charged  pursuant to the latter part of Article 325 of the Criminal Procedure Act (in the case of the one crime of disseminating false information in November 2005, the prosecutor's appeal against the not-guilty verdict by ground is groundless, but as long as the remainer are decided not guilty at this court, the one crime must be treated inseparably in the lawsuit and therefore the part not guilty by ground is decided not guilty along with the part found not guity at this court). 

**Grounds for the Sentences**

Although the Planet 82's funds embezzled by Defendant                are a large sum of up to five billion KRW, the facts that the embezzled amount was returned to Planet 82 later, that in light of the characteristics of  the embezzlement at issue, the criminality thereof does not seem to deserve a heavy criminal punishment, that most of the profits obtained due to the rise in stock price was used for the operation of the company, and the age, character and conduct, and environment of the defendant, the motive for the commission of the crime, the means and the result, circumstances after the commission

No document certification or copy-prevention marks have been printed on this document (perforation required)

of the crime, and others found in the records and pleadings constituting the principles for determining

punishment are comprehensively considered and thereby decided as ordered.


        Presiding Judge:                     _____


                                            _____


                                            _____



# Certificate of Finalized Decision

**Case No.:**                    **Seoul High Court 2008No2243 Act on Aggravated**

                            **Punishment of Specific Economic Crimes**

                            **(Embezzlement), Etc.**

**Defendants:**                            **and two others**

**Certificate applied for by:**    **Counsel, DR & AJU International Law Group**

It is hereby certified that the above case has been finalized as follows:



Defendant Kim, Hoon: Finalized on January 22, 2009. End.

January 22, 2009

Seoul High Court

;, Court Clerk (seal impression)

For any questions concerning this certificate (Document No.: Issuance of Integrated Certificates, 909, General Receiving

Office), please call 02-530-1221.

2008노2243

# 판 결 서




# 서울고등법원



# 서 울 고 등 법 원

## 제 8 형 사 부



등본입니다.

2009. 1. 13.

법원주사보 김 동

## 판       결

사       건       2008노2243   가. 특정경제범죄가중처벌등에관한법률위반(횡령)

　　　　　　　　　　나. 특정경제범죄가중처벌등에관한법률위반(사기)

　　　　　　　　　　다. 증권거래법위반

　　　　　　　　　　라. 범죄수익은닉의규제및처벌등에관한법률위반

　　　　　2008초기1064   배상명령신청

피  고  인       1.가.다.라.                      , (주) 플래닛팔이 대표이사

　　　　　　　　주거

　　　　　　　　등록기준지

　　　　　　　　2.나.다. 김훈                   , 전자부품연구원 수석연구원

　　　　　　　　주거

　　　　　　　　등록기준지

　　　　　　　　3.가.다.라.                      , (주) 플래닛팔이 이사

　　　　　　　　주거

　　　　　　　　등록기준지   :

항  소  인       피고인                및 검사(피고인들 모두에 대하여)

검       사

변  호  인       변호사                 (피고인     를 위한 사선)

법무법인 대륙 담당변호사        (피고인 김훈을 위한 사선)

변호사            (피고인        을 위한 사선)

배상 신청인

원 심 판 결      서울중앙지방법원 2008. 8. 14. 선고 2008고합164 판결

판 결 선 고      2009. 1. 9.


## 주        문

원심판결 중 피고인        에 대한 부분, 피고인        에 대한 유죄부분을 각 파기한

다.

피고인        , 피고인        을 각 징역 2년 6월에 처한다.

원심판결 선고 전의 구금일수 201일을 피고인        에 대한 위 형에 산입한다.

다만, 이 판결 확정일로부터 피고인        에 대하여는 4년간, 피고인        에 대하여

는 3년간 위 각 형의 집행을 유예한다.

이 사건 공소사실 중 피고인        의 2004. 12. 허위사실유포 및 2005. 11. 허위사

실유포로 인한 각 증권거래법위반의 점, 범죄수익 가장으로 인한 범죄수익은닉의규제

및처벌등에관한법률위반의 점은 각 무죄.

검사의 피고인 김훈에 대한 항소 및 피고인        의 무죄부분에 대한 항소를 각 기각

한다.

배상신청인의 배상신청을 각하한다.


## 이        유



I. 피고인          !의 항소이유

1. 사실오인 내지 법리오해

원심판결은 아래에서 보는 것처럼 사실을 오인하거나 법리를 오해하여 유죄를 인정하는 잘못을 저질렀다.

가. 원심 판시 범죄사실 1의 가에 대하여(피고인          .)

2004. 12. 6.자 공시는 '나노기술을 이용한 초고감도 이미지센서[이하 'SMPD(Single Carrier Modulation Photo Detector. 단일 전하 변조 광검출 방식) 이미지센서'라고 한다]'의 개발과정을 증권 애널리스트들에게 설명하기 위한 것으로서 예측공시인 공정공시에 해당하고, 위 이미지센서는 기존의 이미지센서와는 다른 기술적 특성을 가지고 있었으며, 피고인은 이를 신뢰하고 발표한 것이므로 허위사실 유포에 대한 범의가 없었을 뿐 아니라 부당한 이득을 얻을 목적도 없었다.

나. 원심 판시 범죄사실 1의 나에 대하여(피고인 ·          )

피고인이 사채업자     ·에게 담보로 제공한 50억 원(MMF 통장에 입금된 돈)은 애당초     와 사이에 유상증자금의 50%를 담보로 제공하기로 한 약정에 따라 유상증자금을 빌릴 당시부터 담보로 제공하기로 한 것으로 위 금원은 주식회사 플래닛팔이(이하 '플래닛팔이'라 한다)의 자본금으로서의 실체를 형성한 바가 없고, 나중에 위 통장에 입금된 돈을 수표로 인출하고 또 교환한 것은     ·의 요구에 따라 담보로 제공하였던 자금의 형태가 바뀐 것에 불과하므로, 피고인들에게는 플래닛팔이의 자금을 불법영득한다는 의사가 있었다고 할 수 없는 이상 피고인들의 행위가 가장납입에 해당할지언정 업무상횡령죄에 해당한다고 할 수는 없다.

다. 원심 판시 범죄사실 2에 대하여(피고인          )



SMPD 이미지센서는 기존의 이미지센서와는 다른 기술적 특성을 가지고 있고, 2005. 11. 10. 공개시연회의 발표 내용에 일부 과장이 있다고 하더라도 위 공개시연회는 산업자원부와 전자부품연구원이 주체가 되어 개최한 것으로서 그 보도자료 역시 주최측에서 작성한 것이며, 피고인은 국가기관에 의해 개발되고 검증된 기술을 신뢰한 것에 불과하므로, 피고인에게 허위사실 유포의 범의가 있었다고 할 수도 없다.

　라. 원심 판시 범죄사실 1의 라에 대하여(피고인　　　　)

　2005. 11. 10. 공개시연회가 허위사실 유포행위에 해당하지 아니하므로 이를 전제로 한 이 부분 범죄는 당연히 성립하지 아니한다. 한편 2005. 9. 2.경 유상증자 이후 예상외로 주가가 올랐고, 이에 정산하고 남은 금액을 안전하게 보관하기 위해 부득이 　　　　에게 맡긴 것이며, 더욱이 위 자금으로 플래닛팔이 주식만을 매수하였던 점, 이후 위 주식을 처분하여 모두 플래닛팔이의 운영자금 등으로 사용하였던 점 등을 고려하면 피고인에게 범죄수익가장의 의사가 있었다고 할 수 없다.

　마. 원심 판시 범죄사실 1의 다에 대하여(피고인　　　　)

　피고인　　은 피고인　　　　의 지시에 따라 별도의 재량권 없이 채무보증에 관한 사무처리를 하였을 뿐 피고인　　　　와 공모하여 채무보증을 한 것이 아니다.

　2. 양형부당

　여러 가지 사정을 고려할 때 원심이 피고인　　　　　　에게 선고한 형(피고인 　　　징역 5년, 피고인　　　2년 6월, 집행유예 4년)은 너무 무거워 부당하다.

II. 검사의 항소이유

　다음에서 보는 것처럼 원심 판시 무죄 부분들은 모두 유죄로 인정이 됨에도 원심은 사실을 오인하거나 법리를 오해하여 무죄를 인정하는 잘못을 저질렀다.

1. 원심 판시 무죄부분 1에 대하여(피고인       에 대하여, 이득액 산정 부분 제외)

피고인       는 명확한 근거자료 없이 연구성과를 과장하기 위하여 나노기술을 채용하지도 않고, 93%의 수율을 달성하지 않았음에도 나노기술을 사용하였고, 수율 93%를 달성하였다고 허위사실을 유포하였다.

2. 원심 판시 무죄부분 2의 가에 대하여(피고인 김훈에 대하여)

피고인 김훈은 피고인       에게 부당한 이득을 얻기 위한 의도가 있다는 것을 알면서 피고인       와 공모하여 공개시연회를 진행하면서 허위사실을 유포하거나 위계를 사용하였다.

3. 원심 판시 무죄부분 2의 나에 대하여(피고인 김훈에 대하여)

피고인 김훈은 조작된 공개시연회 등을 통해 자신의 연구성과를 과장한 다음 이를 근거로 거액의 연구비를 편취하였다.



4. 원심 판시 무죄부분 3의 가에 대하여(피고인       에 대하여)

피고인       은 2004. 12. 6.자 공시와 관련하여 공시담당자는 아니었지만, 공시담당자로부터 공시내용을 사전에 받아 내용을 검토한 후 피고인       의 결재를 받는 등 피고인       와 공모하여 허위사실을 유포하였다.

5. 원심 판시 무죄부분 3의 나에 대하여(피고인       에 대하여)

피고인       은 그 당시 피고인       가 허위사실을 유포하였음을 인식하고 있었으며, 회사의 자금사정에 관해 충분히 알고 있었을 뿐 아니라,       에게 전달한 자금이 주식처분의 이득금이라는 것을 알고 있었던 사정에 비추어 보면, 피고인       :와 공모하여 범죄수익을 가장하였음이 인정된다.

Ⅲ. 피고인              의 항소이유에 대한 판단



1. 기초사실

원심 및 당심이 적법하게 조사하여 채택한 증거들에 의하면 다음의 사실을 인정할 수 있다.

가. 이미지센서의 개념 및 제조과정

(1) 이미지센서는 외부의 빛 신호를 사람이 볼 수 있는 영상으로 바꾸주는 반도체로서 빛을 받아들여 전기신호로 변환하는 픽셀 부분과 신호처리회로 부분(픽셀에서 나온 전기적 신호를 영상으로 전환시키는 기능을 갖는 부분으로서 아날로그 회로, 아날로그 디지털 변환기(ADC) 등으로 구성된다)으로 구성되는데, 이 중 픽셀이 핵심적인 기술 부분이다.

(2) 기존의 이미지센서는 CCD형(Charge Coupled Device, 전하결합소자)과 CMOS형(Complementary Metal Oxide Semiconductor, 상보성 금속 산화막 반도체형 영상센서)으로 구분되는데, 이들 모두 빛을 받아들여 전기신호로 전환하는 수광부를 가지고 있었고, 한편 CCD형은 전용공정을 이용하여 제작되므로 제조비용이 높고 전력소비가 많으며 개발하기 어려운 단점은 있으나 이미지 품질이 좋은 장점이 있어 고급 이미지센서 제품에 채용되었고, CMOS형은 일반 CMOS공정을 이용하여 제작되므로 제조비용과 전력소비량이 낮은 장점이 있으나 이미지 품질이 낮은 단점이 있었다.

(3) 한편 피고인 김훈은 자신이 개발한 SMPD 이미지센서는 나노기술이 적용된 수광부의 메커니즘을 이용함으로써 CMOS 공정을 통해 제작하면서도 CCD형 이미지센서보다 좋은 감도 특성을 갖는다고 주장하고 있다.

(4) CCD 및 CMOS 이미지센서의 픽셀 수광부는 모두 포토다이오드 구조를 가지고 있는 반면, 위 SMPD 이미지센서의 픽셀 수광부는 포토트랜지스터(모스켓) 구조이



고, 플로팅 게이트(Floating Gate)를 갖고 있다는 점에서 기존 기술과 구별되는 특징을 가지고 있다.

(5) 일반적으로 이미지센서는, ① 플래닛팔이와 같은 팹리스(Fabless: 자체 반도체 공장이 없는 회사)는 먼저 파운드리(칩을 직접 제작해주는 업체)를 선정하여 그 파운드리가 제공하는 설계양식에 따라 이미지센서의 회로를 설계하고, ② 시뮬레이션 작업(설계를 마친 상태에서 컴퓨터를 이용하여 그 성능을 모의실험하는 것)을 거쳐 파운드리에 실제 설계도면을 제출하며(설계도면 제출 단계를 '펩인(Fab-In)', 제작이 완료되어 칩을 제공받는 단계를 '펩아웃(Fab-Out)'이라고 한다). ③ 웨이퍼 형태로 펩아웃된 칩을 개별 칩으로 분리하는 패키징 작업을 한 다음, ④ 별도의 영상구현용 PCB 보드를 제작하여 패키징된 이미지센서칩을 구동시킴으로써 그 영상을 확인하거나 테스트를 하는 과정을 거쳐 제작된다.

나. 고감도 이미지센서 개발과제 및 그 기술이전계약의 체결 경위

(1) 전자부품연구원은 구 산업자원부(현재의 지식경제부, 이하 '산업자원부'라 한다)와 정보통신부가 전자부품의 국산화율 80%를 달성하기 위하여 공동으로 추진한 'Electro-0580' 사업에서 '나노기술을 이용한 초고감도 이미지센서 개발'을 사업과제로 지정받아 그 개발에 착수하였는데, 위·연구개발의 수행기간은 2002. 1. 1.부터 2006. 12. 31.까지로, 그 지원금은 약 100억 원으로 각 정해져 있었다.

(2) 피고인 김훈은 전자부품연구원 산하의 나노광전소자 연구센터장으로서 초고감도 이미지센서 개발의 책임자로 지정되었다.

(3) 한편 피고인       가 대표이사로 있는 플래닛팔이는 2003. 12. 24. 전자부품연구원과 사이에 기술료 50억 원 및 향후 매출액의 2%를 지급하는 것을 조건으로



하여 위 초고감도 이미지센서에 관한 기술이전계약을 체결하였고, 이에 따라 2004. 1.
26. 기술료 중 일부로 5억 원을 지급하였다. 그 후 2006. 2. 8. 최종적으로 기술료 총
액을 45억 원으로 하는 내용의 '기술실시에 관한 협약'을 체결하였고, 이에 따라 2005.
11. 10. 공개시연회 이후인 2005. 12. 15. 기술료 중 일부로 10억 원을 지급하는 등
2006. 6. 30.까지 나머지 기술료 41억 원을 모두 지급하였다.

(4) 플래닛팔이는 위 기술이전계약 체결 이후에 기술이전을 받기 위하여 별도로
건물을 임대하여 연구소를 설치하였고, 2004. 3.경 이미지센서의 신호처리회로를 설계
한 경험이 있는         과 신호처리회로 설계용역계약을 체결하였다.

다. SMPD 이미지센서의 개발과정과 2005. 11. 10. 공개시연회 개최 경위

(1) 피고인 김훈에 의하여 주도된 SMPD 이미지센서 개발과정 중 주요한 것들을
살펴보면 아래 표 기재와 같다.



| 순번 | 파운드리 업체 (칩 명칭) | 제작기간 (Fab In - Fab Out) | 비고 |
|---|---|---|---|
| 1 | TSMC (T1칩) | 2004. 6. - 2004. 7. | 아날로그 디지털 변환기(ADC)가 없는 것으로서 영상은 확인되었으나 노이즈가 많았음 |
| 2 | TSMC | 2004. 10. - 2004. 12. | 픽셀 없이 아날로그회로와 ADC만으로 구성된 신호처리 회로칩 |
| 3 | TSMC (T2칩) | 2004. 11. - 2005. 1. | 픽셀, 아날로그회로, ADC 등이 포함된 이미지센서칩으로서 T1칩보다 노이즈가 일부 개선되었음 |
| 4 | 매그너칩 (M1칩) | 2005. 7. - 2005. 8. | 2005. 11. 10. 공개시연회에서 사용된 칩 |
| 5 | 매그너칩 (M2칩) | 2006. 5. - 2006. 7. | 2007. 4. 30.자 검증위원회와 예비조사위원회에서의 검증에 사용된 칩 |
| 6 | IBM (I1칩) | 2007. 7. - 2007. 8. | 본조사위원회에서의 검증에 사용된 칩 |
| 7 | 매그너칩 (M3칩) | 2007. 9. - 2007. 11. | 본조사위원회에서의 검증에 사용된 칩 |

(2) 피고인 김훈과 그 연구원들은 휩아웃된 M1칩에 대한 테스트를 진행하던 중 2005. 10. 19.경 저조도에서 영상이 구현되는 칩을 확인하게 되었고, 이에 전자부품연구원장     , 피고인 김훈, 피고인     등이 참석한 가운데 내부시연회를 거쳤는데, 위 칩이 저조도에서 영상을 구현하는 것을 확인한     .는 전자부품연구원의 홍보팀에게 산업자원부에 보고하고 공개시연회를 개최할 것을 지시하였는데, 이 과정에서 피고인 김훈이나 피고인     .가 공개시연회의 개최를 제안하지는 않았다.

(3) 공개시연회는 산업자원부와 전자부품연구원의 공동 개최로 2005. 11. 10. 진행되었는바, 이때 SMPD 이미지센서와 다른 이미지센서들(PC 카메라와 일반 디지털 카메라)에 대한 비교시연이 이루어졌다.

(4) 위 공개시연회에서 산업자원부는 SMPD 이미지센서가 나노기술을 이용한 세계 최초의 고감도 이미지센서로서 기존 제품보다 500배 이상의 감도를 갖고 있으며, 내년 중 본격적인 양산체제에 돌입할 수 있을 것으로 예상된다는 보도자료를 배포하였다.

그런데, 위 보도자료는 전자부품연구원에서 초안을 제공하여 산업자원부 담당 서기관이 감도 부분 등 기술적 부분에 관하여는 피고인 김훈의 확인을 거쳐 작성을 하였으며, 플래닛팔이에서는 시장 규모와 마켓팅에 관한 자료만을 제공하였을 뿐이다. 그 후 플래닛팔이는 위 보도자료를 넘겨받아 영문으로 번역한 보도자료 및 한글 보도자료를 위 공개시연회 당시 배포하기도 하였는데, 그 내용은 산업자원부의 보도자료와 거의 유사하였으며, 피고인 ·    도 그 과정에서 보도자료 내용을 확인하기는 하였으나 따로 기술데이터를 제공하거나 보도자료를 수정하지는 않았다.

(5) 플래닛팔이는 위 공개시연회 이후 이준을 비롯한 6명의 마켓팅 직원을 신규



채용하여 마케팅팀을 만들었으며, 2006. 1.경 이미지센서에 대한 양산경험이 풍부한

을 기술연구소장으로 채용하고,          부장을 비롯한 10여 명의 연구인력을 채용

하여 자체적으로 완전 양산용 컬러버전개발에 착수하였으나 영상이 제대로 나오지 않

았다.

    (6) 플래닛칩이는 위와 같은 과정에서 2006. 1.경부터 매그너칩사 및 IBM과 최상

의 이미지센서 생산을 위한 전략적 제휴를 추진하기도 하였으나 무산되었다.

    라. 그 이후의 사건진행 경위

    (1) 한편 한국방송공사에서는 2007. 1.경부터 SMPD 이미지센서 기술에 대한 여

러 가지 의혹을 제기하였고, 이에 전자부품연구원은 2007. 4. 30. 대학교수 5인이 참

여하는 기술검증위원회를 열어 그 기술을 검증하였다(당시 참여한 검증위원들은

                    등이었다. 이하 '2007. 4. 30.자 검증위원회'라고 

한다).

    2005. 11. 10. 공개시연회에서 사용된 칩은 M1칩이었으나 2007. 4. 30.자 검

증위원회는 M2칩(아날로그회로로 일부를 보완하여 M1칩보다 노이즈가 좀 더 제거된

칩)을 이용하여 다른 이미지센서와의 비교 시연을 실시하였다.

    (2) 한국방송공사는 2007. 4. 30.자 검증위원회의 검증결과 발표 이후인 2007.

5. 20.경 KBS스페셜 <신기술이 만든 풍경 '대박과 의혹'>이라는 프로그램을 방영하여

SMPD 이미지센서 기술에 관한 의혹을 보도하였다.

    (3) 이에 전자부품연구원은 2007. 6.경 내부 검증위원들로 구성된 연구진실성검

증 예비조사위원회를 조직하여 SMPD 이미지센서의 기술을 검증하였고(당시 참여한

검증위원들은 전자부품연구원 소속의                              등이었

다. 이하 '예비조사위원회'라고 한다), 그 후 2007. 11.경 외부 전문가들로 구성된 연구진실성검증 본조사위원회를 조직하여 다시 그 기술을 검증하였다(당시 참여한 검증위원들은                                        등이었다. 이하 '본조사위원회'라고 한다).

   2. 위 항소이유 1의 가에 대하여(피고인        .의 2004. 12. 허위사실유포의 점)

   가. 공소사실의 요지 및 원심의 판단

      (1) 피고인   .는 2003. 12. 24. 플래닛팔이 명의로 전자부품연구원과 50억원을 지급하는 대가로 "나노이미지센서칩 개발"과 관련된 기술을 이전받는 계약을 체결하였다. 그러나 피고인      :는 2004. 8. 24. 플래닛팔이에서 실시한 유상증자시사채업자      로부터 빌린 약 19억 9,000여만 원의 유상증자 자금을 변제하지 못하였고, 월 5,700여만 원 가량이 이자로 지출되고 있었을 뿐만 아니라 매월 3~5억 원씩의 적자가 발생하고 있었으므로, 주가를 상승시켜 위 최현주가 담보로 갖고 있던 주식(153만주, 주당 1,300원)을 처분할 필요성을 갖고 있었다.

      그러던 중 피고인      는 2004. 10.경 실험 중이던 나노이미지센서칩이 저조도하에 영상구현이 가능하지 않다는 것을 확인하였음에도 앞서와 같은 필요성 때문에 마치 개발이 완료된 것처럼 공시하여 주가를 상승시키기로 마음먹게 되었다.

      그래서 피고인      는 누구든지 부당한 이득을 얻기 위하여 고의로 허위의 시세 또는 허위의 사실 기타 풍설을 유포하거나 위계를 쓰는 행위를 하여서는 아니됨에도 2004. 12. 6. 금융감독원 전자공시시스템에 '고감도 이미지센서 개발, 신제품의 개요 : 초고감도의 나노 CMOS 이미지센서, 기존의 표준 CMOS 공정을 이용한 VGA급 이미지센서, 신제품의 특징 : 빛이 거의 없는 저조도 상태에서 플래시 없이 촬영 가능,



신규제품 매출전망 : 2005년 분기별 매출전망, 카메라폰(VGA) 총 102억 원, 카메라폰(MEGA) 84억 원, CCTV 27억 원 합계 218억 원'이라고 허위사실을 공시하였고, 또 다시 2004. 12. 15. 한국경제TV와의 전화인터뷰에서도 "플래닛팔이의 이번 신제품이 30만 화소급이라는데 지금 제품들을 보면 300만까지 나와 있다. 어떻게 생각하는가"라는 기자의 질문에 "... 내년에도 세계적으로 30만 화소가 수류를 이루는 가운데 점차 메가급이 교체 수요로 발생하는 시점이라고 보기 때문에, 30만 화소에서 경쟁력을 갖춘 제품이 출시되는 것이라고 할 수 있습니다. ... 내년 상반기에 1.3메가, 2메가를 출시 준비중입니다"라고 말하는 등 마치 저조도에서 동영상 촬영이 가능한 이미지센서칩 개발이 완료되어 제품 생산이 곧 될 것처럼 답변함으로써 허위사실을 공표하였다.

　　(2) 위와 같은 공소사실에 대하여 원심은 피고인 　　　의 주장을 배척하고 공소사실을 유죄로 인정하였다.

　나. 판단

　　(1) 먼저 위와 같은 사실을 공표할 당시 피고인 　　　에게 허위사실 유포에 대한 인식 내지 범의가 있었는지에 관하여 본다.

　　위에서 든 증거들에 의하여 인정되는 다음과 같은 사정들, 즉 앞서 본 것처럼 플래닛팔이는 전자부품연구원과 50억 원이라는 거액에 기술이전계약을 체결하고 이미 일부 기술료를 지급하였으며, 연구소를 설치하는 등 기술개발을 위한 노력을 하여 왔고, 그 결과 피고인 김훈이 개발한 TI칩의 경우 비록 노이즈가 많았지만 일반 조도에서 영상은 확인되었으며 픽셀 감도 측정값도 2400v/lux.sec로서 기존 CMOS 이미지센서의 픽셀 감도(1~20v/lux.sec)에 비해 수 백에서 천 배 이상의 값을 나타내고 있었던 점,

이에 따라 피고인     으로서는 TSMC사에 제작을 의뢰한 T2칩의 경우 기존의 미비점을 보완하였으므로 개발의 성공을 기대할 수도 있었던 것으로 보이는 점, 그러한 과정에서 칩의 개발과 관련하여 문의가 폭주하자 증권회사 애널리스트들에게 당시 상황을 설명하기 위하여 위 공소사실 기재와 같이 고감도 이미지센서 개발 및 이미지센서의 개발이 성공할 경우를 예상하여 외부시장 조사기관들의 예상정보 예측치를 바탕으로 신규 제품 매출 전망에 관한 내용의 공시를 한 점, 플래닛팔이는 위 공시와 관련하여 위 공시는 예측정보이고 회사의 전략이나 시장 상황, 외부 환경변화에 따라 변경될 수 있으며 플래닛팔이가 공시내용에 대하여 법적인 책임을 지지 않음을 명확히 한 점, 한국경제TV와의 인터뷰도 같은 연장선상에서 T2칩 개발이 성공할 경우의 전망을 말한 것으로 보이는 점 등에 비추어 보면, 비록 결과적으로 위와 같은 공시 내지 인터뷰의 내용이 그대로 실현되지는 아니하였지만 그러한 사정만으로 그 당시 피고인        .에게 허위사실을 유포한다는 인식 내지 범의가 있었다고 단정할 수 없다.

  (2) 다음으로 부당한 이득을 얻을 목적이 있었는지 여부에 관하여 본다.

    플래닛팔이의 자금 사정이 어려운 상태에 있었다는 것은 앞서 본 바와 같으나, 한편, 앞서 든 증거들에 의하여 인정되는 다음과 같은 사정, 즉 그 당시 피고인    는 이미 시세조종 등 혐의로 금융감독원으로부터 조사를 받고 있었던 점, 위 공시 및 인터뷰를 전후하여 플래닛팔이의 주가에 별다른 변동이 없었던 점 등에 비추어 보면 피고인        가 주식의 시세조정을 통해 부정한 이득을 취득할 목적이 있었다고 인정하기도 어렵다.

  (3) 따라서, 위 공소사실은 범죄사실의 증명이 없는 경우에 해당하므로 형사소송법 제325조 후단에 의하여 무죄를 선고하여야 함에도, 원심은 사실을 오인하여 위 공소사

실을 유죄로 인정하는 잘못을 저질렀다.

  3. 위 항소이유 1의 나에 대하여(업무상횡령 부분)

  가. 주식회사의 설립업무 또는 증자업무를 담당한 자와 주식인수인이 사전 공모하여 주금납입취급은행 이외의 제3자로부터 납입금에 해당하는 금액을 차입하여 주금을 납입하고 납입취급은행으로부터 납입금보관증명서를 교부받아 회사의 설립등기절차 또는 증자등기절차를 마친 직후 이를 인출하여 위 차용금채무의 변제에 사용하는 경우, 위와 같은 행위는 실질적으로 회사의 자본을 증가시키는 것이 아니고 등기를 위하여 납입을 가장하는 편법에 불과하여 주금의 납입 및 인출의 전 과정에서 회사의 자본금에는 실제 아무런 변동이 없다고 보아야 할 것이므로 그들에게 회사의 돈을 임의로 유용한다는 불법영득의 의사가 있다고 보기 어렵다 할 것이고, 따라서 회사 자본이 실질적으로 증가됨을 전제로 한 업무상횡령죄가 성립한다고 할 수는 없으며(대법원 2004. 6. 17. 선고 2003도7645 전원합의체 판결 참조), 또한 이러한 법리는 증자등기절차를 마친 직후 납입금 중 일부를 인출하여 양도성예금증서의 형태로 위 차용금채무에 대한 담보로 제공한 경우에도 마찬가지라 할 것임은 위 피고인들의 주장과 같은바(대법원 2006. 9. 22. 선고 2004도3314 판결 참조), 이는 양도성예금증서의 경우 금융시장에서 무기명의 형태로 자유롭게 유통되는 환가성을 가지고 있어서 차용금채무에 대한 담보로 제공되었다 하더라도 담보로 받은 자가 임의로 제3자에게 양도하거나 현금화하여 변제에 충당할 수 있으므로 현금을 변제하는 경우와 동일하게 볼 수 있기 때문이다.

    그러나 납입된 주금이 일단 실질적으로 회사에 귀속되어 회사 자본을 증가시킨 이후에는 증자대금의 임의적 사용행위가 업무상횡령죄를 구성한다고 할 것이다.

  나. 이러한 전제에서 이 사건에 관하여 보건대, 위 증거들에 의하면, 피고인 ·



피고인      은 2005. 9. 2.자 유상증자대금 차용 이전에도 여러 차례 사채업자

·를 찾아가 유상증자대금을 빌렸고 그 당시에는 담보로 양도성예금증서를 제공하

였으며, 차용 및 채무변제 등 실무적인 일은 주로 피고인      이 담당해 왔던 사실,

피고인      는 다시 2005. 8. 22.  ·로부터 플래닛팔이의 2005. 9. 2.자 유상증

자대금 80억 원을 차용하되, 유상증자 완료 후 차용금액의 50%에 해당하는 담보를 제

공하고 2005. 10. 1.까지 차용원리금을 변제하기로 약정하였던 사실, 그런데 피고인

      는 일반 투자자들의 유상증자 참여가 저조하자 2005. 9. 2.   ·로부터 당초 약

정액보다 많은 96억 9,290만 원을 차용하였고, 유상증자대금 납입 직후 유상증자대금

이 입금되어 있던 기업은행 계좌에서 50억 원을 수표로 인출하여 바로 플래닛팔이의

우리투자증권 MMF 계좌에 입금한 다음 그 통장을      에게 담보조로 교부하였던

사실, 위 통장에 관한 도장은      가 플래닛팔이에 반환하여 플래닛팔이 측에서 계

속 보관하고 있었을 뿐만 아니라, 그 계좌는 고객출금 불응 등록이 되어 있어서

      가 위 통장으로부터 직접 금원을 인출하여 사용할 수 없었던 사실, 그 후      가

위 통장으로는 제3자로부터 자금을 활용하는데 사용할 수 없다면서 수표로 인출하여

줄 것을 요구하여 피고인      는 2005. 9. 12. 내지 같은 해 9. 30. 사이에 위 MMF

계좌에서 50억 원을 자기앞수표로 인출하여      ·에게 다시 담보로 제공하면서 그 통

장을 회수하였고, 피고인      는 위 수표를 다시 제3자에게 담보로 제공하고 금전을

융통하였던 사실(이후 피고인      는 2005. 10. 13.부터 같은 해 11. 14. 사이에

      로부터 위 50억 원 상당의 자기앞수표를 다시 회수하고, 이와는 별개로 50억 원

상당의 자기앞수표를 다시 변제조로 제공하였다), 그 후 위 피고인들은 다시 약 50억

원을 마련하여 플래닛팔이에 입금하여 회사 운영자금으로 사용한 사실, 그리고 피고인

은 플래닛팔이의 재무담당 이사로서 피고인        를 대신하여 위와 같은 업무

를 직접 처리하였던 사실을 인정할 수 있다.

위 인정사실에 의하면, 담보로 제공된 위 MMF 통장은 도장을 플래닛팔이에서

계속 소지하고 있었을 뿐만 아니라, 고객출금 불응 등록이 되어 있어서 위 통장에 입

금된 금원이        에 의하여 입금 즉시 인출이 예정되었다거나        가 바로 현금화

할 수 있는 상태에 있었다고 볼 수 없으므로 결국        에게 제공된 위 통장은 현금

이나 양도성예금증서와 달리 임의로 환가할 수 없는 담보에 불과한 것으로 보이고(최

현주도 원심에서 의 통장에서 위 피고인들이 돈을 찾아가면 그만이라고 생각하고 있었

다고 진술하고 있다), 이에 따라 위 피고인들이        의 요구에 따라 MMF 통장을 돌

려받으면서 그 통장에 입금된 50억 원을 인출하여        에게 다시 담보로 제공하기도

하였던 점에 비추어 보면, 의 MMF 계좌에 입금되어 있던 유상증자금 50억 원은 이미

플래닛팔이에 실질적으로 귀속되었다고 할 것이다.

따라서 위 피고인들이 피해자 플래닛팔이에 귀속되어 있던 자금을 인출하여 피고

인        의 개인 채무에 대한 담보로 제공한 행위는 업무상횡령죄를 구성한다고 봄이

상당하므로(피고인        에 의하면 그 이전에 양도성예금증서를 담보로 주었다가 금

융감독원 조사에서 고생한 적이 있어        와 협의하여 MMF 통장을 담보로 제공한

것이라고 진술하고 있는바, 이는 위 피고인들도 MMF 통장의 경우 위 예금의 소유주가

여전히 플래닛팔이므로 이를 단순히 담보로 제공하는 형식을 취하면 환가성이 있는 양

도성예금증서보다 횡령의 소지가 덜 할 것으로 인식하고 있었음을 알 수 있다), 위 피

고인들의 위 주장은 이유 없다.

4. 위 항소이유 1의 다에 대하여(피고인        의 2005. 11. 허위사실유포의 점)

가. 공소사실의 요지 및 원심의 판단

(1) 피고인          는 원심 판시 범죄사실 1의 가항 기재 유상증자시 빌린 사채
도 상환하지 못한 상태에서 2005. 9. 2. 유상증자를 실시하면서          로부터 다시 사
채 97억 원을 빌려서 총 427만주를 취득하였으나, 이를 변제하지도 못한 채 주가가
하락하여 2005. 10.경          가 반대매매를 실시하는 등 채무 상환압박에 시달리게 되
자 본건 이미지센서칩의 기술개발이 완료되지 않았음에도 마치 완료되어 곧 제품생산
이 가능하고 매출을 올릴 수 있는 것처럼 허위로 공표할 필요성이 있었다.

그러던 중 피고인          .는, 누구든지 부당한 이득을 얻기 위하여 고의로 허위의
시세 또는 허위의 사실 기타 풍설을 유포하거나 위계를 쓰는 행위를 하여서는 아니됨
에도 2005. 11. 10. 서울 강남구 삼성동 소재 코엑스 인터콘티넨탈호텔에서 개최된 나
노이미지센서칩 개발시연회에서 "고감도 나노이미지센서칩 상용화칩, (세계)최초 개발
성공"이라고 기재된 구 산업자원부(현 지식경제부, 이하 '산업자원부'라 한다) 자
료 및 플래닛팔이 보도자료를 배포하고 이를 발표하였으며, 또 조선일보 등 8개 일간
지 등 언론매체에 마찬가지로 "고감도 사진·동영상 나노센서칩 세계 최초 개발, 3개월
내 양산 가능 혹은 내년 중 본격적인 양산체제 돌입 내지 93% 수율(제작성공률)" 등
의 기사를 게재케 하였다.

그러나 사실은 ① 본건 이미지센서칩이 비디오, CCTV, PC카메라 등 다른 동영
상을 촬영할 수 있는 제품보다 성능이 좋지 않으므로 기존 이미지센서보다 500배 이
상의 감도를 갖는 '고감도 이미지센서칩'을 세계 최초로 개발성공하지 않았고, ② 시연
회를 하면서 이미지센서의 성능을 비교시연하는 방법으로 우수성을 입증하려고 하는
경우 카메라는 빛의 양에 따라 그 성능에 차이가 있으므로 빛을 받아들이는 조건을 동

등하게 해야 함에도 적외선 방출양이 많은 150와트의 할로겐등을 설치한 다음 비교대
상 다른 카메라들은 적외선을 차단하는 필터를 부착하고 본건 이미지센서칩에는 적외
선차단필터를 장착하지 않아 비교대상 카메라보다 빛의 양을 많이 감지할 수 있도록
준비한 상태에서 대부분의 가시광선을 차단하고 적외선은 투과시키는 성질을 가진 ND
필터를 이용하여 밝기를 조절함으로써 점차 눈에 보이는 밝기가 어두워짐에 따라 본건
이미지센서칩만 작동하는 도습을 보임으로써 마치 성능이 다른 카메라보다 우수한 것
처럼 속임수를 사용하여 시연하였으며, ③ 또한 노이즈제거 등 성능개선, 신뢰성테스
트, 기술이전 등 기술문제 및 자금력 부족으로 양산에 상당한 시간이 소요되기 때문에
3개월 내 양산이나 그 다음해 제품 양산체제 돌입이 불가능한 것이었음에도 이를 속이
고 발표함으로써 허위사실을 유포하였다.

　　그로 인하여 플래닛팔이의 주가를 4,300원에서 46,950원으로 급등케하여 피고인
　　는 2005. 11. 20.부터 2006. 4. 10.까지 차명인　　　　등 22명 명의로 보유하
고 있던 243만 2,917주를 매도함으로써 합계 25,748,140,864원 상당의 부당이득을
취하였다.

　　(2) 위와 같은 공소사실에 대하여 원심은 피고인　　　가 플래닛팔이의 자금난
을·해결하기 위하여 고의로 허위의 사실을 유포하거나 공개시연회에서 위계를 사용하
였다고 봄이 상당하다고 하면서, 피고인　　　.의 주장을 배척하고 공소사실을 유죄로
인정하였다.

　　나. 판단

　　물론, 위 공소사실과 같이 그 당시 피고인·　　　는 채무 상환압박에 시달리고
있었고, 공개시연회 및 보도자료 발표 등을 통하여 플래닛팔이의 주가가 대폭 상승함

으로써 결과적으로 상당한 이득을 취득하였으며, 현재까지도 제품의 상용화가 이루어지지 않았다는 점에서, 피고인 ·      가 SMPD 이미지센서의 기술이 허위임을 인식하면서도 허위사실을 유포하거나 위계를 사용한 것이 아닌가 하는 강한 의심이 드는 것도 사실이다.

그러나 다음과 같은 사정들에 비추어 보면, 위 공개시연회나 보도자료에서 위 SMPD 이미지센서의 기술이 사실과 다르게 허위로 발표되었다고 단정하기는 어렵고, 설사 위 기술이 공개시연회에서의 발표나 보도자료 내용과 차이가 있다 하더라도 그 당시 피고인      가 그러한 사실을 인식하고도 고의로 허위사실을 유포하였다거나 위계를 사용하였다고 보기도 어렵다.

(1) 허위사실유포 또는 위계사용에 해당하는지 여부

(가) 일반적인 이미지센서의 감도의 정의에 관하여

원심은 SMPD 이미지센서의 감도가 기존 제품에 비해 500배 이상인지 여부를 일반인의 관점에서 판단해야 한다고 전제하면서 영상감도를 기준으로 볼 때 기존 제품보다 500배 이상이라는 내용은 허위라는 취지로 판단하였는바, 일반인들의 입장에서 센서의 감도가 500배 이상이라고 할 경우 영상의 품질 내지 영상감도가 500배 이상 좋다는 것으로 생각할 여지가 있다는 점에서 원심의 판단을 수긍할 수 있는 여지도 있다.

그러나, 본조사위원회의 보고서에 의하면 이미지센서의 성능지표로 표현되는 감도는 여러 문헌에서 포토디텍터의 감응도, 감도, 단위 픽셀의 감도 등이 혼용되어 사용되고 있고, SMPD 이미지센서의 감도가 기존칩 대비 500배라는 것은 SMPD 이미지센서가 얼마나 적은 빛에서도 영상을 구현할 수 있는 의미있는 '신호'를 검출할 수 있는지



를 의미한다고 하고 있으며, 그와 같은 표현 자체에 부정이나 오류는 없다고 하고 있는 점(특히 위 본조사위원회 5차 회의록에 의하면 감도의 정의로 통용되는 방법은 여러 가지가 있으며 연구책임자가 발표하였던 방식, 즉 다른 조건은 변동시키지 않고 조도를 낮춰가면서 영상을 인식할 수 없는 시점의 조도 차이를 감도의 차이로 정의하는 것도 틀린 것이 아니라고 기재되어 있다), 이미지센서 전문가와 이미지센서 제조업체에서는 일반적으로 이미지센서의 감도를 'v/lux.sec'로 표현하고 있는 점(본조사위원회 위원이던 원심 증인        은 픽셀 감도를 기준으로 SMPD 이미지센서의 칩의 감도를 표현하는 것은 옳은 방법이라고 진술하였고, 이미지센서 감도 전문가인 원심 증인 :

도 통상적으로 영상감도라는 표현을 사용하지 않는다고 진술하였으며, 마이크론사, 하이닉스 등 이미지센서 제조업체들도 이미지센서의 감도를 픽셀의 감도로 표기하고 있다), 영상의 품질은 이미지센서 자체의 성능뿐만 아니라 영상보정회로(ISP)의 성능에 의해서도 결정되는 점 등에 의하면, 영상의 품질은 별론으로 하더라도 이미지센서의 감도를 픽셀의 감도로 표기한 것 자체에 허위가 있다고 보기는 어렵고, 용어의 혼용으로 인한 오해에 기인한 것으로 보일 뿐이다.

(나) 500배 감도의 칩을 세계 최초로 개발했다는 부분에 관하여

살펴건대 위에서 든 증거들에 의하여 인정되는 다음과 같은 사정들, 즉 이미지센서의 픽셀의 감도는 'v(전압)/lux(조도).sec(시간)'으로 표현되는데, SMPD 이미지센서의 픽셀 감도는 2400v/lux.sec로서 기존 CMOS 이미지센서의 픽셀 감도(1~20v/lux.sec)에 비해 수백에서 천 배 이상의 값을 나타내고 있고 이는 2007. 4. 30.자 검증위원회, 예비조사위원회, 본조사위원회에서도 모두 인정된 점, 보도자료의 작성과 관련하여 산업자원부에서 구체적인 수치를 요청해와 피고인 김훈으로서는 위와 같



은 픽셀감도의 수치를 고려하여 500배 감도를 사용해도 무방하다고 해서 500배 감도 부분이 보도자료에 기재된 점, 특히 2007. 4. 30.자 검증위원회는 'SMPD 이미지센서가 긴 파장인 900-1000nm(근적외선 파장대역)에서는 감도가 우수함을 확인할 수 있었다 '고 판단하였고, 본조사위원회에서 증거자료로 채택한 예비조사위원회도 다른 제품들과 의 비교 시연을 거친 다음, 'SMPD 이미지센서가, 형광등 광원에서는 저가형 PC 카메 라 대비 200배의 감도를 보였고, 백열등 광원에서는 H사 CMOS 대비 5000배, 저가형 PC 카메라 대비 8000배의 감도를 보였나. SMPD 이미지센서가 촛불 광원에서는 1룩스 이하의 저조도에서도 영상을 구현하였는데 그 외의 나머지 비교대상 이미지센서들은 전혀 영상을 구현하지 못하였다'고 판단하면서 피고인 김훈의 감도 관련 실험 및 시연 방법상에 부정은 없었던 것으로 결론을 내린 점, 본조사위원회 역시 'SMPD 이미지센 서는 짧은 적분시간에 기인하여 기존 이미지센서의 광반응 특성 값보다 수 백에서 수 천 배 이상의 값을 가지고, 단위픽셀의 감도측정 값은 짧은 적분시간으로 인해 기존 CMOS 이미지센서의 픽셀감도에 비해 수 백에서 수천 배 이상의 값을 나타낸다'고 판 단한 점, 본조사위원회는 또한 '연구책임자가 측정한 감도 측정 장비 및 측정방식도 적 정하게 이루어지고 있음을 확인. 현재까지 조사위원회에서 확인한 바로는 연구책임 자가 연구부정을 의도하였거나 연구 부정을 하였다는 증거는 찾을 수 없었음'이라고 판단하였고, 이러한 판단에 대하여 이의를 제기한 위원은 없었던 것으로 보이는 점, 본 조사위원회에서는 A사 CCTV(Sony사 CCD 칩 내장)와 비교시연 결과 SMPD 이미지센 서의 영상 감도가 높다고 하기는 어렵다고 판단하면서도 다만 SMPD 이미지센서는 칩 이 현재 Bare 상태로 계속 개발을 진행하고 있고, 비교 대상의 CCD 칩은 이미 상용화 되어 군사용 등으로 사용되는 고가의 최첨단 이미지센서로서 많은 영상보정회로를 포

함하고 있다는 점을 고려할 때 정확한 비교가 어려운 측면이 있으며, 저조도에서의 영상 확인 결과 양자 모두 0.1lux 이하에서 영상을 확인할 수 있었던 점(물론 그 당시 사용된 칩은 M3칩으로 공개시연회에서 실제 사용된 M1칩과 달리 회로 처리부에 저항 대신 커패시터를 사용함으로써 기존의 칩에 비해 노이즈를 상당 부분 해결하였다는 점에서 M1칩의 영상감도가 더 좋지 못하였을 것이라는 원심의 판단이 수긍이 가나, M3 칩은 이미지센서의 핵심적인 기술인 픽셀 부분이 아니라 잡음을 개선하기 위하여 일반적으로 사용하는 기술인 커패시터 부분만을 바꾼 것에 불과하고 앞서 본 것처럼 감도를 단위픽셀의 감도로 이해하는 이상 500배 감도라는 표현 자체에 부정이 있다고 보기는 어렵다) 등에 비추어 보면, 이 부분 발표 내용이 SMPD 이미지센서가 갖는 기술적인 특성에 근거한 것으로 같도 500배 기재 부분과 관련한 발표내용이 허위라고 단정하기는 어렵다.

  (다) 공개시연회에서 위계를 사용하였다는 부분에 관하여

   앞서 든 증거들에 의하면, SMPD 이미지센서는 특히 적외선 파장대에서 다른 이미지센서보다 높은 감도 특성을 나타냈으며, 위 공개시연회 당시 적외선 방출량이 많은 150와트 할로겐등이 설치되어 있었고, 조도 조절에 사용된 ND필터 역시 가시광선은 상당 부분 차단하는 반면, 적외선은 상당 부분 투과시키는 특성을 갖고 있었던 점은 인정이 된다.

   그러나, 앞서 든 증거들에 의하여 인정되는 다음과 같은 사정들, 즉 이 사건 공개시연회는 앞서 본 바와 같이 전자부품연구원의 내부시연회 직후 원장인       의 지시에 의하여 급하게 이루어진 것으로, 공개시연회의 개최와 관련하여 피고인      ·나 플래닛팔이는 필요한 장소를 섭외하고, 인형, 디지털카메라 등의 도구를 준비하는 역할

을 맡았을 뿐 공개시연회의 개최나 진행과 관련하여 주도적인 역할을 하지는 않은 점,

예비조사위원회의 검증 당시 SMPD 이미지센서 베어칩과 CMOS 이미지센서 베어칩,

CCD가 장착된 CCTV, CMOS 이미지센서가 장착된 PC 카메라 등 4대를 적외선차단필

터를 제거한 채 비교시연하였고(다만 PC 카메라의 경우 적외선차단필터를 제거하는

것이 어려워 그대로 부착한 상태였다), 그 결과 적외선이 거의 없는 형광등을 광원으

로 사용한 경우에 SMPD 이미지센서 베어칩만 흑백은 0.8lux, 컬러는 0.5lux에서 영상

을 구현하였고, PC 카메라의 경우 100lux, CMOS칩의 경우 50lux, CCTV의 경우

20lux부터 영상을 구현하지 못하였으며, 백열등 광원에서는 SMPD 이미지센서 베어칩

의 경우 0.01lux 이하에서도 영상을 구현하였고, PC 카메라의 경우 80lux, CMOS칩의

경우 50lux, CCTV의 경우 0.04lux까지 동영상을 구현하는 것이 확인된 점(이 과정에

서 특히 저가형 PC카메라에 설치된 적외선차단필터는 대부분의 적외선을 투과시키는

것으로 확인되기도 하였다), 위와 같은 결과는 공개시연회 당시 비교대상 이미지센서

들은 ND필터를 사용하기 훨씬 전부터 동영상을 구현하지 못하였던 사실과 일치하는

점, 이와 같이 비교대상 이미지센서들이 동영상을 구현하지 못하는 상황에서 조도조절

기로 더 이상 조도를 낮출 수 없게 되자 조도조절을 위하여 광원을 움직이지 않고도

광량을 조절하는 효과가 있는 ND필터를 사용한 것으로 볼 수도 있는 점(피고인 ·

나 피고인 김훈이 ND필터의 특성을 알면서 의도적으로 ND필터를 사용하였다고 볼

만한 증거도 없다), 위 비교시연회 당시 비교대상 이미지센서들에는 집광량을 높여 감

도를 향상시켜 주는 마이크로렌즈 등의 영상보정회로가 부착되어 있었으므로 공개시연

의 조건이 반드시 SMPD 이미지센서에 유리한 것만은 아니었던 점, 위 공소사실에는

'비교대상 다른 카메라들은 적외선을 차단하는 필터를 부착하고 본건 이미지센서칩에

는 적외선차단필터를 장착하지 않아' 라고 표현하여 의도적으로 피고인        나 피고

인 김훈이 적외선차단필터의 장착 여부를 소삭한 것으로 오해할 소지가 있게 기재되어

있으나 분리가 어려워 부착된 적외선차단필터를 제거하지 아니하였을 뿐 의도적으로

장착한 것은 아닌 점, 피고인        나 피고인 김훈이 공개시연회와 관련하여 연구개

발팀의 다른 연구원들조차도 속이고 위계를 사용하였다고 보기 어려운 점, 예비조사위

원회 및 본조사위원회도 위와 같은 실험결과에 기초하여 피고인 김훈의 감도 측정 장

비나 방식에 부정은 없었다고 판단하면서 적외선 센서라는 방송보도는 잘못된 것이라

고 인정한 섬 등에 비추어 보면, 공개시연회 당시 적외선차단필터의 부착 여부나 ND

필터의 사용 여부가 결과에 큰 영향을 주지 않았다고 볼 수도 있으므로 피고인

가 피고인 김훈과 공모하거나, 또는 피고인 김훈이나 다른 연구원들조차도 모르게 의

도적으로 위계를 사용하였다고 보기 힘들다.

  (라) 3개월 또는 내년(2006.) 중 양산가능성 주장 부분에 관하여

    2005. 11. 10. 공개시연회에 참석했던        (한국경제신문 기자),        (전

자신문 기자)은 검찰 및 원심에서 '피고인        와 피고인 김훈이 3개월 내의 양산가

능성을 언급하였다'고 진술하고 있고, 그 외에 한국일보와 서울경제신문 등 일부 신문

들에서도 같은 취지의 기사가 보도된 것은 사실이다.

    그러나 당시 공식적으로 배포된 보도자료에는 내년 중 양산화가 가능하다는 기

재가 있을 뿐 3개월 내의 양산 가능성에 관하여는 아무런 기재가 없고 공식적인 기자

회견에서도 3개월 내의 양산 가능성에 관한 발언이 없는 점, 그 무렵 발행된 신문들

중 '3개월 내의 양산가능성'을 보도하지 아니한 신문들도 일부 존재하는 점, 이경우,

    의 진술은 진술 당시로부터 대략 2년 전에 있었던 발언에 관한 것으로 피고인



김훈,        증 누가 3개월 내의 양산가능성을 언급했는지 반드시 명확하다고 볼 수

만은 없는 점. 가사 위 피고인들이 3개월 내의 양산가능성을 언급했다고 하더라도 공

식적인 기자회견 자리가 아닌 몇몇 기자들과의 사적인 대화에서 공개시연회 이후 기술

개발 과정이 순조롭게 진행된다면 3개월 내에도 양산이 가능할 수도 있을 것이라는 기

대를 표명한 것에 불과하다면 그것만으로 위 발언이 허위라고 단정할 수는 없는 점 등

을 종합하면, 피고인        가 허위사실을 발표하였다고 보기 어렵다.

다음으로 내년 중 양산가능성 부분에 관하여 보건대, 앞서 본 바와 같이

SMPD 이미지센서의 기술이 허위라고 단정할 수 없는 점, 공개시연회 이후 기술유출

사건과 관련한 검찰 수사, 전략적 제휴업체의 변경, 한국방송공사의 보도 및 이와 관련

한 검증절차, 이 사건 수사 등이 개발과정에 끼친 영향을 무시할 수 없는 점, 본조사위

원회에서도 저조도에서의 영상 확인 결과 공개시연회 이후 개량된 SMPD 이미지센서

(M3칩)와 CCTV 모두 0.1lux 이하에서 영상을 확인할 수 있었고 M3칩의 경우 회로 처

리부에 저항 대신 커패시터를 사용함으로써 논란이 되었던 노이즈를 상당 부분 해결하

였음을 인정하고 있기도 한 점, SMPD 이미지센서가 단순히 연구·개발 차원에서 만들

어진 실험실용 제품이 아니라 양산화가 가능한 Fab공정을 이용하여 제작된 점, 공개시

연회 이후 플래닛팔이의 자체 양산팀을 통하여 컬러버전의 칩 개발에 착수하기도 한

점 등에 의하면, 현재까지 양산화가 이루어지지 아니하였다는 점만으로 공개시연회 당

시 양산가능성이 전혀 없었다고 인정하기는 어렵다.

(2) 피고인        의 범의 인정여부

앞서 든 증거들에 의하여 인정되는 다음과 같은 사정들, 즉 이 사건 공개시연회

는 앞서 본 바와 같이 전자부품연구원의 내부시연회 직후 원장인        의 지시에 의

하여 급하게 이루어진 것으로, 공개시연회의 개최나 진행과 관련하여 피고인       니

플래닛팔이가 주도적인 역할을 하지는 않은 점, 이 사건 나노이미지센서 기술은 국책

과제로 선정되어 국가의 예산지원을 받으며 수행되어 왔던 기술인 점, 배포본 보도자

료의 기술적 부분 작성과 관련하여 앞서 본 것처럼 그 내용이나 문구에 관하여 피고인

       나 플래닛팔이에서 직접적으로 관여하지 아니하였고 산업자원부에서 주도적으로

작성한 점, 공개시연회 당시에도 언론을 상대로 한 발표는       가 하면서 양산 내지

상용화 가능성에 관하여도 그가 직접 언급을 한 점, 피고인       는 위 공개시연회

이후 여러 차례에 걸쳐 나머지 기술료 41억원을 모두 지급하였고 마케팅 및 연구를 위

하여 신규인력을 충원한 점, 연구진실성검증 예비조사보고서에 의하면 연구원들조차도

자신이 수행·개발한 기술에 대해 기존 기술과 차별성이 있다고 판단하고 있는 점(연구

원 중 한 사람인       도 원심에서 SMPD 이미지센서가 픽셀레벨에서는 초고감도라고

할 수 있다고 진술하고 있다), 전문가들 사이에서도 이 사건 이미지센서 기술의 실체

여부에 관하여 의견이 대립되고 있는 점, 단지 대학에서 사진학을 전공하고, 사진기자

경력이 있다는 점만으로 피고인       가 할로겐등과 ND 필터의 특성을 정확히 인식

하고 공개시연회에서 다른 연구원들까지 속이면서 위계를 사용하였다고 인정하기는 어

려운 점, SMPD 이미지센서 관련 특허들이 이미 일부 등록이 된 점 등을 종합하면, 피

고인       에게 허위사실 유포에 대한 범의가 있었다고 쉽사리 인정하기도 어렵다.

        (3) 따라서, 위 공소사실은 범죄사실의 증명이 없는 경우에 해당하므로 형사소송

법 제325조 후단에 의하여 무죄를 선고하여야 함에도, 원심은 사실을 오인하여 위 공

소사실을 유죄로 인정하는 잘못을 저질렀다.

        5. 위 항소이유 1의 라에 대하여(피고인       의 범죄수익가장의 점)

가. 공소사실의 요지 및 원심의 판단

    (1) 피고인       는 원심 판시 범죄사실 2.항 기재 범행으로 취득한 부당이득금
을       ·로부터 건네받자 제3자인       계좌로 입금하여 금융감독원 및 수사기관
등의 추적 등을 회피하기로 마음먹었다.

       피고인       는 2006. 2. 20. 성남시 분당구 소재 현대증권 분당지점에서
    명의의 계좌를 개설한 다음 위 부당이득금 중 일부인 자기앞수표 27장 합계
1,690,000,000원을 입금한 것을 비롯하여 원심 판시 별지1 '       증권계좌 입금내역'
기재와 같이 총 6회에 걸쳐 금액 합계 11,040,000,000원인 자기앞수표 총 126장을 각
입금하여 범죄수익 등의 취득 또는 처분에 관한 사실을 가장하였다.

    (2) 위와 같은 공소사실에 대하여 원심은 피고인       의 주장을 배척하고 공소
사실을 유죄로 인정하였다.

나. 판단

    그러나, 위 4항에서 본 것처럼 피고인       에 대하여 2005. 11. 허위사실유포로
인한 증권거래법위반이 성립하지 않으므로 피고인       가 주식가격의 상승으로 인해
얻은 이득을 범죄수익이라고 볼 수 없고, 달리 피고인       기 취득한 이득이 범죄수
익에 해당한다고 볼 민한 증거가 부족하다.

    따라서, 위 공소사실은 범죄사실의 증명이 없는 경우에 해당하므로 형사소송법
제325조 후단에 의하여 무죄를 선고하여야 함에도, 원심은 사실을 오인하여 위 공소사
실을 유죄로 인정하는 잘못을 저질렀다.

    6. 위 항소이유 1의 마에 대하여

    앞서 든 증거들에 의하면 피고인       은 플래닛팔이의 재무담당 이사로서 사채업



자        로부터 자금을 조달하거나 변제하는 등 대부분의 행위를 피고인        :를 대

신하여 한 사실을 인정할 수 있는바, 피고인        의 지위, 자금조달에의 관여 정도

등에 비추어 보면, 피고인 '        .이 피고인        와 공모하여 플래닛팔이로 하여금

채무보증을 하게 하였음이 인정된다. 따라서 피고인        의 위 주장은 이유 없다.

    7. 피고인        의 양형부당 주장에 대하여

    비록 피고인        이 피고인        .와 공모하여 횡령한 플래닛팔이의 자금이 50억

원에 이르는 거액이기는 하나, 그 이후에 횡령한 금액이 플래닛팔이에 반환된 점, 이

사건 횡령행위의 특성에 비추어 그 가벌성이 크다고 보이지 않는 점, 피고인        !은

피고인        의 지시에 의해 이 사건 범행에 가담한 것으로 그 가담 정도가 무겁다고

할 수 없는 점, 초범인 점 등 형법 제51조에 정한 여러 양형 조건에 비추어 보면, 원심

이 피고인        에게 선고한 형은 다소 무거워서 부당하다.

## IV. 검사의 항소이유에 대한 판단

  1. 검사의 위 항소이유 1에 대하여

  가. 공소사실의 요지

      이 부분 공소사실의 요지는, 피고인        :가 판시 범죄사실 제2항 기재와 같이

2005. 11. 10. 허위사실을 유포함에 있어 ① 사실은 SMPD 이미지센서에 나노기술이

사용되지 아니하였고, 수율 93%를 달성하였다고 볼 만한 아무런 실험자료가 없음에도

불구하고, 판시 범죄사실 제2항 기재와 같은 발표를 함으로써 허위사실을 유포하였다

는 것이다.

  나. 판단

  (1) 먼저 나노기술 사용여부에 관하여 본다.

피고인 김훈도 검찰에서 SMPD 이미지센서가 나노공정을 이용한 나노기술은 아님을 인정하고 있다. 그러나 나노기술은 나노공성을 이용한 경우뿐만 아니라, 양사현상이 나타나는 경우에도 나노기술에 해당한다고 볼 수 있다.

원심은 위 증거들에 의하여 인정되는 다음과 같은 사정들, 즉, ① 2004. 4. 30.자 검증위원회는 '관점에 따라서는 상이할 수 있으나, SMPD 이미지센서칩의 구조가 가지는 양자적 성질을 고려했을 때 나노기술이 채용되었다고 판단'하였던 점. ② 본조사위원회에서도 '피고인 김훈에 의해 이론적 가설이 제시되었는데 현재 학계에 알려진 이론으로는 이에 관한 명쾌한 설명이 어려워 명확한 판단을 내리기 어렵고, 따라서 SMPD 이미지센서에 적용된 기술이 나노기술이 아니라고 단정할 수 없다'고 결론지었던 점, ③ 이에 반하여 증인                  등은 SMPD 이미지센서에 적용된 기술이 나노기술이 아니라는 취지로 진술하고 있으나, 나노기술의 개념이 광범위한 것을 고려할 때 SMPD 이미지센서칩에 나노기술이 적용되지 않았다고 단정할 수 없는 점 등을 종합적으로 고려하면, 검사 제출의 증거만으로는 SMPD 이미지센서에 나노기술이 적용되지 아니하였다는 사실을 인정하기 부족하고 달리 이를 인정할 증거가 없다고 판단하였는바, 원심의 위와 같은 판단을 기록과 대조하여 살펴보면 원심의 판단은 수긍이 되고 거기에 채증법칙을 위반하여 사실을 오인하거나 법리를 오해하여 판결에 영향을 미친 위법이 있다고 할 수 없다. 결국, 검사의 위 주장은 이유 없다.

(2) 다음으로 수율 93% 주장에 관하여 본다.

원심은 위 증거들에 의하여 인정되는 다음과 같은 사정들, 즉, ① SMPD 이미지센서의 제작에는 이미 상용화된 Mixed Signal 표준공정이 그대로 사용되었던 점, ② 그런데 파운드리 업체들은 위 공정에 관하여 이미 90% 이상의 수율을 보장하고 있었



던 점(원심 증인　　　의 진술,　　에 대한 검찰 제2회 진술조서) 등을 고려하면,

검사 제출의 증거만으로는 이 부분 진술이 허위라는 사실을 인정하기 부족하고 달리

이를 인정할 증거가 없다고 판단하였는바, 원심의 위와 같은 판단을 기록과 대조하여

살펴보면 원심의 판단은 수긍이 되고 거기에 채증법칙을 위반하여 사실을 오인하거나

법리를 오해하여 판결에 영향을 미친 위법이 있다고 할 수 없다(　　·도 원심에서 공

개시연회 당시 100여 개의 M1칩을 생산하였는데 영상이 구현되는 칩 수를 검사한 결

과 93% 정도가 구현되었다고 진술하고 있다). 결국, 검사의 위 주장도 이유 없다.

　2. 검사의 위 항소이유 2에 대하여

　가.　공소사실의 요지

　　이 부분 공소사실의 요지는, 피고인 김훈이 원심 판시 범죄사실 제2항 기재와 같

은 피고인　　:의 범행에 공모하여 가담하였다는 것이다.

　나.　판단

　　그러나, 2005. 11. 10. 공개시연회에서 허위의 사실이 유포되었다거나 공개시연회

방법에 관하여 위계의 사용이 있었다고 인정하기 어려움은 앞서 본 바와 같고, 그 당

시 공개시연회를 연 것은 나노기술을 이용한 이미지센서의 원천기술을 확보했다는 것

을 발표하기 위한 것으로 보일 뿐이고, 피고인 김훈에게 피고인　　의 주식 매매에

영향을 주어 유가증권의 매매 기타 거래와 관련하여 부당한 이익을 얻기 위한 목적이

있었다고도 보이지 아니하므로, 검사 제출의 증거만으로 이 부분 공소사실을 인정하기

부족하고 달리 이를 인정할 증거가 없다.

　　따라서, 같은 취지에서 무죄를 선고한 원심의 판단은 정당하고 검사의 위 주장은

이유 없다.



3. 검사의 위 항소이유 3에 대하여

가. 공소사실의 요지

이 사건 나노이미지센서칩 개발은 전자부품연구원이 정보통신연구진흥원이 관리하는 정보화촉진기금에서 지원되는 연구개발비를 지원받아 개발하는 연구과제로서 1년마다 정보통신연구원에게 그간 연구성과를 보고하고 평가받아 연구개발비의 지원여부가 결정되고 있었다.

피고인 김훈은 2006. 3. 27. 대전 유성구 엑스포로 소재 정보통신연구진흥원에서, 사실은 원심 판시 범죄사실 제2항 기재와 같이 기존의 다른 동영상을 촬영할 수 있는 제품보다 우수하다고 볼 수 없고 세계 최초의 신기술도 아님에도 이를 담당하는 직원에게 2005. 11. 10. 시연회에서 발표한 내용을 소개하면서 본건 나노이미지센서칩이 세계최고의 신기술로 평가되는 것처럼 허위로 보고하고 연구개발비 지급신청을 하여 이에 속은 직원으로부터 2006. 7. 25. 전자부품연구원 개발책임자 피고인 명의로 19억 2,000만 원의 연구개발비를 지급받아 사람을 기망하여 재물의 교부를 받았다.

나. 판단

이 사건 기록에 의하면 피고인 김훈이 위 공소사실 기재와 같은 방법으로 연구개발비 19억 2,000만 원을 지급받은 사실이 인정되므로, 피고인 김훈에게 이에 관한 편취의 범의가 있었는지에 관하여 살핀다.

그런데 위에서 든 증거들에 의하여 인정되는 다음과 같은 사정들, 즉, 앞서 본 바와 같이 이 사건 이미지센서 기술이 허위라거나 나노기술을 채용하지 않았다고 단정할 수 없는 점, 2007. 4. 30.자 검증위원회는 '기존 이미지센서는 빛의 세기에 따른 전자나 홀의 숫자를 직접 검출하는데 비해서 SMPD 이미지센서의 기술은 화소를 구성하는



모스펫(MOSFET)의 문턱전압에 변화를 감지하는 원리이고, 이러한 차이에 따라 구조 공정과 회로기술이 달라지므로 기존 기술에 비해 차별성 있는 기술'이라고 판단하였고, 본조사위원회 역시 'SMPD 이미지센서는 플로팅 게이트 구조의 포토트랜지스터 원리라 는 측면에서 PN 포토다이오드의 원리를 적용한 CCD 및 CMOS 이미지센서칩과는 구조 와 동작원리가 다르며 제작비용의 절감도 가능하다'라고 판단하기도 하였던 점 등에 비추어 볼 때, 피고인 김훈이 2006. 3.경 연구개발비를 신청함에 있어 SMPD 이미지센 서의 기술적 특성과 전혀 무관한 허위의 사실을 적시하였다고는 보기 어려운 이상, 검 사 제출의 증거만으로 피고인 김훈에게 편취 범의가 있었음을 인정하기 부족하고 달리 이를 인정할 증거가 없다.

따라서, 같은 취지에서 무죄를 선고한 원심의 판단은 정당하고 검사의 위 주장은  이유 없다.

4. 검사의 위 항소이유 4에 대하여

가. 공소사실의 요지

이 부분 공소사실의 요지는, 피고인        이 원심 판시 범죄사실 제1의 가.항 기재와 같은 피고인        .의 범행에 공모하여 가담하였다는 것이다.

나. 판단

그러나, 앞서 본 바와 같이 피고인        에게 2004. 12. 허위사실유포로 인한 증권거래법위반이 인정되지 아니하는 이상, 피고인        이 피고인        .와 공모하 여 허위사실을 유포하였다고 할 수 없고, 달리 피고인        !이 독자적으로 허위사실 을 유포하였음을 인정할 증거도 없다.

따라서, 같은 취지에서 무죄를 선고한 원심의 판단은 정당하고 검사의 위 주장은

이유 없다.

  5. 위 항소이유 5에 대하여

  가. 공소사실의 요지

    이 부분 공소사실의 요지는, 피고인        이 원심 판시 범죄사실 제1의 라.항 기재와 같은 피고인        의 범행에 공모하여 가담하였다는 것이다.

  나. 판단

    그러나, 앞서 본 바와 같이 피고인        에게 범죄수익가장으로 인한 범죄수익은닉의규제및처벌등에관한법률위반이 인정되지 아니하는 이상, 피고인        이 피고인    .와 공모하여 범죄수익 등의 취득 또는 처분에 관한 사실을 가장하였다고 할 수 없다.

    따라서, 같은 취지에서 무죄를 선고한 원심의 판단은 정당하고 검사의 위 주장은 이유 없다.

## V. 결론

  1. 그렇다면, 검사의 피고인 김훈에 대한 항소 및 피고인        의 무죄부분에 대한 항소는 모두 이유 없으므로 형사소송법 제364조 제4항에 의하여 검사의 위 항소를 각 기각한다.

  2. 한편, 피고인        의 경우 2005. 11. 허위사실유포의 점은 일죄인바 피고인은 유죄부분에 대하여, 검사는 이유 무죄부분에 대하여 각 항소를 하였고, 앞서 본 것처럼 검사의 항소는 이유 없고 피고인의 항소가 이유 있는 이상, 비록 피고인의 항소만이 이유있다 하더라도 일죄에 대하여는 소송상 불가분적으로 취급하여야 하므로 2005. 11. 허위사실유포로 인한 증권거래법위반 부분에 대하여는 직권으로 이를 전부 파기를



하여야 할 뿐만 아니라, 피고인      .의 사실오인 주장이 이유있는 부분들과 나머지

부분들은 형법 제37조 전단의 경합범관계에 있으므로, 양형부당의 항소이유에 관하여

더 나아가 판단할 필요 없이 형사소송법 제364조 제2항, 제6항에 의하여 피고인

에 대한 원심판결을 파기하고 변론을 거쳐 다시 다음과 같이 판결한다.

3. 피고인      의 항소는 이유 있으므로 형사소송법 제364조 제6항에 따라 피고인

에 대한 원심판결 중 유죄부분을 파기하고 변론을 거쳐 다시 다음과 같이 판결

한다.

증거의 요지 및 범죄사실

이 법원이 인정하는 피고인             에 대한 범죄사실과 그에 대한 증거의 요지

는 피고인      .에 대한 원심 판시 범죄사실 '제1의 가, 제1의 라, 제2항'을 각 삭제

하고, 증거의 요지 중 위 삭제하는 범죄사실과 관련된 '판시 제1의 가항 사실, 제1의

라항 사실, 제2항 사실' 부분을 각 삭제하는 외에는, 원심판결의 각 해당란 기재와 같

으므로 형사소송법 제369조에 의하여 이를 그대로 인용한다.

법령의 적용

1. 범죄사실에 대한 해당법조 및 형의 선택

가. ·피고인      : 특정경제범죄 가중처벌 등에 관한 법률 제3조 제1항 제1호,

형법 제356조, 제355조 제1항. 제30조(업무상횡령의 점, 유기징역형 선택), 증권거래

법 제207조의3 제7호, 제191조의19 제1항 제1호 다목, 형법 제30조(주요주주 등 이

해관계자와의 거래의 점, 징역형 선택), 각 증권거래법 제210조 제5호, 제188조 제6항

(소유주식보고의무 위반의 점, 각 징역형 선택), 각 증권거래법 제210조 제5호의2, 제

200조의2 제1항(대량보유보고의무 위반의 점, 각 징역형 선택)



　나. 피고인　　　　 : 특정경제범죄 가중처벌 등에 관한 법률 제3조 제1항 제1호,

형법 제356조, 제355조 제1항, 제30조(업무상횡령의 점, 유기징역형 선택), 증권거래

법 제207조의3 제7호, 제191조의19 제1항 제1호 다목, 형법 제30조(주요주주등 이해

관계자와의 거래의 점, 징역형 선택)

1. 경합범 가중

　각 형법 제37조 전단, 제38조 제1항 제2호, 제50조(피고인　　　　 에 대하여는 형이

가장 무거운, 피고인　　　 에 대하여는 형이 더 무거운 특정경제범죄가중처벌등에관

한법률위반(횡령)죄에 정한 형에 각 경합범 가중(다만 위 각 죄의 장기형을 합산한 범

위 내에서))

1. 작량감경

　각 형법 제53조, 제55조 제1항 제3호(피고인　　　 은 앞서 본 정상 참작, 피고인

　　　 는 아래 양형이유 중 유리한 정상 등을 참작)

1. 미결구금일수의 산입(피고인　　　 :)

　형법 제57조

1. 집행유예

　각 형법 제62조 제1항(각 앞서 본 정상 참작)

1. 배상신청각하

　소송촉진 등에 관한 특례법 제32조 제1항, 제2항, 제25조 제3항 제3호(배상책임의

범위가 명백하지 아니한 때에 해당하므로)

**무죄부분**

　이 사건 공소사실 중 피고인　　　의 2004. 12. 허위사실유포 및 2005. 11. 허위

사실유포로 인한 각 증권거래법위반의 점, 범죄수익 가장으로 인한 범죄수익은닉의규제및처벌등에관한법률위반의 점의 요지와 이에 대한 판단은 앞의 Ⅲ의 2, 4, 5 기재와 같은바, 이 부분 공소사실은 모두 범죄사실의 증명이 없는 경우에 해당하므로 형사소송법 제325조 후단에 의하여 각 무죄를 선고한다(일죄인 2005. 11. 허위사실유포의 경우 이유무죄 부분에 대한 검사의 항소가 이유 없으나 나머지 부분도 당심에 이르러 무죄가 되는 이상 일죄에 대하여는 소송상 불가분적으로 취급하여야 하므로 이유무죄부분도 당심에서 무죄가 된 부분과 함께 주문에서 무죄를 선고하기로 한다).

양형이유

피고인      가 횡령한 플래닛팔이의 자금이 50억 원에 이르는 거액이기는 하나, 그 이후에 횡령한 금액이 플래닛팔이에 반환되었고, 이 사건 횡령행위의 특성에 비추어 그 가벌성이 크다고 보이지 않는 점, 주가상승으로 인하여 취득한 이득금의 대부분을 회사 운영자금으로 사용한 점, 그 밖에 피고인의 연령, 성행, 환경, 이 사건 범행의 동기 및 수단과 결과, 범행 후의 정황 등 기록과 변론에 나타난 양형의 조건이 되는 여러 가지 사정 등을 종합하여 주문과 같이 형을 정한다.

재판장    .판사    _____

판사    _____

판사    _____



# 확 정 증 명 원

사        건 : 서울고등법원    2008노2243  특정경제범죄가중처벌등에관한법
            률위반(횡령) 등

피 고 인 :          외 2명

증명신청인 : 변호인 법무법인 대륙

위 사건에 관하여 아래와 같이 확정되었음을 증명합니다.

피고인 김훈 : 2009. 1. 22. 확정. 끝.

2009. 1. 22.


서울고등법원

법 원 사 무 관


본 증명(문서번호:통합제증명발급(종합접수실) 909)에 관하여 문의할 사항이 있으시면 02-530-1221로 문
의하시기 바랍니다.

등부 2023년 제  4189호

Registered No. 2023–4189

외 국 어 번 역 행 정 사 확 인 서

CERTIFICATE OF LICENSED
TRANSLATION

나는 첨부된 문서가 본 사무소에 의하여 번역
이 되었으며 그 번역이 진실되고 원본과 일치
한 것임을 증명한다.

I hereby certify that GNS CO.,LTD., translated
the attached document.
The translation is true, correct and accurate
to the original.

위 번역문은 원본과 일치하게 번역하였기에 대
한민국 행정사법 제 20조에 의거하여 번역확
인증명서에 서명 날인 하였다.

Since the above translation was translated to
match the original, the Certificate of
Translation was signed and sealed in
accordance with Article 20 of the Licensed
Administrative Agent Act in the Republic of the
Korea.

2023 년 08 월 28 일
위 사무소에서 인증한다.

This is hereby confirmed on this 28th day of
August 2023 at this office.

대한행정사협회
등록번호 : 제 267호

Korean Association of Public Administration Lawyer
Registration Number : 267

 

외국어 번역행정사
자격증 번호:15300000110

Licensed Administrative Agent
License No.15300000110

지앤에스 번역행정사 사무소
서울 종로구 인사동길 12, 1405호(인사동, 대일빌딩)

GNS TRANSLATION & ADMINISTRATION OFFICE
#1405 Daeil Bldg, 12, Insadong-gil, Jongno-gu, Seoul, Korea

ATTACHMENT 4

# 서 울 행 정 법 원

## 제  1  3  부

## 판            결

사        건        2011구합24958   정부출연금환수처분취소

원        고        전자부품연구원

                    성남시 분당구 00

                    대표자 이사000

                    소송대리인 법무법인 다래

                    담당변호사 박지환

피        고        한국산업기술평가관리원

                    소송대리인 법무법인 광장

                    담당변호사 김운호, 박해원

변 론 종 결        2012. 4. 5.

판 결 선 고        2012. 5. 10.

## 주          문

1. 피고가 2011. 6. 20. 원고에 대하여 한 9,220,000,000원의 정부출연금 환수처분을 취

   소한다.

2. 소송비용은 피고가 부담한다.

<center>청 구 취 지</center>

주위적 청구 : 주문 제1항과 같다.

예비적 청구 : 원고와 피고 사이의 별지 협약 목록 기재 각 협약에 기한 환수금채무
및 이에 대한 이자채무 기타 일체의 채무는 존재하지 아니함을 확인한다.


<center>이        유</center>

1. 처분의 경위

  가. 원고는 1999. 1. 30. 전자 및 관련 부품산업의 기술혁신에 필요한 연구개발을 수
행하고 중소기업의 첨단전자기술개발을 지원함으로써 전자산업의 국제경쟁력 제고에
이바지함을 목적으로 하는 비영리 민간법인이고, 피고는 산업기술혁신촉진법(이하 '촉
진법'이라 한다)에 의하여 설립되어 산업기술개발에 대한 기획, 평가, 관리 등의 사업을
수행하는 특수법인인데 촉진법에 따라 2009. 1월경 정보통신연구진흥원(이하 '진흥원'
이라 한다)의 권리·의무를 승계하였다.

  나. 구 산업자원부와 구 정보통신부가 2001년경 공동으로 유망전자부품의 국산화를
목표로 '유망전자부품기술 개발사업(Electro-0580 사업)'을 추진하였는데, 원고는 위 사
업의 일환으로 2001. 12월경부터 2006. 1월경까지 5차례에 걸쳐 매년 산업자원부장관
또는 진흥원장 등과 사이에 "나노기술을 이용한 초고감도 이미지센서 기술개발과제(이
하 '이 사건 과제'라 한다)"에 관한 기술개발사업협약(이하 '이 사건 협약'이라 한다)을
체결하였다. 이 사건 과제 및 협약의 주요 내용은 다음과 같다.

| [이 사건 과제의 개요] |
| --- |
| ○  협약명  :  IMT-2000  출연금  기술개발사업협약  또는  유망전자부품기술개발사업 |

이 새로운 기술이라고 할 수 있고 기술의 도용이나 표절 등의 연구부정이 없었다는 내용의 결론을 내렸다(다만, 센서 자체의 고감도 여부에 관하여는 실질적인 비교평가가 어렵고 나노 기술 적용 여부에 관하여는 향후 검증이 필요하다고 하여 다소 유보적 결론을 도출하였다).

바. 그럼에도 한국방송공사가 재차 피고에 대하여 이 사건 과제에 관한 이의를 제기하자, 피고는 "나노이미지센서 연구진실성 검증 재조사위원회(이하 '재조사위원회'라 한다)"를 구성하여 이 사건 과제에 관한 재조사를 실시하였는데, 재조사위원회는 2010. 12월경 연구부정 여부는 판단하지 못하였으나 이 사건 과제의 기술이 기존 CMOS기술과 차별성이 없고, 영상감도도 500배 가량의 고감도라고 볼 수 없으며 나노기술도 적용하고 있지 아니하다는 내용의 결론을 내렸다.

사. 피고는 2011. 6. 20. 원고에게 이 사건 과제에 관하여 지급된 정부출연금 92억 2,000만 원을 환수하라는 통보(이하 '이 사건 통보'라 한다)를 하였는데, 그 주요 내용은 다음과 같다.

---

수신 : 원고(00 박사)
제목 : '나노이미지센서' 연구윤리진실성 검증 관련 후속조치 결과 통보
2. 관련
  가. 연규윤리 확보를 위한 지침(과학기술부 /'09. 9. 23)
  나. 지식경제 기술혁신사업 연구윤리진실성 확보 등에 관한 요령(지식경제부/ '08. 12. 29)
3. 위 관련, '나노이미지센서' 연구윤리·진실성 검증 관련 후속조치 결과를 아래와 같이 통보드리오니 참조하시기 바랍니다.
– 아 래 –
나. 후속조치 결과
  ○ 제재대상 : 연구책임자 000000 3년 참여제한, 정부출연금 전액(92.2억 원) 환수
  ※ 지식경제 기술혁신사업 연구윤리진실성 확보 등에 관한 요령 제24조(조사결과에 대한 후속조치)

---

[인정근거] 다툼 없는 사실, 갑 제1 내지 8, 11, 12, 14호증의 각 기재, 변론 전체의 취지

**2. 피고의 본안 전 항변에 관한 판단**

　가. 피고의 주장

　　1) 재조사위원회의 검증결과에 의하여 이 사건 과제는 실패하였음이 판명되었기 때문에, 피고는 이 사건 협약의 당사자로서 이 사건 통보를 통하여 이 사건 협약서 제8조, 관리규정 제21조 제1항에 의하여 이 사건 협약을 해약한다는 의사표시를 하면서 협약 해지의 효력으로서 원고에게 지급된 정부출연금 전액을 환수하여야 함을 고지하였다. 피고는 이 사건 통보 이후 2011. 7. 20. 원고에게 후속 공문을 발송하여 그 의미를 분명히 하였다. 따라서 이 사건 통보는 피고가 이 사건 협약당사자 지위에서 행한 것인바 국가기관의 공권력행사인 행정처분이 아니다.

　　2) 나아가 피고가 이 사건 통보 및 후속 공문을 통하여 이 사건 협약을 해약하였음을 통보한 이상 그 법률효과로서 원상회복의무(출연금환수의무)가 이미 발생하였으므로 원고가 이 사건 소를 통하여 어떠한 권리 또는 자격을 회복할 수 있는 것이 아니어서 원고에게 법률상 이익이 있다고 보이지 않는다.

　나. 관련 법령

　　별지 관련 법령 기재와 같다.

　다. 이 사건 통보의 처분성

　　1) 행정청의 어떤 행위를 행정처분으로 볼 것이냐의 문제는 추상적, 일반적으로 결정할 수 없고, 구체적인 경우 행정처분은 행정청이 공권력의 주체로서 행하는 구체적 사실에 관한 법집행으로서 국민의 권리의무에 직접적으로 영향을 미치는 행위라는 점

을 염두에 두고, 관련 법령의 내용 및 취지와 그 행위가 주체·내용·형식·절차 등에 있
어서 어느 정도로 행정처분으로서의 성립 내지 효력요건을 충족하고 있는지 여부, 그
행위와 상대방 등 이해관계인이 입는 불이익과의 실질적 견련성, 그리고 법치행정의
원리와 당해 행위에 관련한 행정청 및 이해관계인의 태도 등을 참작하여 개별적으로
결정하여야 할 것이다(대법원 2007. 6. 14. 선고 2005두4397 판결 등 참조).

　　2) 살피건대 앞서 본 사실 및 증거들에 갑 제16, 22, 23호증의 각 기재, 변론 전체
의 취지를 종합하여 인정되는 다음과 같은 사정들에 의하면 피고의 이 사건 통보는 항
고소송의 대상이 되는 행정처분이라고 판단된다.

　　가) 이 사건 본조사위원회 및 재조사위원회는 "구 지식경제기술혁신사업 연구윤
리·진실성 확보 등에 관한 요령(2009. 8. 21.자 지식경제부 고시 제2009-193호로 개
정되기 전의 것, 이하 '이 사건 요령'이라 한다)"에 의하여 구성된 것이고, 원고는 이
사건 통보서상 처분이유로 이 사건 요령 제24조(조사결과에 대한 후속조치)를 언급하
고 있을 뿐, 이 사건 협약 제8조 및 이 사건 관리규정 등을 적시하고 있지 아니하다.

　　나) 이 사건 요령에 의하면, 부정행위란 연구개발과제의 제안, 연구개발의 수행,
연구개발결과의 보고 및 발표 등에서 행하여진 위조·변조·표절·부당한 논문저자 표
시행위를 말하고(제4조 제1호), 전담기관(피고 등) 또는 수행기관(원고 등)에 부정행위
에 대한 제보가 있으면 수행기관이 부정행위 검증에 관한 예비조사 및 본조사를 성실
하게 시행하여 조사내용 및 결과를 제보자 및 피조사자에게 통보하여야 하며(제8조,
제11조, 제14조, 제15조, 제17조, 제21조), 이에 대하여 제보자 또는 피조사자가 불복하
여 이의를 제기하면 전담기관이 이의제기의 타당성을 검토하여 재조사할 수 있다(제22
조). 재조사결과에 따라 전담기관의 장은 수행기관에 대하여 3년 이내의 범위로 정한

연구부정행위 관련자에 대한 징계요구, 국가연구개발사업에의 참여 제한, 기지급된 정부출연금의 일부 또는 전액 회수 등을 통보한다. 이와 같은 전담기관장의 국가연구개발사업 참여제한, 정부출연금 환수와 같은 제재조치는 이 사건 요령 제1조 및 지식경제 기술혁신사업 공통 운영요령(2009. 8. 21. 지식경제부고시 제2009-193호로 개정되기 전의 것) 제1조, 제36조, 제38조 및 촉진법 제44조 제1항, 촉진법 시행령 제57조 제4항 등에 의할 때 촉진법 제11조의2 제1항, 제2항, 촉진법 시행령 제14조의3 제6항에 그 근거를 두고 있는 것으로 보인다. 그런데 이와 같은 제재조항(이 사건 요령 제24조 및 위 촉진법 규정)은 이 사건 관리규정과 달리 이 사건 협약 조항을 통하여 이 사건 협약 내용으로 포함되어 있지 않다.

다) 갑 제16호증의 기재에 의할 때 피고가 2011. 7. 20. 원고의 이 사건 통보에 대한 이의신청에 대하여 원고에게 "제재 및 환수의 내용은 연구윤리진실성에 근거한 것이 아니라, 협약서에 근거한 것이므로 이의제기의 타당성이 없다"는 내용과 이 사건 통보 내용의 관련규정으로 '이 사건 협약서 제8조, 이 사건 관리규정 제21조, 제31조 제4항' 등을 추가 기재한 통보서를 송부한 사실은 인정된다. 그러나 앞서 본 사실 및 변론 전체의 취지에 의하여 인정되는 다음과 같은 사정, 즉 ① 구 정보화촉진기본법(2008. 2. 29. 법률 제8867호로 개정되기 전의 것, 이하 '기본법'이라 한다) 제18조, 제35조의2, 기본법 시행령 제18조에 의하면 정부는 정보통신연구개발사업의 효율적 지원을 위하여 진흥원을 설립하고, 정보통신산업 기반조성을 위하여 기술개발 등을 추진하고 이를 위하여 필요한 때에는 연구기관 및 민간단체로 하여금 기술개발을 대행하도록 하되 이에 소요되는 비용을 대통령령에 의하여 지원할 수 있는데 그 지원 방법 · 절차 등 필요한 세부사항은 정보통신부장관이 고시하도록 하고 있는 점, ② 위와 같은 기본

법 및 기본법 시행령의 위임에 의하여 제정된 이 사건 관리규정에 의하면 관리기관의 장인 피고는 연구개발과제의 연구개발결과 평가를 위한 기준, 평가계획 등을 미리 정하여 주관연구기관의 장인 원고 또는 연구책임자인 김훈에게 통보하여야 하고(제30조, 제31조 제1항), 평가결과에 대하여 주관연구기관 및 연구책임자가 이의를 제기할 수 있는 것으로 규정하고 있는 점(제31조 제2항), ③ 진흥원은 2007. 5. 25. 김훈이 제출한 이 사건 과제에 관한 최종결과보고서를 토대로 이 사건 과제의 위탁관리기관이었던 Electro-0580사업단이 제시한 평가기본계획에 따라 이 사건 관리규정상 평가를 진행하여 연구결과가 우수(91.8점)하다는 평가를 하였으며 이에 대하여 원고측이 이의를 제기하지 아니한 점, ④ 위와 같이 이 사건 과제와 같은 정부가 출연하는 연구개발과제에 관한 평가는 그 결과가 부적정, 불량 등으로 판정될 경우 협약의 해약, 정부출연금 환수, 국가연구개발사업 참가제한 등의 중대한 법률상 불이익이 초래되는바, 과제에 참가하는 수행기관 및 참가기관에게 있어 연구개발과제에 관한 평가절차, 방법, 계획, 평가위원의 구성 등은 매우 중요한 의미를 가지므로, 기본법 등에서 위임한 이 사건 관리규정에서 정한 바에 따라 이루어져야 하는 것으로 보이는 점(참고로 지식경제부 고시인 '지식경제 기술혁신사업 공통운영요령', 지식경제부 예규인 '지식경제 기술혁신사업 기술개발 평가관리지침' 등에서는 기술혁신사업에 관한 평가위원회의 구성과 평가의 절차, 방법, 이의제기 등에 관하여 상세한 규정을 두고 있다), ⑤ 그럼에도 앞서 본 바와 같이 이 사건 본조사 및 재조사위원회는 이 사건 요령에 의하여 구성되어 이 사건 과제에 관한 검증작업을 수행하였을 뿐 이 사건 관리규정에서 정한 절차, 방법에 따라 구성된 평가위원회로 보이지는 아니하고, 이 사건 요령에 의할 때 본조사 및 재조사위원회는 연구과제에 관한 연구부정이 있었는지 여부를 가리기 위한 목적으로 구성되는 검증위원회인 점, ⑥ 갑 제15, 16호증의

기재에 의할 때 피고의 2011. 7. 20.자 후속통보는 이 사건 통보에 대한 원고의 이의신청에 관한 답변일 뿐이므로 그 내용을 이 사건 통보의 일부로 볼 수는 없는 점 등에 비추어 볼 때, 위 인정사실만으로 피고의 이 사건 통보가 이 사건 협약 제8조 또는 이 사건 관리규정 제21조 등에 근거한 것으로 볼 수 없다.

라) 촉진법 제11조의2 제1항 제7호, 촉진법 시행령 제14조의3 제1항 제3호에 의하면, 출연사업비 환수금을 납부하지 않을 경우 5년 이내의 범위에서 국가연구개발사업의 참여를 제한 할 수 있는 것으로 규정하고 있고, 지식경제기술혁신사업 기술개발 평가관리지침에 의하면 신규사업에 대한 신청자격 사전검토사항으로 환수금 등을 납부하지 않은 자의 경우 사전 지원제외 대상으로 처리할 수 있는 것으로 규정하고 있어 이 사건 통보에 따라 정부출연금 환수의무 외에 공법상 불이익이 가해질 여지가 있고, 이와 같은 방법으로 환수의무이행을 강제하고 있는 이상 위 환수의무를 단순한 금전채무 이행의무와 동일한 것으로 평가할 수 없다.

마) 피고가 앞서 본 바와 같이 2011. 7. 20. 원고에게 이의신청에 대한 통보서를 발송하였고, 갑 제17호증의 기재에 의할 때 계좌번호와 납부기한이 정해진 평가결과 확정 통보서를 발송하기는 하였으나 이 사건 재조사위원회 이후 별도로 이 사건 과제에 대한 평가절차가 없었고, 이 사건 통보 당시 처분의 근거 및 환수금액, 환수대상자를 명시한 이상 이 사건 통보로 인하여 원고에게 환수의무가 발생한 것으로 보아야 한다.

3) 따라서 피고의 이 사건 통보의 처분성 여부에 관한 본안 전 항변은 이유 없다.

라. 법률상 이익 여부

앞서 본 사실, 갑 제9, 10호증의 각 기재 및 변론 전체의 취지에 의하여 인정되는 다음과 같은 사정 즉, ① 앞서 본 바와 같이 이 사건 본조사 및 재조사위원회의 검증결과를

이 사건 협약서 및 관리규정상 해약의 근거가 될 수 있는 평가로 보기 어려운 점, ② 진흥원은 이 사건 과제에 관한 이 사건 관리규정에 따른 평가 당시 그 수행결과가 우수하다는 평가를 하였고, 이 사건 본조사위원회 역시 이 사건 과제에 적용된 기술이 새로운 기술로 보이고 나노 기술 및 센서의 고감도 여부에 관하여도 부정적으로 판단하지 아니한 점, ③ 검찰은 김훈에 대하여, 김훈 등이 이 사건 과제의 기술이 세계 최초 신기술이 아니고 이미지센서에 나노기술이 적용되지 아니하였으며 감도 역시 기존의 CMOS 방식과 큰 차이가 없음에도 진흥원을 기망하여 연구개발비를 교부받아 이를 편취하였다는 등의 공소사실로 기소하였으나, 서울고등법원(2008노2243호)은 2009. 1. 9. "김훈이 개발한 SMPD 이미지센서는 기존의 이미지센서와 다른 기술적 특성을 가지고 있고, 양자현상이 나타나는 경우도 나노기술에 해당한다고 볼 수 있는 여지가 있으며, 이미지센서의 감도 정의에 의할 때 김훈 등의 감도표기 자체에 허위가 있었다고 보기 어렵다"는 이유로 김훈에 대하여 무죄를 선고하였고, 이 부분에 대하여는 검사가 항소하지 아니하여 같은 달 22. 위 판결이 확정된 점, ④ 피고가 이 사건 협약의 당사자 지위에서 이 사건 협약내용 및 관리규정에 따라 이 사건 과제가 실패한 것으로 평가될 경우 이 사건 협약을 해약할 수 있으나 앞서 본 바와 같이 2007년경 우수로 평가된 것 외에 이 사건 관리규정에 따른 별도의 평가절차를 거치지 아니하였는바, 피고에게 이 사건 협약을 해약할 수 있는 협약상 권리가 발생하였다고 보기 어려운 점 등에 의할 때, 이 사건 통보 및 이 사건 후속통보로 이 사건 협약이 해약되었다고 단정할 수 없다. 따라서 피고의 이 부분 주장은 더 나아가 살펴볼 필요 없이 이유 없다.


3. 주위적 청구에 관한 판단

가. 원고의 주장

이 사건 통보는 이 사건 요령 제24조 제3, 4항에 근거한 처분인데 전담기관의 장이 위 조항에 따라 수행기관 등을 제재하기 위해서는 수행기관 또는 연구책임자가 이 사건 요령상 연구부정행위를 저질렀음이 인정되어야 함에도 피고나 김훈이 연구부정행위를 저지르지 아니하였다. 또한 이 사건 요령은 부칙 제1조에 의하여 2009. 1. 1.부터 시행되는 규정임에도 그 이전에 체결되어 수행기간이 종료된 이 사건 과제에 관하여 이를 적용할 수 없다. 그럼에도 불구하고 피고는 이 사건 요령 제24조 제3, 4항에 따라 이 사건 통보를 하였는바 이는 위법하다.

나. 판단

1) 앞서 본 이 사건 요령에 의하면, 이 사건 요령에서 정한 연구부정행위에 대한 제보가 있는 경우 이에 관하여 수행기관이 제보내용에 따라 연구개발과제의 제안, 수행, 보고 및 발표에 있어 위조, 변조, 표절, 부당한 논문저자 표시 등이 있었는지 여부에 관하여 예비조사 및 본조사를 실시하고, 그 조사결과에 대하여 제보자의 이의제기가 있으면 전담기관이 연구개발과제를 재조사하는 것으로 규정되어 있고, 이 사건 요령은 기술혁신사업을 추진·관리하거나 수행하는 기관들에게 연구부정행위를 방지하고 연구윤리를 확보하는데 필요한 역할과 책임에 관하여 원칙과 방향을 정함을 그 입법목적으로 하고 있다. 이와 같은 이 사건 요령의 규정내용 및 입법목적에다가 위에서 본 바와 같이 이 사건 관리규정 및 '지식경제 기술혁신사업 공통운영요령' 등에서 연구개발과제에 관한 평가방법 및 절차 등에 관하여 상세하게 규정하고 있는 점 등에 비추어 보면, 이 사건 요령에 따라 구성된 본조사위원회 및 재조사위원회는 수행기관 및 연구책임자가 이 사건 요령에서 정한 연구부정행위를 저질렀는지 여부에 관하여 검증할 권한이 있을 뿐 이 사건 과제의 실패여부

에 관한 평가권한이 부여되어 있는 것으로 보이지 않는다. 갑 제11, 12호증의 기재에 의하더라도 "본조사위원회는 제보자가 제기한 의혹에 대해 연구개발내용의 위조, 변조, 왜곡, 표절에 관련된 부분만 검증하였음", "재조사 위원회는 이 사건 요령 제5조와 훈령 제4조에 근거하여 연구 개발 내용의 위조, 변조, 표절, 부당한 논문저자 표시에 관련된 부분을 검토하고자 하였다"라고 기재되어 있다. 따라서 이 사건 요령 제24조 제3, 4항에 따른 후속조치 역시 이 사건 요령에 따른 본조사 내지 재조사에서 수행기관 및 연구책임자의 연구부정이 밝혀진 경우에 행할 수 있는 것이다(이 사건 요령 전체 규정은 물론 제24조 제3, 4항의 문언상에도 제재조치의 요건으로서 연구과제의 실패여부 평가에 관하여 아무런 언급이 없다).

그런데 갑 제11, 12, 22, 23호증의 각 기재 및 변론 전체의 취지에 의하면 이 사건 본조사 및 재조사위원회의 검증결과 원고 및 김훈이 이 사건 과제 수행에 있어 연구부정 행위를 하지 아니하였거나 이를 밝히지 못하였음을 인정할 수 있을 뿐, 달리 원고 및 김훈이 이 사건 과제를 수행하면서 연구부정을 저질렀음을 인정할 증거가 없다.

2) 행정청이 행정상의 제재처분을 하려면 근거법령의 부칙 등에 특별한 규정이 없는 한 위반행위 당시에 시행되던 법령의 의하여야 한다(대법원 1987. 1. 20. 선고 86누63 판결 등 참조). 적어도 2003년부터 2006년까지 원고의 협약 상대방은 진흥원이었고 진흥원은 기본법에 의하여 설립되었으며 이 사건 관리규정 역시 기본법 제18조 제2항, 기본법 시행령 제18조 제4항에 따라 정보통신연구개발사업 등을 효율적으로 시행하기 위하여 정보통신부장관이 정한 고시인바 이 사건 협약의 근거법령은 기본법이라 할 수 있다. 그런데 기본법 제18조 제2항, 기본법 시행령 제18조 제3, 4항에는 정보통신산업 기술개발을 위해 필요한 때에는 이에 소요되는 비용을 지원하여 민간단체로 하여금 이를 대행하게

할 수 있다고 하면서 기타 지원의 방법·절차 등 세부사항은 정보통신부장관이 고시하되, 정보통신부장관은 지원을 받은 자가 정당한 사유 없이 그 지원 목적 이외에 지원금을 사용한 때에는 이를 회수할 수 있다고 규정하고 있을 뿐 연구부정행위가 있을 경우 정부출연금을 환수할 수 있다는 내용의 근거규정은 없었다. 진흥원의 권리·의무가 2009. 1월경 피고에게 승계된 이상, 촉진법 및 이 사건 요령상에 연구부정행위에 관한 정부출연금 환수규정이 있다고 하더라도 위 촉진법 규정이 진흥원이 전담하여 피고에게 권리의무가 승계되기 이전에 종료된 이 사건 협약에 관하여 적용될 수는 없다.

결국 2006년 말에 이미 종료된 이 사건 과제 수행에 관하여 촉진법 제11조의2 및 이 사건 요령이 적용될 수는 없다고 할 것임에도 이와 다른 전제에 선 이 사건 처분은 위법하다.

3) 피고는 이 사건 통보 및 2011. 7. 20.자 원고의 이의신청에 대한 통보를 통하여 원고와 사이에 이 사건 관리규정 제21조 제1항, 제31조 제4항에 의해 이 사건 협약을 해약하였기 때문에 원고가 피고에게 출연금을 반환할 의무가 있다는 취지로 주장하나, 앞서 본 바와 같이 이 사건 재조사위원회 조사결과를 이 사건 관리규정에서 이 사건 협약의 해약사유로 정한 평가위원회의 평가로 볼 수 없고 이 사건 재조사위원회의 조사결과 외에 이 사건 관리규정에 의하여 이 사건 과제에 관하여 '불량' 이하의 평가가 있었다고 볼 만한 자료가 없는 이상, 이 사건 관리규정 제21조 제1항, 제31조 제4항 소정의 협약해지 사유가 발생하였다고 보이지 않는다. 따라서 설령 피고가 이 사건 협약을 해약할 의사로 원고에게 위와 같은 통보를 하였다고 하더라도 이 사건 협약이 위 통보로 인하여 해약되었다고 볼 수 없으므로, 피고의 이 부분 주장은 이유 없다.

4. 결  론

    그렇다면 원고의 이 사건 주위적 청구는 이유 있으므로 이를 인용하기로 하여 주문과 같이 판결한다.

|  |  |  |  |
|---|---|---|---|
| 재판장 | 판사 | 박정화 | ＿＿＿＿＿＿＿＿＿＿＿＿＿＿ |
|  | 판사 | 김태환 | ＿＿＿＿＿＿＿＿＿＿＿＿＿＿ |
|  | 판사 | 김진하 | ＿＿＿＿＿＿＿＿＿＿＿＿＿＿ |

별지

## 협 약 목 록

1. 2001. 12. 29.자 IMT-2000 출연금 기술개발사업 협약

2. 2003. 6. 10.자 유망 전자부품기술개발사업(Electro-0580)협약

3. 2004. 6. 25.자 유망 전자부품기술개발사업(Electro-0580)협약

4. 2005. 5. 18.자 유망 전자부품기술개발사업(Electro-0580)협약

5. 2006. 5. 2.자 유망 전자부품기술개발사업(Electro-0580)협약. 끝.

# 관 련 법 령

■ 산업기술혁신촉진법

**제11조의2 (국가연구개발사업의 참여제한 등)**

① 지식경제부장관은 제11조에 따라 산업기술개발사업에 참여한 기관, 단체, 기업 또는 소속 임직원이 다음 각 호의 어느 하나에 해당하는 경우에는 5년 이내의 범위에서 지식경제부장관이 발주하는 「과학기술기본법」 제11조에 따른 국가연구개발사업의 참여를 제한할 수 있으며 지식경제부장관이 이미 출연한 사업비의 전부 또는 일부를 환수할 수 있다.

1. 연구개발의 결과가 극히 불량하여 지식경제부장관이 실시하는 평가에 따라 실패한 사업으로 결정된 경우
2. 정당한 절차를 거치지 아니하고 연구내용을 누설(누설)하거나 유출한 경우
3. 정당한 사유 없이 연구개발과제의 수행을 포기한 경우
4. 정당한 사유 없이 제12조에 따른 기술료를 납부하지 아니한 경우
5. 출연금을 연구개발비의 연구용도 외의 용도로 사용한 경우
6. 연구개발 자료 및 결과의 위조・변조・표절 등 부정행위를 한 경우
7. 그 밖에 제11조제2항 또는 제3항의 협약에 대한 중대한 위반 행위로서 대통령령으로 정하는 경우

② 제1항제1호에 따른 연구결과의 평가기준, 평가절차, 연구개발의 참여제한 기간 및 이의신청 절차 등 필요한 사항은 대통령령으로 정한다.

③ 제1항에 따라 국가연구개발사업에 참여를 제한하는 경우 지식경제부장관은 다른 관계 중앙행정기관의 장에게 참여제한 사실을 알려야 한다.

**제44조 (권한의 위임・위탁)**

① 이 법에 따른 지식경제부장관 또는 교육과학기술부장관의 권한은 그 일부를 대통령령으로 정하는 바에 따라 소속 기관의 장 또는 중소기업청장에게 위임하거나 기술진흥원・평가관리원・세라믹기술원・한국공학한림원・시험원의 장, 그 밖에 대통령령으로 정하는 법인 또는 단체에 위탁할 수 있다.

■ 산업기술혁신촉진법 시행령

**제14조의3 (국가연구개발사업의 참여제한 등)**

① 법 제11조의2제1항제7호에서 "대통령령으로 정하는 경우"란 협약상의 의무사항을 이행하도록 시정을 요구받고도 정당한 사유 없이 이에 따르지 아니한 경우로서 다음 각 호의 어느 하나에 해당하는 경우를 말한다.

1. 사업비 사용실적 보고서를 제출하지 않은 경우
2. 사업 수행으로 발생한 수익금을 목적 외의 용도로 사용한 경우
3. 정산금이나 환수금을 납부하지 않은 경우
4. 협약상 부담하기로 한 부담금을 부담하지 않은 경우

② 법 제11조의2제1항제1호에 따른 연구 결과의 평가기준 및 평가절차에 관하여는 제9조의2를 준용한

다. 이 경우 "산업기술혁신사업"은 "산업기술개발사업"으로, "평가지표"는 "평가기준"으로 본다.

③ 국가연구개발사업의 참여제한 기간은 다음 각 호의 구분에 따른다.

1. 법 제11조의2제1항제1호의 경우: 3년

2. 법 제11조의2제1항제2호의 경우: 2년(해외로 누설하거나 유출한 경우에는 5년)

3. 법 제11조의2제1항제3호의 경우: 3년

4. 법 제11조의2제1항제4호의 경우: 2년 이내

5. 법 제11조의2제1항제5호의 경우: 5년 이내

6. 법 제11조의2제1항제6호의 경우: 3년 이내

7. 제1항 각 호를 위반한 경우: 1년

④ 지식경제부장관은 제2항에 따른 평가 결과를 주관연구기관의 장에게 통보하여야 한다.

⑤ 주관연구기관의 장은 제2항에 따른 평가 결과에 이의가 있을 때에는 지식경제부장관이 평가 결과를 통보한 날부터 10일 이내에 지식경제부장관에게 이의신청을 할 수 있다.

⑥ 제2항부터 제5항까지에서 규정한 사항 외에 평가 및 이의신청 등에 필요한 세부 사항은 지식경제부장관이 정하여 고시한다.

제57조 (권한의 위임·위탁)

④ 지식경제부장관은 법 제44조제1항에 따라 법 제11조의2에 따른 국가연구개발사업의 참여제한에 관한 업무 및 출연한 사업비의 전부 또는 일부의 환수에 관한 업무를 기술진흥원 또는 평가관리원에 위탁한다.


■ 구 정보화촉진기본법(2008. 2. 29. 법률 제8867호로 개정되기 전의 것)

제18조 (기술개발의 추진)

①정부는 정보통신산업의 기반조성에 필요한 기술개발과 기술수준의 향상을 위하여 다음 각호의 사항을 추진하여야 한다.

1. 기술수준의 조사, 기술의 연구개발, 개발기술의 평가 및 활용에 관한 사항

2. 기술협력·기술지도 및 기술이전에 관한 사항

3. 기술정보의 원활한 유통을 위한 사항

4. 산학협동을 촉진하기 위한 사항

5. 기타 기술개발과 관련하여 필요한 사항

②정부는 제1항의 규정에 의한 사항을 효율적으로 추진하기 위하여 필요한 때에는 정보통신산업 기술개발과 관련된 연구기관 및 민간단체로 하여금 이를 대행하게 할 수 있다. 이 경우 이에 소요되는 비용은 대통령령이 정하는 바에 따라 지원할 수 있다.

제35조의2 (정보통신연구진흥원의 설립등)

①정보통신연구개발사업을 효율적으로 지원하기 위하여 정보통신연구진흥원(이하 "연구진흥원"이라 한다)을 설립한다.

②연구진흥원은 다음 각호의 사업을 한다.

1. 제35조제2항의 규정에 의하여 정보통신부장관이 위탁하는 기금의 운영·관리
2. 정보통신연구개발 수요조사·기술예측 및 연구기획
3. 정보통신연구개발사업에 대한 평가·관리
4. 기타 정보통신연구개발사업과 관련하여 대통령령이 정하는 사업
③정부는 연구진흥원의 설립 및 운영에 필요한 경비를 예산의 범위안에서 출연할 수 있다.
④제10조제2항·제6항 및 제7항의 규정은 연구진흥원에 관하여 이를 준용한다. 이 경우 "한국전산원"은 "정보통신연구진흥원"으로, "전산원"은 "연구진흥원"으로 본다.


■ 구 정보화촉진기본법 시행령(2008. 2. 29. 대통령령 제20741호로 개정되기 전의 것)
제18조(기술개발비의 지원)
① 정보통신부장관은 법 제18조제2항의 규정에 의하여 정보통신연구개발에 소요되는 비용을 지원하는 경우 그 지원금은 이를 분할하여 지급한다. 다만, 연구개발사업의 규모·착수시기등을 참작하여 필요하다고 인정하는 때에는 일시에 이를 지급할 수 있다.
② 제1항의 규정에 의한 지원을 받은 자는 이에 대하여 별도의 계정을 설정하여 관리하여야 하며, 당해 연구개발사업에 소요되는 비용에만 사용하여야 한다.
③ 정보통신부장관은 제1항의 규정에 의하여 지원을 받은 자가 정당한 사유없이 그 지원목적 이외에 지원금을 사용한 때에는 이를 회수할 수 있다.
④ 기타 지원의 방법·절차등 필요한 세부적인 사항은 정보통신부장관이 정하여 고시한다.


■ 정보통신연구개발관리규정(2005. 9. 28. 정보통신부 고시 제2005-39호로 개정된 것)
제1조(목적) 이 규정은 정보화촉진기본법 제18조 제2항, 동법시행령 제18조 제4항, 전기통신기본법 제10조 제2항, 제11조 제2항, 동법 시행령 제4조 제2항 및 국가연구개발사업의 관리 등에 관한 규정에 따라 정보통신부장관이 시행하는 정보통신연구개발사업 및 이와 관련된 사업을 효율적으로 시행하기 위하여 필요한 세부사항을 정하고, 기간통신사업자의 투자·출연에 관한 사항을 규정함을 목적으로 한다.
제21조(협약의 해약) ① 관리기관의 장은 다음 각호의 1에 해당하는 사유가 발생한 경우에는 협약을 해약할 수 있다.
1. 연구개발과제수행계획서에 허위사실을 기재하였거나 과제 수행 등과 관련하여 재산상의 이익을 취득 또는 제공한 경우
2. 연구개발과제의 평가에 불응하거나, 제28조제3항에 의해 연구개발 중단조치가 내려진 경우
3. 다년도협약을 체결한 경우 당해 연구개발과제의 평가결과가 "불량" 이하인 경우
4. 연구개발목표가 타 연구개발수행에 의하여 성취되어 동 연구개발을 계속할 필요성이 인정되지 아니할 때
5. 협약체결 후 3개월 이내에 연구개발에 착수하지 않는 경우
6. 연구개발과제의 수행을 포기한 경우
7. 외부압력, 허위, 청탁 등 부정한 방법에 의해서 연구개발과제 수행기관으로 선정된 경우

8. 기 완료 연구개발과제 또는 진행중인 연구개발과제와 연구내용이 중복되게 수행하는 경우

9. 정부 등의 출연금을 연구개발 목적 외의 용도로 사용한 경우

10. 부도·법정관리·폐업 등의 사유로 연구기관에 의한 연구개발과제의 계속적인 수행이 불가능하거나 이를 계속 수행할 필요가 없다고 인정되는 경우

11. 기타 사유로 인하여 연구개발을 계속 수행할 수 없다고 인정되거나 소기의 연구개발성과를 기대하기 곤란하다고 판단되는 경우

<u>제30조(연구개발결과의 평가기준 등) ① 관리기관의 장은 연구개발과제의 연구개발결과 평가를 위한 평가기준을 미리 정하여 연구개발결과 평가에 이를 적용하여야 한다.</u>

②제1항의 규정에 의한 평가는 상대평가 및 공개적인 발표를 통한 평가를 원칙으로 하되, 연구개발사업 또는 연구개발과제의 성격 등에 따라 평가방법 및 기준을 달리 정하여 적용할 수 있다.

③국가안보상 필요한 경우에는 제1항의 규정에 의한 연구개발결과에 대한 평가를 실시하지 아니할 수 있다.

<u>제31조(연구개발결과의 평가) ① 관리기관의 장은 연구개발결과를 평가함에 있어서 연구개발과제의 선정을 위한 평가에 참여한 전문가를 중심으로 평가위원후보단을 이용하여 평가위원회를 구성하여야 하며 연구개발경과의 평가방법 및 평가절차 등 세부사항이 포함된 연구개발결과 평가계획을 작성하여 주관연구기관의 장 또는 연구책임자에게 통보하여야 한다.</u>

<u>②관리기관의 장은 제29조에 따라 연구개발결과에 대하여 평가를 실시하고, 계속과제의 경우 다음 연도 연구개발수행계획서에 대하여 제15조에 따라 연구개발과제의 검토·심의 및 조정을 하여야 하며 그 결과를 장관에게 보고하고 주관연구기관에 통보하여야 한다. 이때 통보된 결과에 대하여 이의가 있는 주관연구기관 및 연구책임자는 관리기관의 장에게 이의를 신청할 수 있으며, 관리기관의 장은 필요한 조치를 취하여야 한다.</u>

④ 관리기관의 장은 연구개발결과의 평가에 불응하거나 연구개발결과의 평가결과가 "불량" 이하인 과제에 대해서는 제21조의 규정에 준하여 당해 과제의 주관연구기관 등에 대한 연구개발비의 환수 등 적절한 제재조치를 취하고 이를 장관에게 보고하여야 하며 당해연구기관은 불량과제에 대한 원인보고서를 관리기관의 장에게 제출하여야 한다.

⑤관리기관의 장은 연구개발평가결과가 아주 우수한 경우 우수결과물에 대한 실용화 지원 등 후속대책과 당해 연구개발과제의 수행기관 또는 당해 연구개발과제에 참여한 연구원에 대한 포상 등을 장관에게 건의할 수 있다.


■ 구 지식경제 기술혁신사업 연구윤리·진실성 확보 등에 관한 요령(2009. 8. 21. 지식경제부고시 제2009-193호로 개정되기 전의 것)

제1조(목적) 이 요령은「국가연구개발사업의 관리 등에 관한 규정」제19조의2 및 「연구윤리 확보를 위한 지침」, 「지식경제 기술혁신사업 공통 운영요령」 제38조에 따라 지식경제 기술혁신사업(이하 "사업"이라 한다)을 추진·관리하거나 수행하는 기관들에게 연구부정행위를 방지하고 연구윤리를 확보하는데 필요한 역할과 책임 등에 관하여 세부적인 원칙과 방향을 정함을 목적으로 한다.

제4조(용어의 정의) 이 요령에서 사용하는 용어의 정의는 다음 각 호와 같다.

1. 연구부정행위(이하 "부정행위"라 한다)는 연구개발과제의 제안, 연구개발의 수행, 연구개발결과의 보고 및 발표 등에서 행하여진 위조·변조·표절·부당한 논문저자 표시 행위 등을 말한다.

제5조(연구부정행위의 범위) 이 요령에서 제시하는 부정행위는 다음 각 호와 같다

1. "위조"는 존재하지 않는 데이터 또는 연구결과 등을 허위로 만들어 내는 행위를 말한다.

2. "변조"는 연구 재료·장비·과정 등을 인위적으로 조작하거나 데이터를 임의로 변형·삭제함으로써 연구내용 또는 결과를 왜곡하는 행위를 말한다.

3. "표절"이라 함은 타인의 아이디어, 연구내용·결과 등을 정당한 승인 또는 인용 없이 도용하는 행위를 말한다.

4. "부당한 논문저자 표시"는 연구내용 또는 결과에 대하여 과학적·기술적 공헌 또는 기여를 한 사람에게 정당한 이유 없이 논문저자 자격을 부여하지 않거나, 과학적·기술적 공헌 또는 기여를 하지 않은 자에게 감사의 표시 또는 예우 등을 이유로 논문저자 자격을 부여하는 행위를 말한다.

5. 본인 또는 타인의 부정행위 혐의에 대한 조사를 고의로 방해하거나 제보자에게 위해를 가하는 행위를 말한다.

6. 과학기술계에서 통상적으로 용인되는 범위를 심각하게 벗어난 행위 등을 말한다.

7. 기타 지식경제부 장관(이하 "장관"이라 한다)이 정하는 사항을 말한다.

제8조(부정행위 제보 및 접수) ①제보자는 전담기관 또는 수행기관의 주관부서에 구술·서면·전화·전자우편 등 가능한 모든 방법으로 제보할 수 있으며, 실명으로 제보함을 원칙으로 한다. 단, 익명으로 제보하고자 할 경우에는 익명이 보호될 수 있도록 서면 등의 방법으로 제보한다.

②제보자는 다음 각 호의 내용을 반드시 포함하여 제보하여야 한다.

1. 연구과제명 또는 논문명

2. 연구부정행위 내용

3. 연구부정행위 증거

4. 기타 연구부정행위와 관련되는 사항

제11조(진실성 검증 책임주체) ① 부정행위의 발생을 인지하거나 제보가 있을 경우 이에 대한 검증 책임은 해당 연구가 수행될 당시 연구자의 소속 연구기관에 있으며, 해당 수행기관의 장은 자체규정에 의해 성실하게 처리하여야 한다.

② 전담기관이 부정행위의 발생을 인지하거나 부정행위에 대한 제보를 접수한 경우에는 해당 수행기관에 의해 자체조사가 이루어질 수 있도록 관련 내용을 이관하여야 한다.

③ 전담기관은 다음 각 호의 사유에 따라 수행기관이 자체조사를 수행하기 어려운 경우 직접 조사를 수행해 줄 것을 요청할 때 특별한 사유가 없는 한 이에 응하여야 한다.

1. 2개 이상의 수행기관이 공동으로 참여한 연구에서의 부정행위에 대한 검증이 원활하게 이루어지지 않을 경우

2. 해당 수행기관의 연구활동 규모 및 전문가 확보의 어려움 등으로 인하여 자체조사를 수행하기가 곤란한 경우

④제3항에 따라 전담기관이 직접 조사를 수행한 경우에 해당 수행기관도 조사에 대한 책임이 있으며, 조사 결과는 해당 수행기관의 관련 규정에 의해 처리되어야 하나, 해당 수행기관의 관련 규정이 없을 경우 본 요령에 의하여 처리한다.

제13조(진실성 검증 원칙) ① 부정행위의 사실 여부를 입증할 책임은 해당 수행기관과 조사위원회에 있다. 단, 피조사자가 조사위원회에서 요구하는 자료를 고의로 훼손하였거나 제출을 거부하는 경우에 요구자료에 포함되어 있다고 인정되는 내용의 진실성을 입증할 책임은 피조사자에게 있다.

② 조사위원회는 제보자와 피조사자에게 의견진술, 이의제기 및 변론의 권리와 기회를 동등하게 보장하여야 하며 관련 절차를 사전에 알려주어야 한다.

③수행기관의 장은 조사위원회가 부당한 압력이나 간섭을 받지 않고 독립성과 공정성을 유지할 수 있도록 노력하여야 한다.

제14조(진실성 검증 절차) ①  정행위에 대한 검증은 예비조사, 본조사, 판정의 단계로 진행하여야 한다.

②조사기관의 장은 제1항의 절차에 따라 진행하되, 검증 절차 외에도 필요하다고 판단한 절차를 추가하여 조사를 진행할 수 있다.

제15조(예비조사) ①예비조사는 신고 접수일로부터 30일 이내에 착수하여 조사일로부터 30일 이내에 완료하여야 하며, 기간 내 완료가 어려운 경우에는 조사기관장의 승인을 받아 30일 이내로 1회 연장할 수 있다.

②예비조사에서는 다음 각 호의 사항에 대하여 검토한다.

1. 제보내용이 제5조제1항의 부정행위에 해당하는지 여부

2. 제보내용이 구체성과 명확성을 갖추어 본조사를 실시할 필요성과 실익이 있는지 여부

3. 제보내용의 검증시효가 경과하였는지 여부 등

③예비조사기구의 형태는 해당 조사기관에서 자율적으로 정할 수 있으며, 관련 전문가 또는 별도의 소위원회를 구성하여 조사를 의뢰할 수 있다

제17조(본조사) ①본조사는 제18조에 따라 조사위원회를 구성하여 진행하여야 하며, 예비조사 승인 후 30일 이내에 착수하고 판정까지를 포함하여 조사시작일로부터 90일 이내에 완료하도록 한다.

②조사위원회는 제13조제2항에 따라 제보자와 피조사자에게 의견진술의 기회를 주어야 하며, 본조사 결과를 확정하기 이전에 이의제기 및 변론의 기회를 주어야 한다. 단, 당사자가 이에 응하지 않을 경우에는 이의가 없는 것으로 간주한다.

③제보자와 피조사자의 이의제기 또는 변론 내용과 그에 대한 처리결과는 조사결과 보고서에 포함되어야 한다.

④조사위원회가 제1항의 기간 내에 조사를 완료할 수 없다고 판단될 경우 조사기관의 장에게 그 사유를 설명하고 기간연장 승인을 거쳐 연장할 수 있다.

제20조(본조사 결과) ①조사위원회는 이의제기 및 변론 내용을 포함하여 본조사결과보고서(이하 "최종보고서"라 한다)를 작성하여 조사기관의 장에게 제출하여야 한다.

②최종보고서에는 다음 각 호의 사항이 포함되어야 한다.

1. 제보내용

2. 조사의 대상이 된 부정행위 혐의 및 관련 연구과제

3. 해당 연구과제에서의 피조사자의 역할과 혐의의 사실 여부

4. 관련 증거 및 증인

5. 조사결과에 대한 제보자와 피조사자의 이의제기 또는 변론 내용과 그에 대한 처리결과

6. 조사위원 명단 등

③조사기관의 장은 본조사 결과에 대한 최종 확정을 위하여 필요시 별도의 심의기구를 둘 수 있다.

  제21조(판정 및 통보) ①조사기관의 장은 최종 보고서의 조사내용 및 결과를 확정하고 이를 제보자 및 피조사자에게 통보한다.

②예비조사 착수 이후 판정에 이르기까지의 모든 조사 일정은 6개월 이내에 종료되어야 한다. 단, 이 기간 내에 조사가 이루어지기 어렵다고 판단될 경우, 조사기관의 장은 전담기관의 장에게 그 사유를 통보하고 조사 기간을 연장할 수 있다.

③제보자 또는 피조사자가 판정에 불복할 경우에는 통보를 받은 날로부터 30일 이내에 전담기관의 장에게 이의신청을 할 수 있다.

제22조(이의제기 및 재조사) ①제21조제3항에 따라 제보자 또는 피조사자가 판정에 불복하여 이의를 제기한 경우 전담기관은 이의 신청 내용에 대해 합리성 및 타당성 검토를 실시하여야 하며, 이 경우 타당성 검토의 내용은 이의제기 내용 및 본조사 결과를 토대로 한다.

②전담기관은 이의제기 타당성 검토를 접수일로부터 30일 이내 검토하고, 결과를 10일 이내 제보자 및 피조사자에게 통보한다. 검토결과에 따라 이의제기 타당성이 인정되는 경우 제17조 및 제21조의 절차를 준용하여 재조사를 착수하여야 한다.

③전담기관의 장은 재조사 결과를 확정하여 이를 제보자 및 피조사자에게 통보하며, 제보자 또는 피조사자는 재조사 결과에 불복할 경우 통보를 받은 날로부터 30일 이내에 전담기관의 장에게 이의신청을 할 수 있다. 단, 전담기관의 장은 재조사 결과에 대해 이의신청이 있을 경우에는 결론도출이 어려운 사안으로 간주하여 국가과학기술위원회로 이관할 수 있다.

  제23조(조사결과 보고) ①조사기관의 장은 예비조사 및 본조사의 결과와 내용을 예비조사의 종료 및 판정 후 각각 10일 이내에 전담기관의 장에게 보고하여야 한다. 단, 전담기관이 직접 조사를 담당한 경우에는 이에 해당하지 않는다.

②전담기관은 수행기관이 조사 과정에서 다음 각 호의 사항이 발생하여 이를 보고 받은 경우 즉시 관계기관에 보고 또는 수사기관에 고발 등 조치를 취하여야 한다.

1. 법령 또는 해당 규칙을 위반한 경우

2. 공공의 복지 또는 안전에 중대한 위험이 발생하거나 발생할 우려가 명백한 경우

3. 그 밖의 전담기관 또는 공권력에 의한 조치가 필요한 경우

  제24조(조사결과에 대한 후속조치) ①전담기관의 장은 제23조제1항에 따라 보고받은 조사내용·결과의 합리성과 타당성에 문제가 있다고 판단되는 경우 해당 수행기관의 장에게 추가적인 조사의 실시 또는 조사와 관련된 자료의 제출을 요구할 수 있으며, 제7조제2항제2호에 따라 직접 재조사를 실시할 수 있

다.

②전담기관의 장이 제1항에 따라 수행기관의 조사결과에 대해 재조사를 추진하는 경우에는 제22조제3항 및 제4항에 따라 실시하되, 필요한 경우 별도의 절차를 마련하여 추진할 수 있다.

③전담기관은 수행기관의 판정결과 또는 제7조제2항의 조사결과에 따라 제4항의 각 호에 대한 사항을 포함하여 장관에게 보고하며, 장관은 전담기관이 후속조치를 할 수 있도록 이를 확정하여 전담기관에게 통보한다.

④전담기관의 장은 제3항에 따라 다음 각 호의 조치를 취하고, 이를 해당 수행기관에 통보하여야 한다.

1. 연구부정행위 관련자에 대한 징계의 요구

2. 3년 이내의 범위로 정한 국가연구개발사업에의 참여 제한

3. 연구부정행위와 관련된 연구자 교체 후 연구개발과제의 계속지원

4. 연구부정행위와 관련된 연구개발과제의 중단

5. 기 지급된 정부출연금의 일부 또는 전액에 대한 회수

6. 그 밖의 부정행위의 규모·범위 등을 고려한 별도의 조치 사항

⑤부정행위자 조치 권고를 받은 해당기관의 장은 관련자 및 관련기관에 적절한 징계조치를 결정하고 조치사항을 통지하여야 한다.

⑥전담기관의 장은 연구윤리의 정착 및 연구진실성의 제고를 위하여 연구기관에 대한 평가 및 국가연구개발사업의 지원 등에 있어 인센티브 또는 불이익 등 필요한 조치를 취할 수 있다.

⑦징계조치에 관한 사항은 다른 관련 규정에 의하거나 별도로 정할 수 있다.

부칙

제1조(시행일)  이 요령은 2009년 1월 1일부터 시행한다. 끝.

**Seoul Administrative Court**

**Division 13**

**Judgement**

| | |
|---|---|
| Case | 2011GuHap24958 Revocation of Disposition for Return of Government Grant |
| Plaintiff | Electronic Components Research |
| | Seongnam-si Bundang-gu 00 |
| | CEO Director 00 |
| | Legal Representative Darae Law Firm |
| | Counsel in Charge Jiwhan Park |
| Defendant | Korea Evaluation Institute of Industrial Technology |
| | Legal Representative Lee & Ko |
| | Counsels in Charge Woonho Kim and Haewon Park |
| Closing Argument | April 5, 2012 |
| Final Order | May 10, 2012 |

**Order**

1. The Defendant's disposition for the return of government grant of KRW 9,220,000,000 against the Plaintiff on June 20, 2011 is revoked.

2. The Defendant shall bear the legal costs.

**Purpose of the Claim**

Peripheral Claim: Same as in paragraph 1 of the order.

Preliminary Claim: It's confirmed that there are no liabilities for recovery of grant, interest liabilities and any other liabilities in each Agreement listed in the list of the attached Agreements between the Plaintiff and the Defendant.

**Reasons**

1. Details of the Disposition

A. The Plaintiff is a non-profit private corporation that aims to contribute to enhancing the international competitiveness of the electronics industry by carrying out research and development necessary for technological innovation in the electronics and related parts industries and supporting the development of advance electronic technologies on January 30, 1999, and the Defendant is a special corporation established under the Industrial Technology Innovation Promotion Act (hereinafter referred to as the "Promotion Act") and carries out projects such as planning, evaluation, and management of industrial technology development, and the rights and obligations of the Information and National IT Industry Promotion Agency (hereinafter referred to as the "Promotion Agency") were inherited around January 2009 in accordance with the Promotion Act.

B. The former Ministry of Commerce, Industry and Energy and the former Ministry of Information and Communication jointly promoted the "Development Business of Promising Electronic Component Technology (Electro 0580 Project)" with the aim of localizing promising electronic components around 2001.  As part of the above project, the Plaintiff signed a technology development project agreement (hereinafter referred to as the "Agreement of this Case") with the Minister of Commerce, Industry and Energy or the head of the Promotion Agency on the "ultra sensitivity image sensor technology development task using nanotechnology" (hereinafter referred to as the "Project of this Case") every year from December 2001 to January 2006 for 5 times.  The main contents of the project and agreement in this case are as follows.

---

[Overview of the Project of this Case]

o    Name of the Agreement: IMT – 2000 Grant Technology Development Project Agreement or Promising Electronic Components Technology Development Project.

---

This new technology can be said to be a new technology, and it was concluded that there was no fraudulent research acts such as theft or plagiarism of the technology (However, a somewhat

reserved conclusion was drawn because the actual comparative evaluation was difficult regarding high sensitivity of the sensor itself and verification was needed in the future as to whether nanotechnology was applied).

F. Nevertheless, when the Korean Broadcasting System raised objections to the Defendant again regarding the Project of this Case, the Defendant formed the "Nano Image Sensor Research Integrity Verification Re-investigation Committee" (hereinafter referred to as the "Re-investigation Committee") and conducted a re-investigation on the Project of this Case.  The Re-investigation Committee could not determine whether the research was fraudulent around December 2010 but concluded that there was no differentiation between the technology of the project and the existing CMOS technology, and that the image sensitivity couldn't not be said to be about 500 times high, and nanotechnology was not applied.

G. On June 20, 2011, the Defendant notified the Plaintiff to return KRW 9.22 billion government grant paid for the Project of this Case (hereinafter referred to as "Notice of this Case"), and the main contents are as follows.

Recipient: Plaintiff (Dr. 00)

Subject: Notice of the results of follow-up measures related to the verification of research ethics for "Nano Image Sensor"

2. Related

A. Guidelines for Securing Research Ethics (Ministry of Science and Technology / Sept 23, 09)

B. Guidelines for Securing Research Ethics Integrity in Information Economy Technology Innovation Projects (Ministry of Knowledge Economy / Dec 29, 08)

3. Regarding the above, please refer to the following notices of the results of follow-up measures related to the verification of research ethics and integrity of 'Nano Image Sensor'.

-- Below –

B. Results of the Follow-up Measures:

Restriction Subject: Restriction of participation by research officer 000000 for 3 years; full return of the government grant (9.22 billion won)

※Guidelines for Securing Research Ethics Integrity in Information Economy Technology Innovation Projects Article 24 (Follow-up measures for the results of the investigation)

[Basis of the Disposition] The fact with no dispute, each of the statements of 8, 11, 12, and 14 in the A1, and the purpose of the entire pleading.


**2. Judgment on the Defendant's Pre-Emptive Defense.**

A. The Defendant's Claims

1) The Project of this Case was found to have failed by the verification results of the Re-investigation Committee, so the Defendant, as a party to the Agreement of this Case, expressed his intention to cancel the Agreement in accordance with Article 8 of the Agreement of this Case and Article 21 Paragraph 1 of the Management Regulations of the Agreement of this Case, and informed the Plaintiff that the entire amount of government grant paid to the Plaintiff should be returned as a result of the cancellation of the Agreement. The Defendant made it clear by sending a follow-up official letter to the Plaintiff on July 20, 2011 after the Notice of this Case. Therefore, the Notice of this Case was made by the Defendant in the position of a party to the Agreement in this Case, not an administrative disposition, which is an exercise of public power by a government.

2) Furthermore, as long as the Defendant has notified that the Agreement of this Case was cancelled through the notice and subsequent official letter, the obligation to restore the original state (the obligation to return the grant) has already occurred as a legal effect, so the Plaintiff does not appear to have any legal interest as the Plaintiff is not able to recover any rights or qualifications through the lawsuit in this case.

B. Related Acts

The relevant laws and regulations are as listed in the attachment.

C. The Disposition of the Notice of this Case

1) The question of which actions of the administrative agency will be considered administrative disposition cannot be determined abstractly and generally, and in specific cases, administrative disposition is an act that directly affects the rights and obligations of the people as law enforcement on specific facts carried out by the administrative agency as a subject of public power. The Defendant's Notice of this Case is considered an administrative disposition subject to appeal, according to the following circumstances, including the extent to which the act meets the requirements for establishment or effectiveness as an administrative disposition in the subject, content, form, and procedure, the actual reliance between the act and the disadvantages suffered by interested parties such as the other party, and the administrative agency and the attitude of

interested parties related to the act. (Refer to June 14, 2007 Supreme Court Judgment 2005 Du 4397).

2) Based on the facts and evidence, each statement from 16, 22, and 23, and in accordance with the below circumstances, which are recognized by considering the purpose of the entire pleading, the Defendant's Notice of this Case is considered to be an administrative disposition subject to an appeal suit.

A) The Main Investigation Committee and the Re-investigation Committee of this Case were formed under the "Former Guidelines for Securing Research Ethics Integrity in Information Economy Technology Innovation Projects." (It is the one before amendment as Ministry of Knowledge Economy Notice No. 2009-193 on Aug 21, 2009, hereinafter referred to as "Guidelines of this Case")", and the Plaintiff only mentions Article 24 (follow-up measures to the investigation results) of this Case as the reason for disposition in the Notice of this Case, but does not specify the Article 8 of the Agreement of this Case and Management and Regulations of this Case.

B) According to the Guidelines of this Case, misconduct act refers to forgery, falsification, plagiarism, and fraudulent note of a research writer conducted during reporting and presentation of research results, etc. (Article 4 -1), and if there is a report on misconduct act to a dedicated agency (Defendant, etc.) or an implementing agency (Plaintiff, etc.), the performing agency shall faithfully conduct a preliminary investigation and main investigation on the verification of misconduct act and notify the informant and the investigator of the details and results of the investigation (Article 8, 11, 14, 15, 17, 21), and if the informant or the investigator object to this, the dedicated agency may review the validity of the objection and re-investigate it (Article 22). According to the results of the re-investigation, the head of the dedicated agency shall notify the implementing agency of a disciplinary request for a person related to fraudulent research within 3 years, restrictions on participation in national R&D projects, and return of some or all of the pre-paid government grant. Sanctions such as restrictions on participation in national research and development projects by the head of a dedicated agency and the return of government grant seem to be based on Guideline of this Case Article 1 and Article 1, Article 36, Article 38 of Guidelines for Common Operation of Knowledge Economy Technology Innovation Project (one before amended to 2009-193 of Knowledge Economy Notice) and Article 44-1 of the Promotion Act, Article 57-4 of the Enforcement Decree of the Promotion Act, Article 11-2 1,2 of the Promotion Act, and Article 24-3 6 of the Enforcement Decree of the Promotion Act. However, unlike the Management Regulations of this

Case, these sanctions (Article 24 of the Promotion Act and the rules of the above Promotion Act) are not included in the Agreement of this Case through the provisions of the Agreement.

C) According to the description of A16, it is acknowledged that the Defendant sent a notice to the Plaintiff on July 20, 2011 noting that "the contents of the sanctions and the recovery are based on the integrity of research ethics, not based on the Agreement, thus there is no validity in raising an objection", and it is also acknowledged that a notice additionally noting "Article 8 of the Agreement of this Case and Article 21 and 31 of the Management Regulations of this Case" was sent in response to the Plaintiff's objection to the Notice of this Case.  However, based on the following circumstances acknowledged by the facts and the purpose of the entire argument, in other words, in the light of the fact that (1) according to Articles 18 and 35-2 of the former Framework Act on the Promotion of Information Technology (before amended by Act No. 8867, hereinafter referred to as the "Basic Act") and Article 18 of the Enforcement Decree of the Framework Act on the Promotion of Information Technology, the government establishes an agency to efficiently support information and communication research and development projects, promotes technology development, etc. to lay the foundation for the information and communication industry, and if necessary, research institutes and private organizations shall be allowed to perform technology development on behalf of the Presidential Decree, and the cost incurred may be subsidized by the Presidential Decree, and the Minister of Information and Communication is required to announce the necessary details, such as the method and procedure, etc.,  (2) according to the Management Regulations of this Case enacted per the above Basic Act and the Enforcement Decree of the Basic Act, the Defendant, who is the head of the management entity, shall notify the Plaintiff, the head of the research institute or Hoon Kim, the person in charge of the project in advance of standards and evaluation plans for evaluating the research and development results of the research and development project (Articles 30 and 31 paragraph 1), and that the research institute and the research director can raise objections to the evaluation results (Articles 31 paragraph 2), (3) based on the final result report on the Project of this Case submitted by Hoon Kim on May 25, 2007, the Promotion Agency evaluated that the research results were excellent (91.8 points) in accordance with the basic evaluation plan presented by the Electro-0580 Project Team, which was the entrusted management agency for the Project of this Case, and the Plaintiff did not raise an objection to this, (4) as described above, if the results of the evaluation of research and development projects presented by the government, such as this case, are judged to be inappropriate or defective, serious legal disadvantages such as

cancellation of the agreement, recovery of government grant, and restrictions on participation in national research & development projects will be implemented, so the evaluation procedures, methods, plans, and composition of evaluation members on research and development projects are very important to the dedicated agencies and implementing agencies participating in the project, thus it seems that they should be done in accordance with the Management Regulation of this Case delegated by the Basic Act, etc. (For reference, a rule by the Ministry of Knowledge Economy, "Guidelines for Common Operation of Knowledge Economy Technology Innovation Project," and a standard by the Ministry of Knowledge Economy, "Guidelines for Evaluation and Management of Technology Development of Knowledge Economy Technology Innovation Projects" provide detailed regulations on the composition, procedure, method, objections, etc. of the evaluation committee on technology innovation projects), (5) nevertheless, as previously seen, the Main Investigation and Re-investigation Committee of this Case were formed by the method of this case and performed verification work on the Project of this Case, but it does not appear to be an evaluation committee formed according to the procedures and methods set forth in the Management Regulations of this Case, and according to the method of this case, the Main Investigation and Re-investigation Committee are verification committees composed of the purpose of determining whether there was any fraudulent research acts on the research project, and (6) the Defendant's follow-up notice on July 20, 2011 is only an answer to the Plaintiff's objection to the Notice of this Case, and the contents cannot be regarded as a part of the Notice of this Case, etc., the Defendant's Notice of this Case cannot be regarded as based on Article 8 of the Agreement of this Case or Article 21 of the Management Regulations in this Case based on the above acknowledged facts alone.

D) According to Article 11-2, 1 and 7 of the Promotion Act and Article 14-3, 1 and 3 of the Enforcement Decree of the Promotion Act, the participation of national research and development projects can be restricted for up to 5 years if the return of contributing project expenses is not paid, and according to the Knowledge Economy Technology Innovation Project Technology Development Evaluation and Management Guidelines, those who fail to pay the return amount as a preliminary review of their qualifications for new projects can be treated as subject to the exclusion from support. According to the Notice of this Case, there is room for disadvantages under the public law in addition to the government's obligation to recover grant, and the above obligation to recover cannot be evaluated as the same as the simple obligation to fulfill monetary obligations.

E) As previously stated, the Defendant sent a notice of objection to the Plaintiff on July 20, 2011, and sent a final notice of the evaluation results with an account number and a payment deadline according to the description in A 17, but there was no separate evaluation procedure for the Project of this Case since the Re-investigation Committee, and as long as the grounds for disposition, the amount of recovery, and the person subject to recovery were specified at the time of the Notice of this Case, the Plaintiff's obligation to recover deemed to have occurred due to the Notice of this Case.

3) Therefore, the Defendant's pre-emptive defense regarding the disposition of the Notice of this Case is without merit.

D. Whether it is legally beneficial or not

Based on the following circumstances acknowledged by the facts and the purpose of the entire argument from A9 and B, in other words, in the light of the fact that (1) as previously stated, it is difficult to view the results of the Main Investigation and Re-Investigation Committee of this Case as an evaluation that can serve as the basis for cancellation under the agreement and management regulations of this case, (2) the Promotion Agency evaluated that the performance results were excellent at the time of evaluation under the Management Regulations of this Case regarding the Project of this Case, and the investigation committee of this case also did not negatively judge whether the technology applied to the project of this case was a new technology and the high sensitivity of nanotechnology and sensors, (3) the prosecution indicted Hoon Kim on charges that he received the research grant and defrauded it even though the technology of the project of this case was not the first new technology in the world, nanotechnology was not applied to image sensors, and sensitivity was not much different from the existing CMOS method, but the Seoul High Court (2008No2243) found him not guilty on the grounds that "SMPD image sensor developed by Hoon Kim has different technical characteristics from the existing image sensor, and there is room for quantum phenomena to be considered nanotechnology, and according to the definition of sensitivity of the image sensor, it is difficult to say that there is a falsehood in the sensitivity marker such as Hoon Kim, etc.," and this was not appealed by the prosecutor, so the judgment was confirmed on 22 of the same month, and (4) If the Defendant is evaluated as having failed in accordance with the contents of the Agreement and the Management Regulations of this Case in the position of the Defendant as a party to the Agreement, the Agreement may be canceled, but as previously stated, the Defendant did not go through a separate evaluation procedure under

the Management Regulations of this Case other than the excellent evaluation received around 2007, it is difficult to see that the Defendant has a right under the Agreement to cancel the Agreement of this Case, etc., it cannot be concluded that the Agreement of this Case has been canceled with the Notice of this Case and the follow-up Notie of this Case.  Therefore, the Defendant's argument in this part needs not be examined further as there is no reason.

**3. Judgment on Peripheral Claims**

A. Plaintiff's Claims

The Notice of this Case is a disposition based on Article 24, Paragraph 3 and 4, and the Defendant or Hoon Kim did not commit research fraud even though the head of the dedicated agency must admit that the implementing agency or the research officer committed research fraud in order to sanction the implementing agency under the above provisions.  Furthermore, although the guidelines of this case are the rules in effect from January 1, 2009 in accordance with the Article 1 of the Supplementary Provision, it cannot be applied to the Project of this Case, which was concluded and its period of performance ended before that.  Nevertheless, it is illegal as the Defendant sent Notice of this Case in accordance with Article 24, Paragraph 3, of the Guideline of this Case.

B. Judgment

1) According to the aforementioned Guidelines of this Case, if there is a report on fraudulent research acts specified in the Guidelines of this Case, the implementing agency conducts a preliminary investigation and main investigation on whether there has been forgery, falsification, plagiarism, unfair thesis author labeling, etc. in the proposal, performance, report, and presentation of research and development projects, and if there is an objection from the informant about the results of the investigation, it is stipulated that a dedicated agency re-investigates the research and development project.  The legislative purpose of the Guidelines of this Case is to set principles and directions for the roles and responsibilities necessary to prevent fraudulent research acts and secure research ethics for institutions that promote and manage technology innovation projects.  Based on the regulations and legislative purposes of this case, and the evaluation methods and procedures for research and development tasks stipulated in detail in the Management Regulations of this Case and the "Guidelines for Common Operation of Knowledge Economy Technology Innovation Project" as seen above, the Main Investigation Committee and the Re-investigation Committee, which were

formed according to the Guidelines of this Case, only have the authority to verify whether the implementing agency and the research officer have committed the fraudulent research acts specified in the Guidelines of this Case, and do not appear to be given the authority to evaluate whether the project has failed.  It is even stated in the statements in A11 and 12 that "the Main Investigation Committee only verified the parts related to the forgery, falsification, distortion, and plagiarism of the research and development contents related to the suspicion raised by the informant," and "the Re-investigation Committee sought to review the parts related to the forgery, falsification, plagiarism, and unfair presentation of the author of the research and development contents based on the Article 5 of the Guidelines of this Case and the Article 4 of the instructions." Therefore, follow-up measures under Article 24, Paragraph 3 and 4 of this case can also be taken when fraudulent research acts by the implementing agency and the research manager are revealed in the main investigation or re-investigation according to the Guidelines of this Case. (there is no mention of the evaluation of the failure of the research project as a requirement for sanctions in Article 24 Paragraph 3 and 4 or the overall regulations of this case).

However, according to each statement and pleading of A11, 12, 22, and 23, and the purpose of the overall pleading, based on the verification results of the main investigation and reinvestigation committee of this case, it can be acknowledged that the plaintiff and Hoon Kim did not commit research misconduct in carrying out the project at issue or failed to reveal such misconduct.  However, there is no evidence to support the assertion that the plaintiff and Hoon Kim committed research misconduct while carrying out the project at issue.

2) If the Administrative Agency wants to impose administrative sanctions, unless there are special provisions in the supplementary provisions of the underlying laws, the Court must comply with the laws in force at the time of the violation. (See 1.20.1987 Supreme Court judgment 86Nu63, etc.).  Because at least from 2003 to 2006, the Plaintiff's counterparty to the Agreement was the Promotion Agency, the Promotion Agency was established under the Basic Act, and the Management Regulations of this Case were guides set by the Minister of Commerce and Industry in order to efficiently implement information communication research and development projects in accordance with Article 18 Paragraph 2 of the Basic Act and Article 18 Paragraph 4 of the Enforcement Decree of the Basic Act, the ground law of the Agreement of this Case can be said to be the Basic Law.  Article 18 Paragraph 2 of the Basic Law and the Article 12 Paragraph 3 and 4 of the Enforcement Decree of the Basic Act states that if necessary for the development of technology

in the information and communication industry, private organizations can perform it on behalf of them, and states that the details such as support methods and procedures, etc. shall be announced by the Minister of Information and Communication, and the Minister of Information and Communication stipulates that if the recipient uses the grant for other than the purpose of the support without justifiable reasons, it can be recovered, but there was no basis for recovering the government's grant in case of fraudulent research acts. As long as the rights and obligations of the Promotion Agency have been inherited to the Defendant, the provisions of the Promotion Act on the return of government grant funds regarding fraudulent research acts cannot be applied to the Agreement of this Case, which was cancelled before the rights and obligations were transferred to the Defendant. Since the rights and obligations of the Promotion Agency were transferred to the Defendant around January 2009, even if there are provisions for the recovery of government research grant related to research misconduct under the Promotion Act and the Guidelines of this Case, the provisions of the Promotion Act cannot be applied to the Agreement of this Case, which was cancelled before the rights and obligations were succeeded to the Defendant by the Promotion Agency.

Consequently, the provisions of Article 11-2 of the Promotion Act and the Guidelines of this Case cannot be applied to the Project of this Case that were already completed by the end of 2006. Therefore, the disposition in this case, which is based on a different premise, is illegal.

3) The Defendant claims that the Plaintiff has an obligation to return the research grant to the Defendant because the Defendant terminated the Agreement of this Case under Article 21(1) and Article 31(4) of the Management Regulations through the Notice of this Case and the notice regarding the Plaintiff's objection filed on July 20, 2011. However, as previously reviewed, the results of the investigation by the Re-investigation Committee in this case cannot be considered as an evaluation by the Re-investigation Committee, which is specified as a reason for the cancellation of the Agreement under the Management Regulations of this Case. Furthermore, in the absence of materials showing that there was an evaluation of 'unsatisfactory' or lower regarding the Project of this Case under the Management Regulations, it cannot be seen that the grounds for cancellation of the Agreement under Article 21(1) and Article 31(4) of the Management Regulations have arisen. Therefore, even if the Defendant notified the Plaintiff of the cancellation of the Agreement, it cannot be concluded that the agreement was cancelled due to that Notice. Thus, the Defendant's

argument on this point is without merit.

**4. Conclusion**

Therefore, since the main claim of the Plaintiff in this case is justified, it is hereby accepted, and the judgment is rendered as ordered.


Presiding Judge                     Judge Jeonghwa Park _____


                                    Judge Taehwan Kim  _____


                                    Judge Jinha Kim   _____

Appendix


**List of Agreements**

1.      Agreement on IMT-2000 Subsidy Technology Development Project dated December 29, 2001


2.      Agreement on Promising Electronic Components Technology Development Project (Electro-0580) dated June 10, 2003


3.      Agreement on Promising Electronic Components Technology Development Project (Electro-0580) dated June 25, 2004


4.      Agreement on Promising Electronic Components Technology Development Project (Electro-0580) dated May 18, 2005


5.      Agreement on Promising Electronic Components Technology Development Project (Electro-0580) dated May 2, 2006. End.

**Relevant Laws**

**■ Industrial Technology Innovation Promotion Act**

**Article 11-2 (Restrictions on Participation, etc. in National Research and Development Projects)**

(1) Where an institution, organization, enterprise or an executive or employee belonging thereto that has participated in a project for industrial technological development pursuant to Article 11 falls under any of the following subparagraphs, the Minister of Knowledge Economy may restrict, within the scope of five years, its or his/her participation in a national research and development project pursuant to Article 11 of the Framework Act on Science and Technology for which the Minister issues an order and redeem all or part of the project costs he/she has already contributed:

1. Where a project is determined as a failed one according to the evaluation conducted by the Minister of Knowledge Economy because the outcomes of research and development is extremely poor;

2. Where he/she or it divulges or leaks details of research without undergoing the right procedure;

3. Where he/she or it ceases the performance of a research and development task without any justifiable grounds;

4. Where he/she or it fails to pay technology fees pursuant to Article 12 without any justifiable grounds;

5. Where he/she or it uses a grant for a purpose, other than the research purpose of the research and development expenses;

6. Where he/she or it engages in an unfair practice, such as forgery, falsification, plagiarism or such, of research and development data and the outcomes thereof;

7. Other cases prescribed by Presidential Decree, as important offenses against an agreement referred to in Article 11 (2) or (3).

(2) Necessary matters, such as the criteria and procedures for the evaluation of the outcomes of research, periods of restrictions on participation in research and development, and procedures for formal objection or such pursuant to paragraph (1) 1 shall be prescribed by Presidential Decree.

(3) Where he/she or it is restricted to participate in a national research and development project pursuant to paragraph (1), the Minister of Knowledge Economy shall notify the heads of other relevant central administrative agencies of the fact of restrictions on his/her or its participation.

**Article 44 (Delegation and Entrustment of Authority)**

(1) The authority of the Minister of Knowledge Economy or the Minister of Education, Science and Technology under this Act may be partially delegated to the head of the agency under his/her control or the Administrator of the Small and Medium Business Administration as prescribed by Presidential Decree, or partially entrusted to the head of the Institute, the Evaluation Institute, the Institute of Ceramic Engineering and Technology, the National Academy of Engineering of Korea or the Laboratory,

or to other corporations or organizations prescribed by Presidential Decree.

**■ Enforcement Decree of The Industrial Technology Innovation Promotion Act**

**Article 14-3 (Restrictions on Participation in National Research and Development Projects)**

(1) "Cases specified by Presidential Decree" in Article 11-2 (1) 7 of the Act means the following cases where a person fails to comply with a request for rectification, without good cause, upon receipt of a request to perform his/her obligations under an agreement:

1. Where a person fails to submit a project expenditure report;

2. Where a person uses any revenue earned from a project for any purpose other than that intended;

3. Where a person fails to pay settlement money or recovery funds;

4. Where a person fails to pay his/her share of grant in breach of the relevant agreement

(2) Article 9-2 shall apply mutatis mutandis to the standards and procedures for the evaluation of the results of research under Article 11-2 (1) 1 of the Act. In such cases, "a project for innovation in industrial technology" shall be construed as "a project for the development of industrial technology", and "indicators for evaluation" as "standards for evaluation", respectively.

(3) The restriction period for participation in national research and development projects is categorized as follows:

1.     For cases under Article 11-2(1)(i) of the Act: 3 years
2.     For cases under Article 11-2(1)(ii) of the Act: 2 years (5 years if the information is leaked or disclosed abroad)
3.     For cases under Article 11-2(1)(iii) of the Act: 3 years
4.     For cases under Article 11-2(1)(iv) of the Act: Within 2 years
5.     For cases under Article 11-2(1)(v) of the Act: Within 5 years
6.     For cases under Article 11-2(1)(vi) of the Act: Within 3 years
7.     For violations of any of the above items in paragraph 1: 1 year

(4) The Minister of Knowledge Economy shall notify the head of the lead research institution of the evaluation results as stipulated in paragraph 2.

(5) If the head of the lead research institution has objections to the evaluation results under paragraph 2, they may file an objection with the Minister of Knowledge Economy within 10 days from the date the evaluation results are notified.

(6) In addition to the matters specified in paragraphs 2 through 5, the Minister of Knowledge Economy shall determine and announce detailed procedures necessary for the evaluation and filing of objections.

**Article 57 (Delegation, Entrustment of Authority)**

(4) The Minister of Knowledge Economy shall delegate the tasks related to the restriction of participation

in national research and development projects under Article 11-2 of the Act, as well as the recovery of all or part of the funded project expenses, to the Korea Institute for Advancement of Technology or the Evaluation Management Agency, in accordance with Article 44(1) of the Act.

**■ Former Framework Act on Informatization Promotion (February 29, 2008. Before amended by Act No. 8867)**

**Article 18 (Promotion of Technology Development)**
(1) The government shall promote the following matters to establish the foundation for the information and communications industry and to improve the level of technology:

1.      Matters concerning the investigation of technology levels, research and development of technology, and the evaluation and utilization of developed technology.
2.      Matters concerning technical cooperation, technical guidance, and technology transfer.
3.      Matters for the smooth distribution of technical information.
4.      Matters to promote industry-academia cooperation.
5.      Other matters necessary for technology development.

(2) In order to efficiently promote the matters prescribed in paragraph (1), the government may, if necessary, have research institutions and private organizations related to the development of information and communications technology carry out such tasks on its behalf. In such cases, the expenses incurred may be supported as prescribed by Presidential Decree.

**Article 35-2 (Establishment of the Institute for Information and Communications Technology Promotion)**

(1) To efficiently support information and communications research and development projects, the Institute for Information and Communications Technology Promotion (hereinafter referred to as the "Institute") shall be established.

(2) The Institute shall carry out the following activities:

1.      Operation and management of funds entrusted by the Minister of Information and Communication under the provisions of Article 35, paragraph 2.
2.      Investigation of demand, technology forecasting, and research planning for information and communications research and development.
3.      Evaluation and management of information and communications research and development projects.
4.      Other projects related to information and communications research and development as prescribed by Presidential Decree.

(3) The government may provide financial support for the establishment and operation of the Institute within the limits of the budget.

(4) The provisions of Article 10, paragraphs 2, 6, and 7 shall apply mutatis mutandis to the Institute. In

this case, "Korea Institute of Computer Science" shall be read as "Institute for Information and Communications Technology Promotion," and "Computer Institute" shall be read as "Institute."

■ **Former Enforcement Decree of the Framework Act on Informatization Promotion (February 29, 2008. Before amended by Presidential Decree No. 20741)**

**Article 18 (Support for Technology Development Costs)**

(1) When the Minister of Information and Communication provides financial support for information and communications research and development costs under Article 18, paragraph 2 of the Act, such support funds shall be paid in installments. However, if it is deemed necessary considering the scale of the research and development project, the starting time, and other factors, the funds may be paid in a lump sum.

(2) Recipients of support under paragraph (1) shall establish a separate account for the management of the funds and shall use the funds exclusively for the costs required for the relevant research and development project.

(3) If a recipient of support under paragraph (1) uses the support funds for purposes other than the intended support purpose without a valid reason, the Minister of Information and Communication may recover the funds.

(4) Other necessary details regarding the methods, procedures, and other matters related to support shall be determined and announced by the Minister of Information and Communication.

■ **Information and Communications Research and Development Management Regulations (As amended by Ministry of Information and Communication Notice No. 2005-39 on September 28, 2005)**

**Article 1 (Purpose)**

The purpose of these regulations is to specify the necessary details for efficiently implementing information and communications research and development projects and related projects conducted by the Minister of Information and Communication, in accordance with Article 18, paragraph 2 of the Framework Act on Informatization Promotion, Article 18, paragraph 4 of the Enforcement Decree of the same Act, Article 10, paragraph 2, and Article 11, paragraph 2 of the Framework Act on Telecommunications, Article 4, paragraph 2 of the Enforcement Decree of the same Act, and the Regulations on the Management of National Research and Development Projects. These regulations also aim to set forth matters concerning investment and grant by common carriers.

**Article 21 (Termination of Agreement)**

(1) The head of the managing organization may terminate the agreement if any of the following reasons occur:

1.        Providing false information in the research and development project plan or obtaining or

providing financial benefits related to the project execution.

2.        Non-compliance with the evaluation of the research and development project or if a suspension of research and development is ordered under Article 28, paragraph 3.

3.        In the case of a multi-year agreement, if the evaluation result of the research and development project is "unsatisfactory" or below.

4.        If the research and development objectives are achieved through other research and development activities, there is no recognized need to continue the project.

5.        If the research and development does not commence within three months of the agreement being signed.

6.        If the research and development project is abandoned.

7.        If the project execution organization was selected through fraudulent means such as external pressure, falsehoods, or solicitation.

8.        If the research and development project duplicates completed or ongoing research and development projects.

9.        If government or other funding is used for purposes other than the intended research and development.

10.       If it is determined that the continuous execution of the research and development project by the research institution is impossible or unnecessary due to reasons such as bankruptcy, legal management, or closure.

11.       If it is recognized that the research and development cannot continue for other reasons or it is deemed difficult to expect the desired research and development outcomes.

**Article 30 (Evaluation Criteria for Research and Development Results)**

(1) The head of the managing organization shall establish evaluation criteria in advance for assessing the results of research and development projects and shall apply these criteria to the evaluation of the research and development results.

(2) The evaluation specified in paragraph (1) shall be conducted primarily through comparative evaluation and public announcement. However, depending on the nature of the research and development projects or tasks, different evaluation methods and criteria may be established and applied.

(3) If necessary for national security reasons, the evaluation of research and development results as specified in paragraph (1) may be omitted.

**Article 31 (Evaluation of Research and Development Results)**

(1) In evaluating the results of research and development projects, the head of the managing organization shall form an evaluation committee using an evaluation committee candidate group composed mainly of experts who participated in the evaluation for the selection of research and development projects. An evaluation plan, including the methods and procedures for evaluating research and development results, shall be prepared and notified to the head of the research institution or the research principal investigator.

(2) The head of the managing organization shall conduct the evaluation of the research and development results in accordance with Article 29. For continuing projects, the research and development plan for the following year shall be reviewed, deliberated, and adjusted according to Article 15, and the results shall be reported to the Minister and notified to the research institution. The research institution and the

research principal investigator may file objections to the notified results with the head of the managing organization, who shall take necessary measures.

(4) The head of the managing organization shall impose appropriate sanctions, such as the recovery of research and development funds, on research institutions responsible for projects with evaluations of "unsatisfactory" or below, in accordance with Article 21. This action must be reported to the Minister, and the research institution must submit a cause report for the unsatisfactory project to the head of the managing organization.

(5) If the research and development evaluation results are exceptionally excellent, the head of the managing organization may recommend follow-up measures, such as support for the commercialization of excellent outcomes, and propose awards for the performing organization or researchers involved in the project to the Minister.


**■ Former Guidelines on Ensuring Research Ethics and Integrity in Technology Innovation Projects (August 21, 2009. Before amended by Ministry of Knowledge Economy Notice No. 2009-193)**

**Article 1 (Purpose)** The purpose of these guidelines is to define detailed principles and directions for the roles and responsibilities of institutions that are involved in promoting, managing, or conducting technology innovation projects (hereinafter referred to as "the Project") in accordance with Article 19-2 of the "Regulations on the Management of National Research and Development Projects," the "Guidelines for Ensuring Research Ethics," and Article 38 of the "Common Operating Guidelines for Knowledge Economy Technology Innovation Projects." The aim is to prevent research misconduct and ensure research ethics.

Article 4 (Definitions of Terms) The definitions of terms used in these guidelines are as follows:

1. Research misconduct (hereinafter referred to as "misconduct") refers to acts of falsification, fabrication, plagiarism, and improper authorship designation that occur in the proposal of research and development projects, the conduct of research and development, and the reporting and presentation of research results.

**Article 5 (Scope of Research Misconduct)** The misconduct described in these guidelines includes the following:

1.    "Falsification" refers to the act of creating false data or research results that do not exist.
2.    "Fabrication" refers to the act of artificially manipulating research materials, equipment, or processes, or arbitrarily altering or deleting data to distort research content or results.
3.    "Plagiarism" refers to the act of using someone else's ideas, research content, or results without proper authorization or citation.
4.    "Improper Authorship" refers to the act of granting authorship to someone without valid scientific or technical grant or omitting authorship from someone who has made a significant scientific or technical grant, for reasons such as acknowledgment or courtesy.
5.    "Intentionally Obstructing Investigations" refers to the act of intentionally interfering with investigations into one's own or others' misconduct or harming whistleblowers.
6.    "Actions Seriously Exceeding Generally Accepted Norms" refers to actions that significantly exceed the norms typically accepted in the scientific and technological community.

7.    Other Matters Defined by the Minister of Knowledge Economy (hereinafter referred to as "the Minister").

## Article 8 (Reporting and Receiving Misconduct)

(1) Whistleblowers may report misconduct to the responsible department of the managing or performing institution by any means such as oral, written, telephone, or email, with the principle of using their real names. However, if reporting anonymously, they should use written methods to ensure anonymity is protected.

(2) Whistleblowers must include the following information in their reports:

1.    Title of the research project or paper
2.    Description of the research misconduct
3.    Evidence of the research misconduct
4.    Other matters related to the research misconduct

## Article 11 (Responsibility for Verifying Integrity)

(1) When misconduct is detected or reported, the responsibility for verifying the issue lies with the research institution where the researcher was affiliated at the time the research was conducted. The head of the performing institution must handle the matter diligently in accordance with their internal regulations.

(2) If the dedicated institution becomes aware of misconduct or receives a report of misconduct, it must transfer the relevant information to the performing institution to allow for an internal investigation.

(3) The dedicated institution must, unless there are special reasons, agree to requests to conduct the investigation directly if the performing institution is unable to carry out an internal investigation due to the following reasons:

1.    Difficulty in conducting verification of misconduct in research involving two or more performing institutions.
2.    Difficulty in performing an internal investigation due to the scale of research activities or challenges in securing experts at the performing institution.

(4) If the dedicated institution conducts the investigation directly according to paragraph (3), the performing institution still holds responsibility for the investigation. The results of the investigation must be handled in accordance with the relevant regulations of the performing institution. If the performing institution lacks relevant regulations, the matter should be handled according to these guidelines.

## Article 13 (Principles of Integrity Verification)

(1) The responsibility for proving whether misconduct has occurred lies with the performing institution and the investigation committee. However, if the person under investigation intentionally damages or refuses to submit materials requested by the investigation committee, the responsibility for proving the authenticity of the contents included in the requested materials lies with the person under investigation.

(2) The investigation committee must ensure equal rights and opportunities for the whistleblower and

the person under investigation to present their statements, raise objections, and make defenses. The related procedures must be communicated to them in advance.

(3) The head of the performing institution must make efforts to ensure that the investigation committee can maintain its independence and impartiality without undue pressure or interference.

### Article 14 (Procedure for Integrity Verification)

(1) Verification of misconduct should proceed through the stages of preliminary investigation, main investigation, and determination.

(2) The head of the investigation agency must follow the procedures outlined in paragraph (1) but may also add additional procedures if deemed necessary for the investigation.

### Article 15 (Preliminary Investigation)

(1) The preliminary investigation must commence within 30 days from the date of receipt of the report and must be completed within 30 days from the start of the investigation. If it is not possible to complete within this period, an extension of up to 30 days may be granted with the approval of the head of the investigation agency.

(2) During the preliminary investigation, the following matters must be reviewed:

1.        Whether the reported issue constitutes misconduct as defined in Article 5, paragraph (1).
2.        Whether the report is sufficiently detailed and clear to warrant the need for and benefit of a main investigation.
3.        Whether the statute of limitations for verifying the report has expired.

(3) The form of the preliminary investigation body can be determined autonomously by the investigation agency, and relevant experts or a separate subcommittee may be appointed to conduct the investigation.

### Article 17 (Main Investigation)

(1) The main investigation must be conducted by forming an investigation committee in accordance with Article 18. It should commence within 30 days of approval of the preliminary investigation and be completed within 90 days from the start of the investigation, including the determination.

(2) The investigation committee must provide the whistleblower and the person under investigation with opportunities to present their statements and raise objections or make defenses before finalizing the main investigation results. However, if the parties do not respond, it will be assumed that there are no objections.

(3) The objections or defenses raised by the whistleblower and the person under investigation, along with the handling results, must be included in the investigation report.

(4) If the investigation committee determines that it cannot complete the investigation within the period specified in paragraph (1), it must explain the reasons to the head of the investigation agency and obtain

approval for an extension.

**Article 20 (Results of the Main Investigation)**

(1) The investigation committee must prepare a final report (hereinafter referred to as the "Final Report") that includes objections and defenses, and submit it to the head of the investigation agency.

(2) The Final Report must include the following items:

1.       The content of the report.
2.       The alleged misconduct and the related research project that was investigated.
3.       The role of the person under investigation in the research project and the facts of the allegations.
4.       Relevant evidence and its significance.
5.       The objections or defenses of the whistleblower and the person under investigation, and the handling results.
6.       The list of investigation committee members, etc.

(3) The head of the investigation agency may establish a separate review body if necessary for the final confirmation of the main investigation results.

**Article 21 (Determination and Notification)**

(1) The head of the investigation agency shall finalize the investigation content and results in the Final Report and notify both the whistleblower and the person under investigation.

(2) All investigation activities, from the commencement of the preliminary investigation to the determination, must be completed within 6 months. However, if it is determined that the investigation cannot be completed within this period, the head of the investigation agency may notify the head of the dedicated agency of the reasons and request an extension of the investigation period.

(3) If the whistleblower or the person under investigation disagrees with the determination, they may file an objection with the head of the dedicated agency within 30 days from the date of notification.

**Article 22 (Objections and Reinvestigation)**

(1) If the whistleblower or the person under investigation files an objection to the determination as per Article 21, Paragraph 3, the dedicated agency must conduct a review of the reasonableness and validity of the objection. This review should be based on the objection and the results of the main investigation.

(2) The dedicated agency must complete the review of the objection's validity within 30 days from the receipt of the objection and notify the whistleblower and the person under investigation of the results within 10 days. If the objection is deemed valid, a reinvestigation must be initiated in accordance with the procedures outlined in Articles 17 and 21.

(3) The head of the dedicated agency shall finalize the results of the reinvestigation and notify the whistleblower and the person under investigation. If the whistleblower or the person under investigation disagrees with the results of the reinvestigation, they may file an objection with the head of the dedicated agency within 30 days from the date of notification. However, if there is an objection to the

results of the reinvestigation, the head of the dedicated agency may consider the matter unresolved and refer it to the National Science and Technology Committee.

**Article 23 (Reporting of Investigation Results)**

(1) The head of the investigation agency must report the results and findings of both the preliminary investigation and the main investigation to the head of the dedicated agency within 10 days after the completion of the preliminary investigation and the determination, respectively. This requirement does not apply if the dedicated agency directly handled the investigation.

(2) The dedicated agency must take immediate action, such as reporting to the relevant authorities or filing a complaint with law enforcement, if the following circumstances occur during the investigation process:

1.    Violations of laws or regulations
2.    Serious risks or clear threats to public welfare or safety
3.    Other situations requiring action by the dedicated agency or public authorities

**Article 24 (Follow-up Measures on Investigation Results)**

(1) If the head of the dedicated agency determines that there are issues with the rationality and validity of the investigation content and results reported under Article 23, Paragraph 1, they may request the head of the performing institution to conduct additional investigations or submit related materials. Additionally, they may directly conduct a re-investigation in accordance with Article 7, Paragraph 2, Item 2.

(2) When the head of the dedicated agency proceeds with a re-investigation of the performing institution's investigation results under Paragraph 1, it must be conducted following Article 22, Paragraph 3 and 4. If necessary, a separate procedure may be established for this purpose.

(3) The dedicated agency must report to the minister, including matters related to the items in Paragraph 4, based on the performing institution's judgment results or the investigation results under Article 7, Paragraph 2. The minister will confirm and notify the dedicated agency of the follow-up measures to be taken.

(4) The head of the dedicated agency must take the following measures based on Paragraph 3 and notify the performing institution:

1.    Request disciplinary action against those involved in research misconduct
2.    Restrict participation in national research and development projects for up to 3 years
3.    Continue support for research and development projects after replacing researchers involved in research misconduct
4.    Terminate research and development projects related to research misconduct
5.    Recover part or all of the government funds already disbursed
6.    Any other measures considering the scale and scope of the misconduct

(5) The head of the performing institution, upon receiving recommendations for actions against those involved in misconduct, must determine and notify appropriate disciplinary measures to the relevant individuals and institutions.

(6) To promote research ethics and enhance research integrity, the head of the dedicated agency may take necessary actions, including incentives or disadvantages, in evaluations of research institutions and support for national research and development projects.

(7) Matters related to disciplinary actions may be governed by other relevant regulations or separately established rules.

Supplementary Provisions

Article 1 (Effective Date)
This guideline shall take effect from January 1, 2009. End.

**Certification of Accuracy**

Re: Translation of Judgment on Litigation Requesting Return of KRW 9.2 billion

I, Claire Park, hereby attest that I have translated the attached documents, and that to the best of my knowledge, ability, and belief, the translation is a true, accurate, and complete translation of the original Korean documents that were provided to me.

Claire Park

8/29/2024